## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA
*ex rel.* **[UNDER SEAL]**,

        Plaintiff and Relator,

      v.

**[UNDER SEAL]**

        Defendants.

Civil Action No. 13cv3002 RHK/FLN

Judge _____

**FILE UNDER SEAL**
Pursuant to 31 U.S.C.
§ 3730(b)(2)
and Local Rule 79.1(C)

**DO NOT SERVE**

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT


SCANNED

NOV = 1 2013

U.S. DISTRICT COURT MPLS

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* KIPP FESENMAIER,<br><br>Plaintiff and Relator,<br><br>v.<br><br>SIGHTPATH MEDICAL, INC.,<br>TLC VISION CORPORATION,<br>THE CAMERON-EHLEN GROUP, INC.,<br>dba PRECISION LENS, and PAUL EHLEN<br><br>Defendants. | : Civil Action No. _____<br>:<br>: Judge _____<br>:<br>:<br>:<br>:<br>: **FILE UNDER SEAL**<br>: Pursuant to 31 U.S.C.<br>: § 3730(b)(2)<br>: and Local Rule 79.1(C)<br>:<br>:<br>:<br>:<br>: **DO NOT SERVE**<br>: |

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

I.      **INTRODUCTION.**

1.      *Qui tam* Relator Kipp Fesenmaier brings this action on his own behalf and on behalf of the United States of America to recover damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, against Defendants Sightpath Medical, Inc., TLC Vision Corporation, The Cameron-Ehlen Group, Inc. dba Precision Lens, and Paul Ehlen.

2.      The violations arise out of Defendants' actions to cause the submission of false claims for payment to Medicare, Medicaid, and other federally-funded health care programs for cataract surgeries performed as a result of illegal financial relationships between Defendants and their referral sources. This complaint details Defendants' fraudulent conduct in offering and paying remuneration to doctors to induce the referrals

of patients receiving items and services, namely cataract surgeries and related supplies, paid by Medicare, Medicaid, and other federally-funded health care programs.

3.     Defendants employ fraudulent schemes to increase the use of their products and services in surgeries by systematic payment of kickbacks to physicians in the form of entertainment, travel, sham consulting agreements and other illegal incentives in order to induce those physicians and other healthcare providers to use their products.

4.     Defendants' schemes to offer and pay these incentives to their referral sources violate the Anti-Kickback Statute and material conditions of payment for federal healthcare programs.

5.     Defendants' knowing violations of these conditions of payment result in the submission of false claims for illegally referred surgeries.

## II.     JURISDICTION AND VENUE.

6.     This action arises under the United States Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*

7.     The Court has subject-matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, and has personal jurisdiction over the Defendants because the Defendants do business and are located in this District.

8.     Venue in this District is proper under 28 U.S.C. 1391(b) and (c), and 31 U.S.C. 3732(a) because Defendants operate and transact business within this District.

9.     The facts and circumstances alleged in this complaint have not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the

Government or its agent is a party; or in a Congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or in the news media.

10.    Relator is an original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

11.    Prior to filing this action, Relator voluntarily disclosed to the United States the information on which his allegations are based. Additionally, should there have been a public disclosure of any aspect of these allegations prior to the filing of this action, Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.

III.    **PARTIES.**

12.    The real party in interest to the claims set forth herein is the United States of America.

13.    Relator Kipp Fesenmaier is a resident of Minnesota. He worked for approximately fifteen years in various capacities for Midwest Surgical Services, Inc. Relator served as a Vice President from 2000 until his departure from the company in September of 2007. After his departure from Midwest Surgical Services, Mr. Fesenmaier continued to work in the same industry for competitors of Defendants following a two-year noncompete period.

14.    Defendant The Cameron-Ehlen Group, Inc. dba Precision Lens ("Precision Lens") is a Nebraska corporation headquartered in Bloomington, Minnesota. It was co-founded by Defendant Paul Ehlen and has been doing business as Precision Lens since approximately 1991. Precision Lens distributes intraocular lenses, viscoelastics, and other eye-related surgical products. It also promotes Defendant Sightpath Medical,

-3-

Inc.'s cataract and LASIK surgical services.  Precision Lens does business in the states

in the Minnesota, North Dakota, South Dakota, Iowa, Nebraska, Wisconsin, Montana,

Wyoming, and the Upper Peninsula of Michigan, Kansas, Western Missouri, and

Northwest Arkansas.

15.    Defendant Sightpath Medical, Inc. ("Sightpath") is a wholly-owned

subsidiary of Defendant TLC Vision Corporation.  Sightpath was formed in 1998 when

Laser Vision Centers, Inc. (now Defendant TLC Vision Corporation) bought Midwest

Surgical Services, Inc.  Sightpath is a Delaware corporation, with its headquarters in

Bloomington, Minnesota, in the same building where Precision Lens is headquartered.

It provides both mobile cataract and glaucoma surgical services and equipment, and

mobile LASIK and other refractive surgical services and equipment, servicing over 800

surgeons in more than 600 facilities across the country.

16.    Defendant Paul Ehlen is a founder and the President of Precision Lens

and a founder of Midwest Surgical Services, Inc., a predecessor to Sightpath.  Ehlen

lives in Bloomington, Minnesota.

17.    Defendant TLC Vision Corporation ("TLC") is an international eye care

services company that provides ophthalmology and optometry services, with centers

located in 33 states.  It is a Delaware corporation, with its U.S. headquarters located in

Chesterfield, Missouri and its international corporate headquarters located in

Mississauga, Ontario, Canada.

IV.    **RULE 9(b), FED. R. CIV. P. ALLEGATIONS.**

18.    Much of the documentary evidence necessary to prove the allegations in this Complaint is in the exclusive possession of either the Defendants or the United States.

19.    With respect to each allegation herein made upon information and belief, Relator has, based upon his knowledge, data, and experience, a reasoned factual basis to make the allegation but lacks complete details of it.

20.    Relator is familiar with Defendants' policies and procedures from his service as a Vice President of Defendant Sightpath's predecessor, Midwest Surgical Services, and as a result of his continued presence in the ophthalmic services market as Vice President for Business Development at Vantage Outsourcing.  He has also learned from other ophthalmologists, optometrists, employees, and affiliates of Defendants.

21.    However, Relator does not have access to all of the information regarding the claims for payment submitted or caused to be submitted by Defendants.  This information is in the exclusive possession and control of Defendants or the United States.

V.    **THE STATUTORY AND REGULATORY ENVIRONMENT.**

   A.    **ANTI-KICKBACK STATUTE.**

22.    Pursuant to the Anti-Kickback Statute ("AKS"), 42 U.S.C. Section 1320a-7b(b), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for referring, recommending or arranging for federally-funded medical

services, including services provided under the Medicare, Medicaid and (as of January

1, 1997) TRICARE programs.  In pertinent part, the statute states:

> (b) Illegal remuneration
>
>> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –
>>
>>> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>>
>>> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>>
>> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>>
>> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>>
>>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>>
>>> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>>
>> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).  Violation of the statute can also subject the perpetrator to

exclusion from participation in federal health care programs and, effective August 6,

1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid.  42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).

23.     The AKS also provides that claims arising out of violations of its provisions are false claims.  42 U.S.C. § 1320a-7b(g).

24.     The AKS is designed to, *inter alia*, ensure that patient care will not be improperly influenced by inappropriate compensation from the healthcare industry.

25.     Compliance with the AKS is a condition of payment of all claims submitted for reimbursement by Medicare, Medicaid, and other federally-funded programs.

26.     Every provider and supplier who seeks payment from federally-funded healthcare programs must enter into an agreement with the United States in which it certifies it will comply with the AKS and other federal healthcare laws.

27.     In addition, every provider and supplier who seeks payment from the program certifies its understanding that payment of claims is conditioned on compliance with the AKS.

28.     Payment of remuneration of any kind violates the statute if one or any purpose for that remuneration was to induce referrals.  Moreover, remuneration offered or paid in return for the promise to refer federally-financed business to a particular provider or facility qualifies as a kickback. Giving a person the opportunity to earn money also constitutes an inducement under the AKS.

29.     Claims submitted or caused to be submitted in violation of the AKS are false claims.

B.   **FEDERALLY-FUNDED HEALTH CARE PROGRAMS.**

30.   The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program, was created in 1965 as part of the Social Security Act ("SSA"). The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare & Medicaid Services ("CMS"), a component of HHS.

31.   The Medicare Program consists of four parts. Medicare Part B authorizes the payment of federal funds for medical and other health services, including without limitation physician services, supplies and services incident to physician services, laboratory services, outpatient therapy, diagnostic services, and radiology services. 42 U.S.C. § 1395(k), 1395(i), 1395(s).

32.   Under Medicare Part B, CMS pays a single global fee for cataract surgeries that includes the cost of a standard prosthetic lens. Medicare Claims Processing Manual, ch. 14, § 40.3.

33.   The Medicaid Program was also created in 1965 as part of the Social Security Act, which authorized federal grants to States for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the Federal and State governments.

34.   As a result of its schemes to utilize improper financial relationships to obtain referrals from ophthalmologists and optometrists, Defendants submitted and caused the submission of false claims to the United States in violation of the Anti-Kickback Statute and the False Claims Act.

## VI.   **ALLEGATIONS OF FACT.**

35.     Defendants offer and pay illegal remuneration to ophthalmologists to use their products and services in surgeries on their patients, a high percentage of which are paid for in whole or in part by federal health insurance programs.

36.     Defendants and their senior management and owners know that Medicare, Medicaid and other federal program beneficiaries represent a significant percentage of cataract surgery patients.

37.     As explained in detail below, Defendants offer and pay remuneration far in excess of fair market value.  This remuneration takes such forms as, *inter alia*, monthly payments under sham consulting agreements and free equipment and other illegal incentives.  Defendants also offer and provide exorbitant entertainment and high-end travel and accommodations.

38.     Each of these schemes funnel monetary incentives to ophthalmologists and optometrists in exchange for their referral of business, including business paid in whole or part by federal healthcare programs.

39.     The purpose of these incentives is to induce the referral of Medicare and Medicaid patients for cataract and other surgeries, including the supplies and other items used in such surgeries, which Defendants provide.

### A.   **Defendants' Schemes to Obtain Referrals Through Illegal Incentives**

40.     One of the ways in which Defendants induce surgeons to utilize their products is to take them on high-end vacations to reward them for utilizing Defendant's products, traveling with them to "solidify" their relationships.

41.     These trips include hunting in South Dakota, skiing in Montana and Colorado, and fishing in Canada.  Defendants have also taken physicians to a private club in Montana called the "Stock Farm" for golf, skiing and hunting activities.

42.     Defendants also pay surgeons under sham consulting agreements.  The agreements provide remuneration to surgeons in amounts far above the fair market value or commercially reasonable value of services they provide, if they provide any.

43.     Under these consulting agreements, consultants are paid monthly stipends ranging from $8,000 to $35,000 per month.

44.     Further, Defendant TLC, through its subsidiary Sightpath (hereinafter collectively referred to as "Sightpath"), offers reduced pricing to surgeons using their "Mobile Access" LASIK equipment and services in order to get the surgeons to use and endorse using Sightpath's mobile cataract equipment and services.  These price reductions provide substantial remuneration to the surgeons, as the LASIK procedures are private pay.

45.     Defendant Sightpath also provides other illegal incentives to induce physicians to use its surgical services, including a free comprehensive print advertising design program accessible through a web portal, which is available exclusively to its customers.  Sightpath provides the advertisements to induce the physicians to use Sightpath's services, which are reimbursed by federal insurers.

46.     Defendants offer and pay the remuneration detailed in this complaint to induce ophthalmologists and opticians to encourage the use of and, in the case of ophthalmologists, themselves use Sightpath's mobile cataract products and services to

-10-

perform cataract procedures using Precision Lens products, a high percentage of which are federally-reimbursed.

47.     Defendants' provision of incentives to induce the referral of business has been ongoing for more than a decade.  For example, Defendants have offered and paid sham consulting fees and other incentives since at least 2002 through the present; and have paid for lucrative trips for their referral sources for even longer, since at least 1995 through the present.

### B.     Specific Examples of Illegal Incentives.

48..     The following are specific examples of ophthalmologists and optometrists for whom Defendants provided luxury vacations and other accommodations from 1995 to, in some cases, the present:

| Physician | Location of Practice |
|---|---|
| Dr. KA[1] | Fredonia, WI |
| BD | St. Peter, MN |
| Dr. ME | Edina, MN |
| Dr. TG | Mankato, MN |
| BJ | Blue Earth, MN |
| Dr. JK | Red Wing, MN |
| Dr. PK | Lacrosse, WI |
| Dr. DL | Lacrosse, WI |
| Dr. ML | Bismarck, ND |
| Dr. RL | Bloomington, MN |
| Dr. KL | Bismarck, ND |
| Dr. MM | Hutchinson, MN |
| Dr. AN | River Falls, WI |
| Dr. GS | Missoula, MT |
| Dr. JS | Elizabeth City, NC |
| Dr. CW | Hutchinson, MN |
| Dr. DW | Sioux Falls, SD |
| Dr. LW | Fargo, ND |

---

[1] Relator has redacted the names of these third parties from the complaint.  Relator can provide the unredacted names upon the Court's direction.

| Dr. JW | Yankton, SD |
|--------|-------------|

49.    By way of specific example, in June 2004 Defendants[2] treated a group of approximately eight ophthalmologists to a luxury fishing trip at the Big Narrows Resort in Ontario, Canada.  The physicians met Paul Ehlen, Jim Tiffany (Sightpath's CEO), Pete Gosz (Precision Lens account executive), and Relator at the Flying Cloud Airport in Eden Prairie, Minnesota.  Defendants then flew the physicians on private aircraft owned by Ehlen to the Big Narrows Resort.  All travel arrangements were arranged by Ehlen's assistant, Linda Norling.

50.    While at the Big Narrows Resort, which Ehlen partially owned, Defendants provided the physicians with free fishing guides, boats, and equipment; free accommodations, meals, and alcohol; and a free special fly-in trip to a remote lake known for its trout fishing.

51.    Sightpath and Precision Lens paid the costs of the trip.  The physicians paid for nothing.

52.    The ophthalmologists who were targeted for the 2004 trip to the Big Narrows Resort included Dr. AN of River Falls, Wisconsin; Dr. TG of Mankato, Minnesota; Dr. RL of Bloomington, Minnesota; Drs. ML and KL of Bismarck, North Dakota; and Dr. DW of Sioux Falls, South Dakota; and Drs. PK and DL of Lacrosse, Wisconsin.

---

[2] Defendant Sightpath has changed its name over the years from Midwest Surgical Services, Inc., to Laser Vision Centers, Inc., and finally to Sightpath, Inc.  But its leadership and its practices have remained the same.  For convenience, Relator refers to Sightpath and its predecessors as "Sightpath" and includes such predecessors in the term "Defendants."

53.     By way of further specific example, Defendant Sightpath and non-party Minnesota Eye Consultants[3] treated a group of optometrists to a trip to the Big Narrows Resort in June 2005 that included all the free benefits and accommodations of the 2004 trip, with the exception of the special fly-in fishing.

54.     The optometrists in attendance included BJ of Blue Earth, Minnesota, and BD of St. Peter, Minnesota.  Tiffany, Minors, Relator, and Harry Oxner, an attorney and independent representative for Sightpath were also in attendance.  Jack Moore, VP for Business Development at Minnesota Eye Consultants, was also there; Mr. Moore helped plan the trip, which was jointly paid for by Sightpath and Minnesota Eye Consultants to reward optometrists who referred business to both companies. Ophthalmologist Dr. PK of Lacrosse, Wisconsin also attended, having missed a previous trip.  His trip was paid for by Precision Lens because he did not use Sightpath's services.

55.     While Sigthpath and Minnesota Eye Consultants paid the trip costs for all attendees, Precision Lens (through Ehlen's assistant) arranged all travel details, and Ehlen's private jets were used to transport the doctors to a resort partially owned by him.

56.     By way of further specific example, Defendants took ophthalmologists on annual luxury fishing trips to Bud's Gunisao Lake Lodge in Manitoba, Canada during the summers from 2000 to at least 2007.  Both Ehlen and Tiffany took multiple ophthalmologists to this remote resort to reward them for using and/or incentivize them

---

[3] Minnesota Eye Consultants, P.A. is a Minnesota corporation incorporated in 1988 with its headquarters in Bloomington, Minnesota.  Its CEO is Dr. RL, who attended the 2004 Big Narrows Resort trip.  It is an unusually large group of ophthalmologists.  Its physicians used Sightpath's services for all of their surgeries.

to use Sightpath and Precision Lens products and services.  Upon information and belief, these trips continue to the present.

57.     Defendants also provide free luxury skiing vacations for ophthalmologists and optometrists in Vail, Colorado.  These trips took place from at least 1995 to 2003, and in 2011.

58.     Defendants provide free high-end fishing, golfing, and hunting trips to Defendants at exclusive resorts.  For example, Defendants took ophthalmologists and optometrists to Sutton Bay, South Dakota during the summers of 2001 through 2007, and the Stock Farm in Hamilton Montana in at least 2007.

59.     Many physicians are also flown for free via company aircraft, not only on vacations, but also to remote, under-serviced areas to perform surgeries for which Defendants received reimbursement.  By way of example, Dr. RL and his staff have received free air transportation to Blue Earth, Minnesota since 2000.

60.     Defendants also take ophthalmologists to sporting events to incentivize them to use their products and services.  For example, Precision Lens took Dr. GO of Sioux Falls, South Dakota via private jet to Hazeltine National Golf club in 2002 for the 84th PGA Championship.

61.     In February, 2011, Precision Lens took a group of ophthalmologists to a Super Bowl Trip in Arlington, Texas.  That summer, Precision Lens hosted a large number of optometrists at a Minnesota Twins baseball game.

62.     Precision Lens provided annual trips to Lambeau Field in Green Bay, Wisconsin for Packers games to Dr. DW of Sioux Falls, South Dakota.

63.     Precision Lens and Sightpath also regularly provide remuneration in the form of expensive entertainment at conferences attended by the surgeons and by paying for or absorbing the cost of transportation to conferences.

64.     By way of example, Jim Tiffany, Sightpath's President and CEO, and Paul Ehlen hosted physicians on trips to Napa Valley, corresponding with the American Academy of Ophthalmology conference in San Francisco, California on October 24-27, 2009.

65.     At the American Society of Cataract and Refractive Surgery meeting in San Francisco, California on April 14, 2003, Sightpath and Precision Lens hosted an evening yacht excursion on San Francisco Bay.  The trip included hors d'oeuvres and alcohol paid for by Sightpath and Precision Lens.  The excursion was intended to induce more than twenty-five ophthalmologists to continue to use Sightpath's and Precision Lens's products and services.

66.     Upon information and belief, Defendants also annually host "surgeon appreciation events" at the American Academy of Ophthalmology conferences and the American Society of Cataract and Refractive Surgery conferences.  By way of example, at the latter organization's conference in April 2013, held in San Francisco, California, Sightpath hosted an event at an upscale nightclub called "The Cellar" for eye surgeons attending the conference to induce them to use or reward them for using Sightpath and Precision Lens products and services.

67.     Upon information and belief, Jim Tiffany annually hosts golf outings and other entertainments for eye surgeons during each of the two annual industry trade shows.  By way of specific example, Jim Tiffany took physicians golfing and fishing

while in Orlando to attend the American Academy of Ophthalmology conference on October 22-25, 2011.

68. Tiffany similarly took physicians golfing at Torrey Pines while in San Diego to attend the American Society of Cataract and Refractive Surgery conference on March 25-29, 2011.

69. Tiffany also took Dr. JS deep sea fishing while attending the Hawaiian Eye Conference on January 15-20, 2012.

70. Defendant Precision Lens provides remuneration in other forms, as well, including by co-signing loans to referring physicians.

71. Defendant Sightpath Medical also pays and has paid Precision Lens a monthly "consultancy" of between $30,000 and $40,000 designed to induce him to encourage his paid surgeons to use Sightpath's services.

72. Sightpath also pays physicians sham consultant arrangements to induce them to utilize its services.

73. By way of example, Dr. JS of Elizabeth City, North Carolina, has received monthly payments of $8,000 as a paid consultant to Sightpath Medical since approximately 2002. The purpose of these payments was to induce referrals.

74. Indeed, as soon as these payments began, Sightpath was selected to supply services to multiple facilities where Dr. JS performs surgery. Dr. JS sought these payments from Jim Tiffany as a quid pro quo for arranging for hospital administrators to utilize Sightpath's services and equipment.

75. Dr. JS does not perform commercially reasonable services for these payments. By way of example, during the entire time Relator was employed by

Sightpath, Dr. JS attended only one regional technician meeting and spoke for fifteen minutes.  Upon information and belief, this was singular service Dr. JS provided for Sightpath in exchange for over a decade's worth of consultancy payments.

76.     Instead, the payments were made to gain Dr. JS's business in Kitty Hawk, Elizabeth City, and Edenton, North Carolina. These payments continued until at least 2008 and, on information and belief, are continuing today.

77.     On information and belief, Sightpath pays similar sham consultancy agreements to Dr. BW and Dr. JK2 of Cleveland, Ohio, and Dr. DD of Danville, Illinois.

78.     Sightpath also paid a sham consultancy of approximately $5,000 per month to JM, the VP for Business Development at Minnesota Eye Consultants, from at least 2002 to 2007.  The payments were intended to induce Moore to ensure that surgeons at Minnesota Eye Consultants used Sightpath's services and products.  Upon information and belief, Sightpath's payments to Moore continue to this day.

79.     Sightpath also pays Kearney Eye Institute in Kearney, Nebraska, payments of $12,500 per month with a purpose of inducing and retaining Kearney's business and to prevent it from becoming a competitor. The payment is far in excess of the fair market value of any commercially reasonable services or equipment Kearney Eye Institute rents or leases to Sightpath.  This practice began in 2005 and, upon information and belief, continues to the present day.

80.     Sightpath Medical also provides free and discounted use of expensive lasers to surgeons in exchange for cataract surgery business.

81.     By way of example, Dr. JS receives free IOL Master usage.

82.   Dr. JH and Black Hills Surgery Center, located in Rapid City, have made use of a free Alcon Accurus Phacoemulsifier for retinal procedures since 2003. Sightpath provides this equipment in order to retain the cataract business in this facility.

83.   On information and belief, Dr. DD of Danville, Illinois, also receives discounts related to its femtosecond laser in exchange for his cataract business.

84.   Payments and other valuable items and services provided pursuant to the schemes described in this complaint constitute illegal "remuneration" under the Anti-Kickback Statute.

### C.   Defendants Intended Their Schemes to Induce Referrals of Business Paid for by Government Healthcare Programs

85.   Defendants' schemes are intended to and do result in increased utilization of their products and services by the ophthalmologists and optometrists they target.

86.   Defendants specifically target high-volume ophthalmologists and optometrists for offers and provision of remuneration, including trips, paid consultant arrangements, free or discounted equipment, and other tangible benefits as described above.  Defendants know that government healthcare programs are a significant payor of the referred services from these ophthalmologists and optometrists.

87.   For example, the 2004 and 2005 trips to the Big Narrows Resort were preceded by planning meetings held in Bloomington, Minnesota at Sightpath's headquarters.  During these meetings Jim Tiffany produced a spreadsheet of high-volume ophthalmologists and optometrists.  The meetings' participants used the spreadsheet to determine which ophthalmologists or optometrists to invite on the trips.

88.   On information and belief, similar meetings are used to target ophthalmologists and optometrists for other remunerative schemes described in this complaint.

89.   Precision Lens induces ophthalmologists to use, *inter alia,* their intraocular lens line and other products such as viscoelastics, surgical blades, surgical packs, syringes, needles, phaco needles, phaco tubing, balanced salt solution, and cannulas in cataract surgeries that were paid for in whole or in part by federal health insurance programs.

90.   Sightpath induces physicians to use and endorse use of its cataract surgery services and equipment.

91.   Defendants benefit from each other's illegal schemes in that each promotes the other's products and services whenever possible.

### D.   Defendants Acted Knowingly

92.   Defendants know that their conduct is illegal.

93.   Defendants attempt to conceal their conduct.  For example, at the planning meetings preceding the Big Narrows Resort trips described above, Jim Tiffany directed the participants to keep the meetings' contents "under the radar."  Specifically, he instructed the participants to limit discussion of the meetings, via email or otherwise.

94.   Despite their knowing violations of the Anti-Kickback Statute, Defendants submit and/or cause to be submitted claims for payments to Medicare, Medicaid, and other federally funded health programs for products and services referred in violation of those laws.  Such claims are false claims.

95.     Defendants specifically intend to violate the Anti-Kickback Statute by their actions to pay illegal incentives in order to influence the judgment of ophthalmologists and optometrists and induce the referral of business, including Medicare, Medicaid, and other federal program business.

96.     Defendants know that their offer and payment of illegal incentives has the foreseeable result of causing the submission of false claims to Medicare, Medicaid, and other federally-funded programs.

97.     As to each of the above factual allegations, Defendants have acted and continue to act with actual knowledge of the truth or falsity of this information, in deliberate ignorance of the truth or falsity of this information, and/or in reckless disregard of the truth or falsity of this information.  Defendants knowingly violated the False Claims Act as that term is defined in 31 US.C. § 3729(b)(1)(A)(i-iii).

98.     The United States has been damaged as a result.

## COUNT I
## Violations of the False Claims Act

99.     The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

100.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (B), (C), and (G) imposes liability upon, *inter alia*, those who knowingly cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government, or those who knowingly conceal, improperly avoid, or decrease an obligation to pay money to the government, as well as those who conspire to do so.

101.   Defendants knowingly and willfully violate the Anti-Kickback statute by offering and paying illegal remuneration to government healthcare program providers to induce those providers to utilize Defendants' products and services in procedures for which payment is sought from federally-financed healthcare programs.  Defendants know that Anti-Kickback statute violations result in claims submitted to government healthcare programs.

102.   Compliance with the Anti-Kickback statute is a material condition of payment for Medicare, Medicaid and other federally-funded healthcare programs. Defendants' actions, if known, would affect the United States' decision to pay the resulting claims.

103.   Claims for payment to federally-financed healthcare programs, which result from unlawful referrals in violation of the Anti-Kickback Statute, are false claims.

104.   By virtue of the acts described above, Defendants knowingly present or cause to be presented false or fraudulent claims to government healthcare programs for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

105.   By virtue of the acts described above, Defendants knowingly make, use or cause to be made or used false records and statements, and omit facts material to false or fraudulent claims to government healthcare programs, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

106.   By virtue of the acts described above, Defendants receive overpayments from government healthcare program funds for medical supplies and services that result from the illegal inducements and material misrepresentations they make or cause to be made to government healthcare programs.  Defendants failed to return the money to the

Government.  Defendants' ongoing and knowing failure to report these overpayments violates the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

107.   Defendants conspire among and between themselves, and each of them engage in one or more overt acts in furtherance of the conspiracy.

108.   Defendants acted knowingly, as that term is used in the False Claims Act.

109.   The United States, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

110.   Because the United States will not pay and would not have paid for services which it knows to have been the result of illegal self-referral and kickback schemes, the United States is harmed in an amount equal to the value the United States pays.

111.   The United States Government has been damaged, and continues to be damaged, as a result of Defendant's conduct in violation of the False Claims Act in an amount to be determined at trial.

### **PRAYER FOR RELIEF**

WHEREFORE, Relator requests:

A.      That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

B.     That in the event the United States Government intervenes in this action,

Relator be awarded 25% of the proceeds of the action or the settlement of any such

claim;

C.     That in the even the United States Government does not proceed with this

action, Relator be awarded 30% of the proceeds of this action or the settlement of any

such claim;

D.     That Relator be awarded all costs, attorneys' fees, and litigation expenses;

and

E.     That the United States Government and Relator receive all relief, both at

law and in equity, to which they may reasonably appear entitled.

Respectfully submitted,

*Jennifer M. Verkamp*

Jennifer M. Verkamp, Esq.
Frederick M. Morgan, Esq.
Morgan Verkamp LLC
700 Walnut Street, Suite 400
Cincinnati, OH 45202
Telephone: (513) 651-4400
Fax: (513) 651-4405
Email: jverkamp@morganverkamp.com
       rmorgan@morganverkamp.com

LOCAL COUNSEL:

Jonathan M. Bye (0148830)
Lindquist & Vennum LLP
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 371-3259
Fax: (612) 371-3207
Email: jbye@lindquist.com

*Counsel for Relator*

-23-