## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* **[UNDER SEAL]**, | : | Civil Action No. **[UNDER SEAL]** |
| | : | |
| | : | Judge Richard H. Kyle |
| Plaintiff and Relator, | : | |
| | : | |
| v. | : | |
| | : | **FILE UNDER SEAL** |
| **[UNDER SEAL]** | : | Pursuant to 31 U.S.C. |
| | : | § 3730(b)(2) |
| | : | and Local Rule 79.1(C) |
| Defendants. | : | |
| | : | |
| | : | |
| | : | **DO NOT SERVE** |
| | : | |

## AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

RECEIVED
APR 0 1 2015
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

SCANNED
APR 0 1 2015
U.S. DISTRICT COURT MPLS

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* KIPP FESENMAIER, | : | Civil Action No. 13-SC-3003 RHK/FLN |
| | : | |
| | : | Judge Richard H. Kyle |
| Plaintiff and Relator, | : | |
| | : | **FILE UNDER SEAL** |
| v. | : | pursuant to 31 U.S.C. § 3730(b)(2) |
| | : | and Local Rule 79.1(C) |
| SIGHTPATH MEDICAL, INC., | : | |
| TLC VISION CORPORATION, | : | |
| THE CAMERON-EHLEN GROUP, INC., | : | **DO NOT SERVE** |
| dba PRECISION LENS, | : | |
| MINNESOTA EYE CONSULTANTS P.A., | : | |
| DAVID DILLMAN, | : | |
| PAUL EHLEN, | : | |
| TODD GAVIN, | : | |
| JEFFREY KETCHAM, | : | |
| PAUL KUCK, | : | |
| DANIEL LANGE, | : | |
| MONTE LEIDENIX, | : | |
| RICHARD LINDSTROM, | : | |
| MICHAEL MERCK, | : | |
| ANTHONY NOVAK, | : | |
| GREGORY OSMUNDSON, | : | |
| JITENDRA SWARUP, | : | |
| VANCE THOMPSON, | : | |
| CHRISTOPHER WALLYN, | : | |
| DAVID WEST, and | : | |
| DARRELL WILLIAMS, | : | |
| | : | |
| Defendants. | : | |

## AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

### I.     INTRODUCTION.

1.     *Qui tam* Relator Kipp Fesenmaier brings this action on his own behalf and on behalf of the United States of America to recover damages and penalties under the

1

False Claims Act, 31 U.S.C. § 3729 *et seq.*, against Defendants Sightpath Medical, Inc.,

TLC Vision Corporation, The Cameron-Ehlen Group, Inc., dba Precision Lens, and Paul

Ehlen ("Supplier Defendants"), and Minnesota Eye Consultants, P.A., David Dillman,

Todd Gavin, Jeffrey Ketcham, Paul Kuck, Daniel Lange, Monte Leidenix, Richard

Lindstrom, Michael Merck, Anthony Novak, Gregory Osmundson, Jitendra Swarup,

Vance Thompson, Christopher Wallyn, David West, and Darrell Williams ("Physician

Defendants").

    2.    The violations arise out of Defendants' actions to cause the submission of

false claims for payment to Medicare, Medicaid, and other federally-funded health care

programs for cataract surgeries and other procedures performed as a result of illegal

financial relationships between and among Defendants and others.  This complaint

details Defendants' fraudulent conduct in offering and paying, as well as accepting and

receiving, remuneration to induce the referrals of patients receiving items and services,

namely cataract surgeries and related supplies and procedures, paid by Medicare,

Medicaid, and other federally-funded health care programs.

    3.    Supplier Defendants employ fraudulent schemes to increase the use of

their products and services in surgeries by systematic payment of kickbacks to

Physician Defendants and other physicians and optometrists in the form of

entertainment, travel, sham consulting agreements, and other illegal incentives, in order

to induce Physician Defendants and other physicians and healthcare providers to use

their products and services.

    4.    Supplier Defendants' schemes to offer and pay these incentives to their

referral sources, and their referral sources' acceptance of such incentives, violate the

Anti-Kickback Statute and material conditions of payment for federal healthcare programs.

5.      Defendants' knowing violations of these conditions of payment result in the submission of false claims for illegally referred surgeries.

## II.     JURISDICTION AND VENUE.

6.      This action arises under the United States Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*

7.      The Court has subject-matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, and has personal jurisdiction over the Defendants because the Defendants do business and are located in this District.

8.      Venue in this District is proper under 28 U.S.C. 1391(b) and (c), and 31 U.S.C. 3732(a), because Defendants operate and transact business within this District.

9.      The facts and circumstances alleged in this complaint have not been publicly disclosed in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; or in a Congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or in the news media.

10.     Relator is an original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

11.     Prior to filing this action, Relator voluntarily disclosed to the United States the information on which his allegations are based.  Relator also voluntarily disclosed to the United States the additional information upon which this Amended Complaint is based, prior to the filing of this amendment.  Should there have been a public disclosure

of any aspect of these allegations prior to the filing of this action or prior to the filing of this Amended Complaint, Relator has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.

III.     **PARTIES.**

12.     The real party in interest to the claims set forth herein is the United States of America.

13.     Relator Kipp Fesenmaier is a resident of Minnesota. He worked for approximately fifteen years in various capacities for Midwest Surgical Services, Inc. Relator served as a Vice President from 2000 until his departure from the company in September of 2007. After his departure from Midwest Surgical Services, Mr. Fesenmaier continued to work in the same industry for competitors of Defendants following a two-year noncompete period.

14.     Defendant The Cameron-Ehlen Group, Inc., dba Precision Lens ("Precision Lens"), is a Nebraska corporation headquartered in Bloomington, Minnesota. It was co-founded by Defendant Paul Ehlen and has been doing business as Precision Lens since approximately 1991. Precision Lens distributes intraocular lenses, viscoelastics, and other eye-related surgical products. It also promoted, until approximately 2013, Defendant Sightpath Medical, Inc.'s, cataract and LASIK surgical services. Precision Lens does business in Minnesota, North Dakota, South Dakota, Iowa, Nebraska, Wisconsin, Montana, Wyoming, the Upper Peninsula of Michigan, Kansas, Western Missouri, and Northwest Arkansas.

15.     Defendant Sightpath Medical, Inc., ("Sightpath") is a Minnesota limited liability company that is a wholly-owned subsidiary of Defendant TLC Vision Corporation.  Sightpath was formed in 1998 when Laser Vision Centers, Inc., (now TLC Vision Corporation) bought Midwest Surgical Services, Inc.  Sightpath's headquarters is in Bloomington, Minnesota, in the same building where Precision Lens is headquartered.  It provides both mobile cataract and glaucoma surgical services and equipment, and mobile LASIK and other refractive surgical services and equipment, servicing over 800 surgeons in more than 600 facilities across the country.

16.     Defendant TLC Vision Corporation ("TLC") is an international eye care services company that provides ophthalmology and optometry services, with centers located in 33 states.  It is a Delaware corporation, with its U.S. headquarters located in Chesterfield, Missouri, and its international corporate headquarters located in Mississauga, Ontario, Canada.

17.     Defendant Minnesota Eye Consultants, P.A., is a Minnesota corporation located in Bloomington, Minnesota, that provides eye care services, including cataract surgery.  Its Chief Executive Officer is Defendant Richard Lindstrom.  Approximately twelve physicians practice with Minnesota Eye Consultants.

18.     Defendant David Dillman is an ophthalmologist licensed in Illinois. He is a resident of Illinois.

19.     Defendant Paul Ehlen is a founder, the majority owner, and the President of Precision Lens and a founder of Midwest Surgical Services, Inc., a predecessor to Sightpath.  Ehlen is a resident of Minnesota.

5

20.     Defendant Todd Gavin is an ophthalmologist licensed in Minnesota. He is a resident of Minnesota.

21.     Defendant Jeffrey Ketcham is an ophthalmologist licensed in Minnesota. He is a resident of Minnesota.

22.     Defendant Paul Kuck is an ophthalmologist licensed in Minnesota and Wisconsin. He is a resident of Wisconsin.

23.     Defendant Daniel Lange is an ophthalmologist licensed in Minnesota. He is a resident of Minnesota.

24.     Defendant Monte Leidenix is an ophthalmologist licensed in North Dakota. He is a resident of North Dakota.

25.     Defendant Richard Lindstrom is an ophthalmologist licensed in Minnesota and the founder and CEO of Defendant Minnesota Eye Consultants.  He is a resident of Minnesota.

26.     Defendant Michael Merck is an ophthalmologist licensed in Minnesota. He is a resident of Minnesota.

27.     Defendant Anthony Novak is an ophthalmologist licensed in Wisconsin. He is a resident of Wisconsin.

28.     Defendant Gregory Osmundson is an ophthalmologist licensed in South Dakota. He is a resident of South Dakota.

29.     Defendant Jitendra Swarup is an ophthalmologist licensed in North Carolina and Virginia. He is a resident of Virginia.

30.     Defendant Vance Thompson is an ophthalmologist licensed in South Dakota.  He is a resident of South Dakota.

31.    Defendant Christopher Wallyn is an ophthalmologist licensed in Minnesota. He is a resident of Minnesota.

32.    Defendant David West is an ophthalmologist licensed in South Dakota. He is a resident of South Dakota.

33.    Defendant Darrell Williams is an ophthalmologist licensed in North Dakota. He is a resident of North Dakota.

## IV.    RULE 9(b), FED. R. CIV. P. ALLEGATIONS.

34.    Much of the documentary evidence necessary to prove the allegations in this Complaint is in the exclusive possession of either the Defendants or the United States.

35.    With respect to each allegation herein made upon information and belief, Relator has, based upon his insider knowledge, data, and experience, a reasoned factual basis to make the allegation but lacks complete details of it.

36.    Relator is familiar with Defendants' policies and procedures from his service as a Vice President of Defendant Sightpath's predecessor, Midwest Surgical Services, and as a result of his continued presence in the ophthalmic services market as Vice President for Business Development at Vantage Outsourcing.  He has also learned from other ophthalmologists, optometrists, employees, and affiliates of Defendants.

37.    However, Relator does not have access to all of the information regarding the claims for payment submitted or caused to be submitted by Defendants.  This

information is in the exclusive possession and control of Defendants or the United

States.

## V.   THE STATUTORY AND REGULATORY ENVIRONMENT.

### A.   ANTI-KICKBACK STATUTE.

22.    Pursuant to the Anti-Kickback Statute ("AKS"), 42 U.S.C. Section 1320a-

7b(b), it is unlawful to knowingly offer or pay any remuneration in cash or in kind in

exchange for referring, recommending or arranging for federally-funded medical

services, including services provided under the Medicare, Medicaid and (as of January

1, 1997) TRICARE programs.  In pertinent part, the statute states:

> (b) Illegal remuneration
>
> > (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind —
> >
> > > (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> > >
> > > (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
> >
> > shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
> >
> > (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person —
> >
> > > (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

8

> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. § 1320a-7(b)(7); 42 U.S.C. § 1320a-7a(a)(7).

23.     The AKS also provides that claims arising out of violations of its provisions are false claims. 42 U.S.C. § 1320a-7b(g).

24.     The AKS is designed to, *inter alia*, ensure that patient care will not be improperly influenced by inappropriate compensation from the healthcare industry.

25.     Compliance with the AKS is a condition of payment of all claims submitted for reimbursement by Medicare, Medicaid, and other federally-funded programs.

26.     Every provider and supplier who seeks payment from federally-funded healthcare programs must enter into an agreement with the United States in which it certifies it will comply with the AKS and other federal healthcare laws.

27.     In addition, every provider and supplier who seeks payment from the program certifies its understanding that payment of claims is conditioned on compliance with the AKS.

28.     Payment of remuneration of any kind violates the statute if one or any purpose for that remuneration was to induce referrals. Moreover, remuneration offered

or paid in return for the promise to refer federally-financed business to a particular provider or facility qualifies as a kickback. Giving a person the opportunity to earn money also constitutes an inducement under the AKS.

29.     Claims submitted or caused to be submitted in violation of the AKS are false claims.

## B.     FEDERALLY-FUNDED HEALTH CARE PROGRAMS.

30.     The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program, was created in 1965 as part of the Social Security Act ("SSA"). The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare & Medicaid Services ("CMS"), a component of HHS.

31.     The Medicare Program consists of four parts. Medicare Part B authorizes the payment of federal funds for medical and other health services, including without limitation physician services, supplies and services incident to physician services, laboratory services, outpatient therapy, diagnostic services, and radiology services. 42 U.S.C. § 1395(k), 1395(i), 1395(s).

32.     Under Medicare Part B, CMS pays a single global fee for cataract surgeries that includes the cost of a standard prosthetic lens. Medicare Claims Processing Manual, ch. 14, § 40.3.

33.     The Medicaid Program was also created in 1965 as part of the Social Security Act, which authorized federal grants to States for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The Medicaid program is jointly financed by the

Federal and State governments.

34.     As a result of its schemes to utilize improper financial relationships to obtain referrals from ophthalmologists and optometrists, Defendants submitted and caused the submission of false claims to the United States in violation of the Anti-Kickback Statute and the False Claims Act.

## VI.     ALLEGATIONS OF FACT.

35.     Supplier Defendants offer and pay illegal remuneration to ophthalmologists, including Physician Defendants, to induce them to use Supplier Defendants' products and services in cataract surgeries and related procedures, a high percentage of which are paid for in whole or in part by federal health insurance programs.

36.     Supplier Defendants and Defendant Minnesota Eye Consultants offer and pay illegal remuneration to optometrists to induce them to refer patients requiring cataract surgery to Minnesota Eye Consultants, which utilizes Supplier Defendants' products and services for such surgeries, including those which are paid for in whole or in part by federal health insurance programs.

37.     All individual defendants and the senior management and owners of entity defendants know that Medicare, Medicaid, and other federal program beneficiaries represent a significant percentage of cataract surgery patients.

38.     As explained in detail below, Supplier Defendants offer and pay remuneration to ophthalmologists, including Physician Defendants, far in excess of fair market value.  This remuneration takes such forms as, *inter alia*, monthly payments

under sham consulting agreements, exorbitant entertainment, high-end travel and accommodations, free or discounted equipment, and other illegal incentives. Supplier Defendants and Minnesota Eye Consultants also offer and provide remuneration in the form of exorbitant entertainment and high-end travel and accommodations to optometrists.

39.     Each of Supplier Defendants' and Minnesota Eye Consultants' schemes funnels monetary incentives to ophthalmologists, including Physician Defendants, and optometrists in exchange for their referral of business, including business paid in whole or part by federal healthcare programs.

40.     The purpose of these incentives is to induce the referral of Medicare and Medicaid patients for cataract and other surgeries, which Minnesota Eye Consultants performs using products and services provided by Supplier Defendants.

### A.     Supplier Defendants' Schemes to Obtain Referrals Through Illegal Incentives

41.     One of the ways in which Supplier Defendants induce ophthalmologists, including but not limited to Physician Defendants, to utilize their products and services is to take them on high-end vacations to reward them for utilizing Supplier Defendant's products, traveling with them to "solidify" these relationships. Supplier Defendants and Minnesota Eye Consultants use the same tactics to reward optometrists for referring patients to Minnesota Eye Consultants for cataract surgeries and related procedures, which utilize Supplier Defendants' products and services.

42.     The trips include hunting in South Dakota, skiing in Montana and Colorado, and fishing in Canada. Supplier Defendants have also taken

ophthalmologists to a private club in Montana called the "Stock Farm" for golf, skiing, and hunting.

43.     Supplier Defendants also pay surgeons under sham consulting agreements.  The agreements provide remuneration to surgeons in amounts far above the fair market value or commercially reasonable value of services they provide, and in many cases, no services are provided.  Under these consulting agreements, consultants are paid monthly stipends ranging from $5,000 to $8,000 to per month.

44.     Further, Defendant TLC, through its subsidiary Sightpath (hereinafter collectively referred to as "Sightpath"), offers reduced pricing to surgeons using their "Mobile Access" LASIK equipment and services in order to get the surgeons to use and endorse using Sightpath's mobile cataract equipment and services.  These price reductions provide substantial remuneration to the surgeons, as the LASIK procedures are private pay.

45.     Defendant Sightpath also provides other illegal incentives to induce physicians to use its surgical services, including a free comprehensive print advertising design program accessible through a web portal, which is available exclusively to its customers at www.sightpathmarket.com.  Sightpath provides the design program to induce the physicians to use Sightpath's services, which are reimbursed by federal insurers.

46.     Supplier Defendants offer and pay the remuneration detailed in this complaint to induce ophthalmologists, including but not limited to Physician Defendants, to use Sightpath's mobile cataract products and services to perform cataract procedures using Precision Lens products, a high percentage of which are federally-reimbursed.

13

47.     Supplier Defendants' and Minnesota Eye Consultants' provision of incentives to induce the referral of business has been ongoing for more than a decade. For example, Supplier Defendants have offered and paid sham consulting fees and other incentives since at least 2002 through the present; and have paid for lucrative trips for their referral sources for even longer, since at least 1995 through the present.

## B.     Specific Examples of Illegal Incentives.

48.     The following are specific examples of ophthalmologists and optometrists for whom Supplier Defendants and Defendants Minnesota Eye Consultants provided luxury vacations and other accommodations from 1995 to, in some cases, the present.

| Doctor | Location of Practice |
|---|---|
| Dr. KA[1] | Fredonia, WI |
| CC | Cambridge, MN |
| BD | St. Peter, MN |
| Dr. ME | Edina, MN |
| Dr. Todd Gavin | Mankato, MN |
| TH | Wayzata, MN |
| BJ | Blue Earth, MN |
| Dr. Jeffrey Ketcham | Red Wing, MN |
| Dr. Paul Kuck | Lacrosse, WI |
| Dr. Daniel Lange | Lacrosse, WI |
| Dr. Monte Leidenix | Bismarck, ND |
| Dr. Richard Lindstrom | Bloomington, MN |
| Dr. KL | Bismarck, ND |
| Dr. Michael Merck | Hutchinson, MN |
| Dr. Anthony Novak | River Falls, WI |
| Dr. Gregory Osmundson | Sioux Falls, SD |
| Dr. GS | Missoula, MT |
| Dr. Jitendra Swarup | Elizabeth City, NC |
| Dr. Vance Thompson | Sioux Falls, SD |
| Dr. Christopher Wallyn | Hutchinson, MN |
| Dr. David West | Sioux Falls, SD |
| Dr. LW | Fargo, ND |

---

[1] Relator has redacted the names of non-parties from the complaint.  Relator can provide the unredacted names upon the Court's direction.

14

| Dr. JW | Yankton, SD |
|---|---|
| Dr. Darrell Williams | Minot, ND |

49.     Relator has specific knowledge that Supplier Defendants and, in the case of optometrists, Supplier Defendants and Minnesota Eye Consultants, have provided these ophthalmologists and optometrists with multiple free or discounted trips and dinners, and in some cases other remuneration as detailed below, for over 15 years.

50.     By way of specific example, in June 2004 Supplier Defendants[2] treated a group of approximately eight ophthalmologists to a luxury fishing trip at the Big Narrows Resort in Ontario, Canada.  The physicians met Defendant Ehlen, Jim Tiffany (Sightpath's CEO), Pete Gosz (Precision Lens account executive), and Relator at the Flying Cloud Airport in Eden Prairie, Minnesota.  Supplier Defendants then flew the physicians on private aircraft owned by Ehlen to the Big Narrows Resort in Ontario, Canada.  All travel arrangements were arranged by Ehlen's assistant, Linda Norling.

51.     While at the Big Narrows Resort, which Ehlen partially owned, Supplier Defendants provided the physicians with free fishing guides, boats, and equipment; free accommodations, meals, and alcohol; and a free special fly-in trip to a remote lake known for its trout fishing.

52.     Sightpath and Precision Lens paid the costs of the trip.  The physicians paid for nothing.

---

[2] Supplier Defendants had a generally symbiotic relationship. Under a supply agreement between Precision Lens and Sightpath that lasted from 2001 to 2009, Sightpath was obligated to purchase supplies, including those used in cataract surgeries paid for by federally-funded healthcare programs, from Precision Lens, unless the latter was unable to provide them. Precision Lens was likewise obligated not to sell its products to Sightpath's competitors without the latter's consent.  A sales representative agreement also existed between the companies, which obligated Precision Lens to use its best efforts to promote and solicit customers for Sightpath in its territory.  This agreement expired in 2013.

53.     The ophthalmologists who were targeted for the 2004 trip to the Big Narrows Resort included Defendants Gavin, Kuck, Lange, Leidenix, Lindstrom, and Novak, as well as Dr. KL of Bismarck, North Dakota.  Precision Lens paid for Defendant Kuck's trip because he did not use Sightpath's services.

54.     By way of further specific example, Defendant Sightpath and Defendant Minnesota Eye Consultants treated a group of optometrists to a trip to the Big Narrows Resort in June 2005 that included all the free benefits and accommodations of the 2004 trip, with the exception of the special fly-in fishing.

55.     The optometrists in attendance included BJ of Blue Earth, Minnesota, BD of St. Peter, Minnesota, and TH of Wayzata, Minnesota.  Tiffany, Minors, Relator, and Harry Oxner, an attorney and independent sales representative for Sightpath, were also in attendance.  Jack Moore, VP for Business Development at Minnesota Eye Consultants, was also present; Mr. Moore helped plan the trip, which was jointly paid for by Sightpath and Minnesota Eye Consultants to reward optometrists who referred business to the latter, which used Sightpath's services (and Precision Lens's products) almost exclusively.

56.     While Sightpath and Minnesota Eye Consultants paid the trip costs for all attendees, Precision Lens (through Ehlen's assistant) arranged all travel details, and Ehlen's private jet and turboprop plane were used to transport the doctors to the resort partially owned by him.  Trips like the one just described were designed to influence optometrists to refer patients, including those whose cataract surgeries would be paid for by federally-funded healthcare programs and performed at Minnesota Eye

Consultants.  Minnesota Eye Consultants, in turn, used Sightpath's services and Precision Lens's supplies for such surgeries.

57.     By way of further specific examples, Supplier Defendants took ophthalmologists on annual luxury fishing trips to Budd's Gunisao Lake Lodge in Manitoba, Canada, during the summers from 2000 to at least 2007.  Ehlen, Tiffany, and Sightpath VP for Sales Joel Gaslin took multiple ophthalmologists to this remote resort to reward them for using and/or incentivize them to use Sightpath and Precision Lens products and services in cataract surgeries paid by federally-funded health insurance programs.

58.     For example, Gaslin, Ehlen, and Tiffany fished together with Defendants Lindstrom, Swarup, and West at Budd's Gunisao Lake Lodge in late May of 2006. Sightpath's sales representative for Swarup's region, Mark Heveroh, was also in attendance.

59.     On another occasion in July, 2011, Lindstrom, Moore (Minnesota Eye Consultants' VP for Business Development), and Tom Ferguson (at the time, TLC Vision Corporation's VP for Licensing and Business Development) were all present at Budd's Gunisao Lake Lodge with optometrist CC, of Cambridge, MN.

60.     On other occasions, upon information and belief, Defendant West was treated to further fishing trips at Budd's Gunisao Lake Lodge on May 22, 2008 and May 31, 2010.

61.     Upon information and belief, and based upon Relator's experience with Supplier Defendants and Minnesota Eye Consultants, the latter entities paid all

expenses for the Physician Defendants and optometrist CC on these trips.  Upon information and belief, these trips continue to the present.

62.     Supplier Defendants also provide free luxury skiing vacations for ophthalmologists and optometrists in Vail, Colorado.  These trips took place from at least 1995 to 2003 and, upon information and belief, continue to the present.

63.     Supplier Defendants provide free high-end fishing, golfing, and hunting trips to Defendants at exclusive resorts.  For example, Defendants took ophthalmologists and optometrists to Sutton Bay, South Dakota, upon information and belief, during the summers of 2003 through 2007, and the Stock Farm in Hamilton, Montana, in at least 2007 and 2013.

64.     By way of further example, in September 2013 Precision Lens paid over $1,000 each in travel costs for Defendants Lindstrom and Thompson to travel to a "strategic planning meeting" held at the Stock Farm in Hamilton, Montana, where Ehlen owns a luxury hunting cabin.  Precision Lens also paid these Defendants "consulting fees" of $13,500 each in 2013.  Upon information and belief, the payments and the travel to the Stock Farm were inducements to use products sold by Precision Lens in cataract surgeries.  The amounts Precision Lens paid to these defendants are far in excess of commercially reasonable compensation for any services they may provide.

65.     Physicians are also flown for free via company aircraft, not only on vacations, but also to remote, under-serviced areas to perform cataract surgeries and related procedures, for which Defendants receive reimbursement from federally-funded health insurance programs.  By way of example, Defendant Lindstrom and his staff from

Minnesota Eye Consultants have received free air transportation to Blue Earth, Minnesota, since 2000 for the purpose of performing such surgeries.[3]

66.     Sightpath and Minnesota Eye Consultants treated BJ, an optometrist in Blue Earth who refers patients to Minnesota Eye Consultants, to a luxury fishing trip to the Big Narrows Resort, as noted above.  Upon information and belief, the same defendants also treated BJ to another luxury fishing trip at Budd's Gunisao Lake Lodge on July 13, 2004, with former Sightpath President Tiffany and Defendant Lindstrom in attendance.  This trip and other remuneration is intended to induce BJ to refer patients to Minnesota Eye Consultants for cataract surgeries and related procedures, which are paid for in whole or in part by federally-funded health-insurance programs.

67.     Supplier Defendants also take ophthalmologists to sporting events to incentivize them to use their products and services.  For example, Precision Lens took Dr. Greg Osmundson of Sioux Falls, South Dakota, via private aircraft to Hazeltine National Golf club in 2002 for the 84th PGA Championship.

68.     In February, 2011, Precision Lens took a group of ophthalmologists to a Super Bowl Trip in Arlington, Texas.  That summer, Precision Lens hosted a large number of optometrists at a Minnesota Twins baseball game.  Upon information and belief, Minnesota Eye Consultants was involved in the planning and execution of this and other similar trips for optometrists through its Vice President for Business Development, Jack Moore, and split the costs of the trips with Supplier Defendants.

69.     Precision Lens provided annual trips to Lambeau Field in Green Bay, Wisconsin for Packers games to Defendant David West of Sioux Falls, South Dakota.

---

[3] Upon information and belief, Sightpath paid a jet services company owned by Ehlen for the costs of transporting Minnesota Eye Consultant physicians on these trips.

70.     Precision Lens and Sightpath also regularly provide remuneration in the form of expensive entertainment at conferences attended by ophthalmologists and by paying for or absorbing the cost of transportation to conferences.

71.     By way of example, Jim Tiffany, Sightpath's President and CEO, and Paul Ehlen hosted physicians on trips to Napa Valley, corresponding with the American Academy of Ophthalmology conference in San Francisco, California on October 24-27, 2009.

72.     At the American Society of Cataract and Refractive Surgery meeting in San Francisco, California on April 14, 2003, Sightpath and Precision Lens hosted an evening yacht excursion on San Francisco Bay.  The trip included hors d'oeuvres and alcohol paid for by Sightpath and Precision Lens.  The excursion was intended to induce more than twenty-five ophthalmologists to use or continue to use Sightpath's and Precision Lens's products and services.

73.     Upon information and belief, Supplier Defendants also annually host "surgeon appreciation events" at the American Academy of Ophthalmology conferences and the American Society of Cataract and Refractive Surgery conferences.  By way of example, at the latter organization's conference in April 2013, held in San Francisco, California, Sightpath hosted an event at an upscale nightclub called "The Cellar" for eye surgeons attending the conference to induce them to use or reward them for using Sightpath and Precision Lens products and services.

74.     Upon information and belief, Jim Tiffany annually hosts golf outings and other entertainments for eye surgeons during each of the two annual industry trade shows.  By way of specific example, Jim Tiffany took physicians golfing and fishing

while in Orlando to attend the American Academy of Ophthalmology conference on October 22-25, 2011.

75.     Tiffany similarly took physicians golfing at Torrey Pines while in San Diego to attend the American Society of Cataract and Refractive Surgery conference on March 25-29, 2011.

76.     Tiffany also took Defendant Swarup deep sea fishing while attending the Hawaiian Eye Conference on January 15-20, 2012.

77.     Defendant Ehlen has also treated individual physicians to high-end dinners to induce them to utilize Supplier Defendants' products and services in cataract surgeries.  For example, on multiple occasions Ehlen has traveled to Red Wing, Minnesota, where Defendants Novak and Ketcham are located, to treat them to dinners at the St. James Hotel.  Ehlen also treated Dr. RD to high-end dinners in and around Minneapolis, Minnesota.

78.     Sightpath also pays physicians under sham consultancy arrangements to induce them to utilize its services.

79.     By way of example, Defendant Swarup has received monthly payments of $8,000 as a paid consultant to Sightpath Medical since approximately 2002.  The purpose of these payments was to induce referrals.

80.     Indeed, as soon as these payments began, Sightpath was selected to supply services to multiple facilities where Swarup performs surgery.  Swarup sought these payments from Jim Tiffany as a *quid pro quo* for arranging for hospital administrators to utilize Sightpath's services and equipment.

81.     Swarup does not perform commercially reasonable services for these payments. By way of example, during the entire time Relator was employed by Sightpath, Swarup attended only one regional technician meeting and spoke for fifteen minutes. Upon information and belief, this was singular service Swarup provided for Sightpath in exchange for over a decade's worth of consultancy payments.

82.     Instead, the payments were made to gain Swarup's business in Kitty Hawk, Elizabeth City, and Edenton, North Carolina. These payments continued until at least 2008 and, on information and belief, are continuing today.

83.     On information and belief, Sightpath pays similar sham consultancy agreements to Dr. David Dillman of Danville, Illinois.

84.     Sightpath also paid a sham consultancy of approximately $5,000 per month to Jack Moore, the VP for Business Development at Minnesota Eye Consultants, from at least 2002 to 2007. The payments were intended to induce Moore to ensure that surgeons at Minnesota Eye Consultants used Sightpath's services and products. Upon information and belief, Sightpath's payments to Moore continue to this day.

85.     Sightpath also pays Kearney Eye Institute in Kearney, Nebraska, payments of $12,500 per month with a purpose of inducing and retaining Kearney's business, and to prevent it from becoming a competitor. The payment is far in excess of the fair market value of any commercially reasonable services or equipment Kearney Eye Institute rents or leases to Sightpath. This practice began in 2005 and, upon information and belief, continues to the present day.

86.     Sightpath has also paid illegal remuneration to Dr. WW and JK related to its purchase of a mobile surgery services and equipment business they owned.

87.     Sightpath also provides free and discounted use of expensive lasers to surgeons in exchange for cataract surgery business.

88.     By way of example, Defendant Swarup receives free IOL Master usage.

89.     Dr. JH and Black Hills Surgery Center, located in Rapid City, South Dakota, have made use of a free Alcon Accurus Phacoemulsifier for retinal procedures since 2003.  Sightpath provides this equipment in order to retain the cataract business in this facility.

90.     On information and belief, Dr. David Dillman of Danville, Illinois, also receives discounts related to its femtosecond laser in exchange for his cataract business.

91.     Payments and other valuable items and services provided pursuant to the schemes described in this complaint constitute illegal "remuneration" under the Anti-Kickback Statute.

## C.     Defendants Intended Their Schemes to Induce Referrals of Business Paid for by Government Healthcare Programs

92.     Supplier Defendants' schemes are intended to and do result in increased utilization of their products and services by ophthalmologists, including Physician Defendants.

93.     Supplier Defendants specifically target ophthalmologists and optometrists for offers and provision of remuneration based on the volume of patients referred, including trips, paid consultant arrangements, free or discounted equipment, and other tangible benefits as described above.  Defendants know that government healthcare programs are a significant payor for the cataract surgeries and other procedures the targeted ophthalmologists perform.

94.     By way of example, the 2004 and 2005 trips to the Big Narrows Resort were preceded by planning meetings held in Bloomington, Minnesota, at Sightpath's headquarters.  During these meetings Sightpath CEO Tiffany produced a spreadsheet of ophthalmologists and optometrists that tracked them by the volume of surgeries they performed or cases they referred.  The meetings' participants used the spreadsheet to determine which ophthalmologists or optometrists to invite on the trips.

95.     At the beginning of the 2005 trip to the Big Narrows Resort, Precision Lens Account Executive Pete Gosz communicated to Relator that the purpose of taking Defendant Kuck, who used a lot of a competitor's products, on the trip was to cause him to use more of Precision Lens's products, and that Relator was to make that fact clear when he accompanied Defendant Kuck while fishing.

96.     On information and belief, similar meetings and methods are used by Supplier Defendants and Minnesota Eye Consultants to target ophthalmologists and optometrists for other remunerative schemes described in this complaint.

97.     Precision Lens induces ophthalmologists to use, *inter alia,* their intraocular lens line and other products such as viscoelastics, surgical blades, surgical packs, syringes, needles, phaco needles, phaco tubing, balanced salt solution, and cannulas in cataract surgeries that were paid for in whole or in part by federal health insurance programs.

98.     Sightpath induces physicians to use and endorse use of its cataract surgery services and equipment.

24

99.     Minnesota Eye Consultants induces optometrists to refer patients for cataract surgeries and related procedures, utilizing Supplier Defendants' products and services.

100.    Prior to the dissolution of their business ties in 2013, Supplier Defendants benefited from each other's illegal schemes in that each promotes the other's products and services whenever possible.

101.    Supplier Defendants and Minnesota Eye Consultants have developed a single plan by which illegal incentives are offered to referral sources with the purpose of increasing government healthcare utilization of their services.  Supplier Defendants and Minnesota Eye Consultants agree to engage in these schemes with Physician Defendants and other referral sources with the shared objective of using illegal incentives to secure referrals of federally-insured cataract business.

102.    Supplier Defendants also use these illegal incentives to ensure that ophthalmologists, including Physician Defendants, require that Supplier Defendants' products and services be utilized by their practices, other surgeons in their practices, and by the hospitals and surgical clinics where they perform surgery.

103.    By way of example, upon information and belief, Defendant Lindstrom, founder and CEO of Defendant Minnesota Eye Consultants, exercises substantial control over which products and services ophthalmologists practicing there use, and he exerts his influence to ensure that Supplier Defendants' products and services are used by all ophthalmologists in the practice.

104.    By way of further example, upon information and belief, Defendant Thompson exercises substantial control over which products and services

ophthalmologists practicing at his namesake practice, Vance Thompson Vision, use, and he exerts his influence to ensure that Supplier Defendants' products and services are used by all ophthalmologists in the practice.

105.    By way of further example, upon information and belief, Defendant West exercises substantial control over which products and services ophthalmologists practicing at Ophthalmology Limited, use, and he exerts his influence to ensure that Supplier Defendants' products and services are used by all ophthalmologists in the practice.

106.    Defendants know that this conduct results in the submission of false claims for such surgeries to federally-funded health insurance programs.

### D.    **Defendants Acted Knowingly**

107.    Defendants know that their conduct is illegal.

108.    As of at least 2007, Sightpath's vendor contracts with physicians made specific reference to the AKS and represented that (1) "no physician providing services under this agreement will receive any remuneration from [Sightpath] as consideration for providing their services"; and (2) no party had obtained payments made pursuant to the Medicare and Medicaid programs by means of false representations or pretenses.

109.    In approximately 2011, Precision Lens's supplier, Abbott Medical, required Precision Lens personnel to undergo compliance training and provided for a compliance professional to give a presentation to Precision Lens personnel regarding the illegality of kickbacks under the AKS.

110.    Defendants actively attempted to conceal their conduct.  For example, at the planning meetings preceding the Big Narrows Resort trips described above, Jim

Tiffany directed the participants to keep the meetings' contents "under the radar." Specifically, he instructed the participants to limit discussion of the meetings, via email or otherwise.

111. Around 2003, Relator remarked to Defendant Ehlen, in relation to a fishing trip to which Ehlen was soon to treat physicians, that his former business partner had disapproved of such trips as inducements. Ehlen responded wryly that, if anyone were to ask, he would "just tell them they're my friends."

112. In addition, at a meeting preceding the 2005 Big Narrows Trip described above, Defendant Ehlen stated that Supplier Defendants needed to make sure to provide "education" for compliance purposes and that Defendant Lindstrom, who would go on the trip, could be involved in providing it. However, there was no further discussion regarding education on the trip and no education, formal or otherwise, occurred on the trip.

113. Despite their knowing violations of the Anti-Kickback Statute, Defendants submit and/or cause to be submitted claims for payments to Medicare, Medicaid, and other federally funded health programs for products and services referred in violation of those laws. Such claims are false claims.

114. Supplier Defendants and Minnesota Eye Consultants specifically intend to violate the Anti-Kickback Statute by their actions to pay illegal incentives in order to influence the judgment of ophthalmologists and optometrists and induce the referral of business, including Medicare, Medicaid, and other federal program business.

115.    Supplier Defendants and Minnesota Eye Consultants know that their offer and payment of illegal incentives has the foreseeable result of causing the submission of false claims to Medicare, Medicaid, and other federally-funded programs.

116.    Physician Defendants specifically intend to violate the Anti-Kickback statute by receiving and accepting the provision of illegal incentives, utilizing Supplier Defendants' products and services in their cataract surgeries, and submitting or causing to be submitted bills to federal payors for such surgeries.

117.    As to each of the above factual allegations, Defendants have acted and continue to act with actual knowledge of the truth or falsity of this information, in deliberate ignorance of the truth or falsity of this information, and/or in reckless disregard of the truth or falsity of this information.  Defendants knowingly violated the False Claims Act as that term is defined in 31 US.C. § 3729(b)(1)(A)(i-iii).

118.    The United States has been damaged as a result.

## COUNT I
## Violations of the False Claims Act

119.    The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

120.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A) (B), (C), and (G) imposes liability upon, *inter alia*, those who knowingly cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim or to an obligation to pay money to the government, or those who knowingly conceal, improperly avoid, or decrease an obligation to pay money to the government, as well as those who conspire to do so.

121.   Supplier Defendants and Minnesota Eye Consultants knowingly and willfully violate the Anti-Kickback Statute by offering and paying illegal remuneration to government healthcare program providers to induce those providers to utilize Defendants' products and services in procedures for which payment is sought from federally-financed healthcare programs.

122.   Physician Defendants knowingly and willfully violate the Anti-Kickback Statute by soliciting and receiving illegal remuneration in return for utilizing products and services provided by Supplier Defendants for use in procedures for which payment is sought from federally-financed healthcare programs.

123.   All Defendants know that Anti-Kickback statute violations result in claims submitted to government healthcare programs.

124.   Compliance with the Anti-Kickback statute is a material condition of payment for Medicare, Medicaid, and other federally-funded healthcare programs. Defendants' actions, if known, would affect the United States' decision to pay the resulting claims.

125.   Claims for payment to federally-financed healthcare programs, which result from unlawful referrals in violation of the Anti-Kickback Statute, are false claims.

126.   By virtue of the acts described above, Defendants knowingly present or cause to be presented false or fraudulent claims to government healthcare programs for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

127.   By virtue of the acts described above, Defendants knowingly make, use or cause to be made or used false records and statements, and omit facts material to false

or fraudulent claims to government healthcare programs, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

128.   By virtue of the acts described above, Defendants receive overpayments from government healthcare program funds for medical supplies and services that result from the illegal inducements and material misrepresentations they make or cause to be made to government healthcare programs.  These claims were noncovered and nonpayable, in violation of material conditions of payment of government healthcare programs.  Notwithstanding these overpayments, Defendants failed to return the money to the Government.  Defendants' ongoing and knowing failure to report these overpayments violates the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

129.   Defendants reached an agreement to participate in these schemes to falsely increase government healthcare utilization of their services, and each of them engage in one or more overt acts in furtherance of the conspiracy.  Defendants' acts to conspire among and between themselves violates the False Claims Act.  31 U.S.C. § 3729(a)(1)(C).

130.   Defendants acted knowingly, as that term is used in the False Claims Act.

131.   The United States, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

132.   Because the United States will not pay and would not have paid for services which it knows to have been the result of illegal kickback schemes, the United States is harmed in an amount equal to the value the United States pays.

133.    The United States Government has been damaged, and continues to be damaged, as a result of Defendant's conduct in violation of the False Claims Act in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests:

A.    That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

B.    That in the event the United States Government intervenes in this action, Relator be awarded 25% of the proceeds of the action or the settlement of any such claim;

C.    That in the event the United States Government does not proceed with this action, Relator be awarded 30% of the proceeds of this action or the settlement of any such claim;

D.    That Relator be awarded all costs, attorneys' fees, and litigation expenses; and

E.    That the United States Government and Relator receive all relief, both at law and in equity, to which they may reasonably appear entitled.

Respectfully submitted,

Susan M. Coler (MN 0217621)
Halunen Law
80 South 8th Street, Suite 1650
IDS Center
Minneapolis, MN 55402
Telephone: (612) 260-5383
Fax: (612) 605-4099
Email: coler@halunenlaw.com


 /s/ Jennifer M. Verkamp
Jennifer M. Verkamp, Esq.
(admited pro hac vice; OH 0067198)
Frederick M. Morgan, Esq.
(admitted pro hac vice; OH 0027687)
Morgan Verkamp LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Telephone:  (513) 651-4400
Fax: (513) 651-4405
Email: jverkamp@morganverkamp.com
         rmorgan@morganverkamp.com

*Attorneys for Relator*


## CERTIFICATE OF SERVICE

I certify that a copy of this document was served on April 1, 2015, by regular mail

on the following counsel for the United States.

Chad Blumenfield, Esq.
Assistant United States Attorney
District of Minnesota
300 South Fourth Street
Suite 600
Minneapolis, MN 55415

 /s/ Jennifer M. Verkamp