## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, ex rel. Kipp Fesenmaier, | Case No. 13-cv-3003 (WMW/DTS) |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| The Cameron-Ehlen Group, Inc., doing business as Precision Lens; and Paul Ehlen, | |
| Defendants. | |

Defendants jointly move to dismiss Plaintiff United States of America's intervenor complaint for failure to state a claim on which relief can be granted.  (Dkt. 122.)  For the reasons addressed below, the motion is granted in part and denied in part.

### BACKGROUND[1]

Defendant The Cameron-Ehlen Group, Inc., doing business as Precision Lens (Precision Lens), is a distributor of intraocular lenses (IOLs) and other products related to ophthalmic surgeries.  Defendant Paul Ehlen is the founder and majority owner of Precision Lens.  Precision Lens provides ophthalmic supplies and equipment to ophthalmologists and facilities for use in ophthalmology procedures, including cataract surgeries.  A cataract surgery requires the implantation of an IOL and the use of other supplies (collectively, "surgical supplies").

---

[1]   The facts presented in this background section are based on the United States's complaint and are accepted as true for the purpose of Defendants' motion to dismiss.  *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).

Physicians who perform cataract surgeries are among the primary decisionmakers who determine the surgical supplies used to perform surgery. Knowing this, Precision Lens and Ehlen directly and indirectly targeted their marketing at physicians with whom they did significant business or hoped to do business with in the future. For many years, including approximately 2006 through 2015, Precision Lens and Ehlen took physicians on lavish trips and provided them private flights, frequent-flyer miles, expensive meals and entertainment, and access to private clubs, at no cost or at a discount. Precision Lens paid for these trips and other expenses using an account that Ehlen and other Precision Lens employees referred to as a "slush fund" or a "secret fund." The physicians who received these trips and other benefits performed surgeries using IOLs and other products supplied by Precision Lens and billed Medicare for some of those surgeries.

Relator Kipp Fesenmaier worked for Precision Lens's corporate partner, Sightpath Medical, Inc. (Sightpath), for approximately 15 years, including several years as its vice president. Fesenmaier filed a qui tam complaint in November 2013 against Sightpath and other defendants, including Precision Lens and Ehlen. The United States investigated Fesenmaier's complaint and, in August 2017, filed a notice of its election to intervene in this case. Pursuant to a settlement agreement, the Court dismissed the claims asserted against Sightpath and Defendant TLC Vision Corporation in September 2017.

The United States filed an intervenor complaint (complaint) against Precision Lens and Ehlen on February 8, 2018. The complaint alleges that Precision Lens and Ehlen offered kickbacks to physicians in violation of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), and as a result of those kickbacks, false and fraudulent claims for payment

were made to federal health care programs, including Medicare, in violation of the False Claims Act (FCA), 31 U.S.C. § 3729(a)(1), (a)(2).  The complaint also alleges common-law claims for unjust enrichment and payment by mistake.  Precision Lens and Ehlen (collectively, Defendants) now move to dismiss the complaint.

## ANALYSIS

A complaint must allege sufficient facts such that, when accepted as true, a facially plausible claim for relief is stated.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  If a complaint fails to state a claim on which relief can be granted, dismissal is warranted.  Fed. R. Civ. P. 12(b)(6).  When determining whether a complaint states a facially plausible claim, a district court accepts the factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).  Factual allegations must be sufficient to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  Mere "labels and conclusions" are insufficient, as is a "formulaic recitation of the elements of a cause of action."  *Id.* at 555.  Likewise, legal conclusions couched as factual allegations may be disregarded.  *See id.*

### I.      False Claims Act (First and Second Claims for Relief)

Defendants argue that the complaint fails to state FCA claims on three grounds.  First, Defendants argue that the United States fails to plead an underlying violation of the AKS.  Second, Defendants argue that the United States fails to plead an FCA violation because it does not plead the existence of false claims or adequately link the alleged kickbacks with a Medicare claim.  Third, Defendants argue that the United States fails to

plead its FCA claims with particularity, as required by Federal Rule of Civil Procedure 9(b).  The Court addresses each argument in turn.

### A.     Anti-Kickback Statute Allegations

Defendants argue that the complaint fails to plausibly allege facts to support an underlying violation of the AKS.  In relevant part, the AKS states:

> **(2)** whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>
> > **(A)** to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> >
> > **(B)** to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony . . . .

42 U.S.C. § 1320a-7b(b)(2).  The AKS defines "[f]ederal health care program" to include Medicare.  *Id.* § 1320a-7b(f).  A violation of the AKS also may be a violation of the FCA if a claim submitted to the United States includes items or services resulting from a violation of the AKS.  *Shoemaker v. Cardiovascular Sys., Inc.*, 300 F. Supp. 3d 1046, 1049 (D. Minn. 2018) (citing 42 U.S.C. § 1320a-7b(g)).

Four elements comprise a violation of the AKS: (1) the defendant acted knowingly and willfully; (2) the defendant offered or paid any remuneration—including a kickback, bribe, or rebate—directly or indirectly, overtly or covertly, in cash or in kind, to any person; (3) the remuneration was offered or paid to induce such person to purchase, lease, order—

or arrange for or recommend purchasing, leasing, or ordering—any good, facility, service, or item, or to refer an individual to a person for the furnishing of any item or service; and (4) such good, facility, service, or item was one for which payment may be made in whole or in part under a federal healthcare program. *See* 42 U.S.C. § 1320a-7b(b)(2); *see also United States v. Nerey*, 877 F.3d 956, 968 (11th Cir. 2017); *United States v. Junius*, 739 F.3d 193, 210 n.18 (5th Cir. 2013). Here, Defendants do not challenge the allegations that they offered or paid remuneration. Instead, Defendants challenge the complaint for failing to plausibly allege that Defendants did so with the intent to induce Medicare purchases and that Defendants acted willfully.

### 1.     Inducement

Defendants first argue that the complaint does not plead facts showing that Defendants intended to induce physicians to purchase items that would be paid for by Medicare.

The complaint alleges that Defendants offered or paid renumerations "in order to persuade physicians to purchase [s]urgical [s]upplies and equipment distributed by [Precision Lens] in connection with eye surgeries, including surgeries paid for by Medicare." In doing so, Defendants targeted physicians who perform cataract surgeries because they are the primary decisionmakers as to what surgical supplies they will use to perform surgery or from whom those products will be purchased. And Defendants took physicians on trips "to curry favor with the physicians, inducing them to either begin purchasing IOLs and other [s]urgical [s]upplies and equipment from [Precision Lens] . . . or to continue doing so." The complaint also contains examples of Precision Lens's

internal discussions about its efforts to increase sales from physicians who were receiving these trips and other benefits.   These discussions referenced both the importance of providing these benefits to persuade physicians and the increased sales that Precision Lens realized as a result.

In addition, the complaint includes dozens of examples of Medicare-billed cataract surgeries involving IOLs provided by Precision Lens that were performed by one of the physicians who received benefits from Defendants.   The complaint also references thousands of additional Medicare-billed surgeries performed by several other physicians that might have involved IOLs or other products provided by Precision Lens.

Defendants assert that these allegations do not plausibly plead an intent to induce Medicare purchases because the allegations "do not demonstrate that Precision Lens or Ehlen intended to enter into a quid pro quo with physicians."   According to Defendants, the complaint does not include any allegations that benefits were provided to physicians "*in exchange for*" or "contingent on" their business.   But at least five federal appellate courts have held that an AKS violation exists if *one* purpose of the remuneration was to induce Medicare purchases, even if other legitimate purposes for the remuneration existed. *See, e.g.*, *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) (collecting cases from the Third, Fifth, Ninth, and Tenth Circuits).   In *Borrasi*, the Seventh Circuit rejected the defendant's argument that inducement must be "the primary motivation behind the remuneration" because nothing in the text of the AKS supports such a requirement.   *Id.* at 781-82.   The Eighth Circuit has not directly addressed this issue.   But the weight of persuasive authority is contrary to Defendants' argument.

Even if the Eighth Circuit were to adopt a "quid pro quo" requirement for AKS violations, Defendants' argument is unavailing here.  A plaintiff need not present evidence or prove its case in the complaint.[2]  *See McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015) (stating that, at the pleading stage, there "is no requirement for direct evidence").  A plaintiff may rely on a "reasonable expectation that discovery will reveal evidence" of the alleged activity.  *Twombly*, 550 U.S. at 556.  Moreover, when determining whether a complaint states a facially plausible claim, a district court draws all reasonable inferences in the plaintiff's favor.  *Blankenship*, 601 F.3d at 853.  Here, the complaint alleges, for example, that Precision Lens contemplated ending its practice of taking physicians on trips in or about 2009 "to reduce expenses and monitor to see whether the change would have an impact on sales," but "ultimately decided not to stop the trips."  And in May 2012, Precision Lens allegedly "resolved that it would monitor [frequent flyer miles] transactions closely to make sure the sale of the miles to the customers [was] generating sufficient value for the company."  These allegations, viewed in light of all the allegations in the complaint, permit a reasonable inference that Defendants provided benefits to physicians in exchange for their business and would have discontinued the benefits if they did not result in sales.

---

[2]     Notably, most of cases on which Defendants rely involve jury instructions or judgments following a trial.  *See, e.g.*, *United States v. Krikheli*, 461 F. App'x 7, 11 (2d Cir. 2012) (affirming use of jury instructions requiring prosecution to prove "that the remuneration was offered or paid as a quid pro quo in return for the referring of the patient"); *United States ex rel. Jamison v. McKesson Corp.*, 900 F. Supp. 2d 683, 699 (N.D. Miss. 2012) (concluding after a bench trial that the government failed to prove existence of a quid pro quo).  But because the standard for *proving* a claim is higher than the standard for plausibly *pleading* a claim, such cases are inapposite.

Defendants also argue that the complaint fails to plausibly plead facts demonstrating that they intended *Medicare*, as opposed to private insurers or patients, to pay for the IOLs they sold to the physicians who received trips and other benefits. The United States does not dispute that Defendants may have provided benefits to physicians with the intent to obtain *all* of those physicians' business, not solely their Medicare business. But an AKS violation exists even if a defendant's remuneration generated legitimate transactions in addition to unlawful transactions. *See, e.g.*, *Borrasi*, 639 F.3d at 782; *United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985). Here, as the complaint alleges that Defendants provided remuneration to physicians to obtain their business, a significant portion of which included Medicare-billed business, Defendants' argument lacks merit.

The complaint plausibly alleges the "inducement" element of the underlying AKS violations.

### 2.      Willfulness

Defendants also argue that the complaint does not plead facts showing that Defendants acted "knowingly and willfully."

The "knowingly and willfully" element of an AKS claim requires a defendant to know that the conduct was wrongful. *United States v. Jain*, 93 F.3d 436, 440-41 (8th Cir. 1996). In both civil and criminal cases, "circumstantial evidence can demonstrate willfulness" and is "just as probative as direct evidence." *United States v. Hirani*, 824 F.3d 741, 747 (8th Cir. 2016); *accord United States v. Starks*, 157 F.3d 833, 839 n.8 (11th Cir. 1998) (recognizing that the "furtive methods" by which remuneration had been paid was

sufficient evidence "from which the jury could reasonably have inferred" that defendants acted willfully).

The United States argues that, if proven, the facts alleged in the complaint would circumstantially demonstrate that Defendants acted willfully.  The complaint alleges that Defendants "knew that providing these items of value in order to induce the recipients to utilize [Precision Lens's] products and services and those of their corporate partner was wrongful and violated the law."  According to the complaint, Precision Lens kept an overview of the AKS in its files and Ehlen acknowledged in 2004 that the AKS prohibited Precision Lens from providing inducements to physicians.  In 2007, Precision Lens's executives discussed another company's recent settlement of a lawsuit pertaining to kickbacks that arose from the company's entertainment practices and concluded that Precision Lens "should proceed with caution in this area."  That same year, Precision Lens's executives questioned how a competitor "gets away with paying for customer trips," and Precision Lens's CFO agreed to investigate that question.  Also, in 2009, Defendants signed an agreement with one of their primary suppliers that states, "a Company should not provide or pay for any entertainment or recreational event or activity for any non-employee Health Care Professional."[3]  Meanwhile, Defendants regularly provided trips and other benefits to physicians and paid for those trips and benefits using what Defendants

---

[3]    The complaint alleges that Precision Lens knew that the supplier included this provision in the agreement in response to recent kickback cases.

referred to as a "slush fund"[4] or a "secret fund."  Drawing all reasonable inferences from these allegations, Plaintiffs plausibly allege that Defendants acted willfully.

Contrary to Defendants' arguments, the complaint plausibly alleges the underlying AKS violations.

## B.    False Claims Act Allegations

Even if the complaint plausibly alleges underlying AKS violations, Defendants argue, the complaint nonetheless fails to plausibly allege the existence of false claims and fails to plead FCA claims with sufficient particularity.

### 1.    Existence of False Claims

Relevant to the argument advanced here, the FCA imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (B).  The FCA defines "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property" from the United States.  *Id.* § 3729(b)(2).  The FCA defines "knowingly" as "actual knowledge," "reckless disregard," or "deliberate ignorance" of truth or falsity, and the FCA requires "no proof of specific intent to defraud." *Id.* § 3729(b)(1).

As to 17 of the 29 physicians identified in the complaint who allegedly received renumeration, Defendants argue, there are no allegations that these physicians submitted a

---

[4]     The term "slush fund" has multiple definitions, including "an unregulated fund often used for illicit purposes."  Merriam-Webster's Collegiate Dictionary 1176 (11th ed. 2014).

claim to Medicare.   For this reason, Defendants seek dismissal of the complaint with respect to these physicians.   But Defendants' argument conflates allegations with FCA claims.   The United States asserts two FCA claims, both arising from one alleged fraudulent scheme.   Although the factual allegations underlying those two FCA claims identify 29 physicians, the United States does not allege 29 distinct fraudulent schemes involving each physician; rather, it alleges one complex scheme that involved multiple physicians.   Defendants offer no legal authority requiring a court to dissect a claim into its component allegations and dismiss those allegations piecemeal when the claim, as a whole, is otherwise viable.   Although Defendants' arguments as to a particular physician might implicate the admissibility of evidence, the scope of recoverable damages, or the ability of the United States to satisfy its burden of proof, it is not a basis for dismissal of the FCA claims.[5]

With respect to 12 of the 29 physicians identified in the complaint, the United States alleges that Medicare paid claims for surgeries that those physicians performed.   The complaint details the Medicare-billed surgeries performed by these physicians or performed at the medical facilities where these physicians practiced.   As to each physician, the complaint alleges that hundreds or thousands of products were purchased from Precision Lens each year, and that those physicians performed hundreds or thousands of

---

[5]     Defendants similarly argue that the Court should dismiss any allegations that pertain to purported false claims that pre-date any kickbacks, as well as any allegations that pertain to conduct that occurred before the date that Defendants assert is the statute-of-limitations cutoff.   The Court need not address these arguments because, even if true, they would not warrant the dismissal of either of the United States's FCA claims in its entirety.

Medicare-billed cataract surgeries during those same years.  These allegations, Defendants argue, fail to adequately link Defendants' alleged AKS violations to any Medicare claims. Defendants assert that it is insufficient for the United States to allege that a physician, or the facility where that physician worked, purchased products from Precision Lens and performed Medicare-billed surgeries during that same time period, unless the allegations also *directly* link the purchase to the surgery.  Defendants contend, in essence, that the complaint must allege that the physician who received the remuneration also made the purchasing decision, performed a surgery using the product purchased from Precision Lens, and billed that surgery to Medicare, because reliance on any inferential link in that chain of occurrences defeats the claim.

Defendants provide no persuasive authority for requiring this degree of detail.  To the contrary, a plaintiff is not required to present evidence or prove its case in the complaint. *See McDonough*, 799 F.3d at 945.  To decide this motion, the Court draws all reasonable inferences in the plaintiffs' favor.  *Blankenship*, 601 F.3d at 853.  The complaint alleges that multiple physicians who received remuneration from Defendants also purchased from Defendants hundreds or thousands of products that typically are used to perform cataract surgery.  And during this same time period, the complaint alleges, those physicians performed hundreds or thousands of Medicare-billed cataract surgeries.  It is reasonable to infer from these facts that at least some of these Medicare-billed surgeries involved the products purchased from Defendants and that the physician who received remuneration from Defendants played a role in purchasing those products.

**2.      Particularity**

Defendants also argue that the United States fails to plead its FCA claims with sufficient particularity. Because the FCA is an anti-fraud statute, any complaints alleging violations of the FCA must comply with the particularity requirements of Federal Rule of Civil Procedure 9(b). *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). To satisfy these requirements, the complaint must plead "the who, what, where, when, and how of the alleged fraud." *Id.* (internal quotation marks omitted). This includes "the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *Id.* Although a complaint alleging an FCA violation need not include the "specific details of *every* alleged fraudulent claim," the complaint "must provide *some* representative examples of [defendants'] alleged fraudulent conduct, specifying the time, place, and content of their acts and the identity of the actors." *Id.* at 557.

Here, the complaint describes Defendants' alleged fraudulent scheme in considerable detail. The complaint includes numerous examples of remuneration that Defendants gave to physicians over the course of many years, with descriptions including the nature of the remuneration, when and where it occurred, how much it cost, how Defendants paid, and who was involved. With respect to 12 of those physicians, the complaint states, on an annual basis, the number of products purchased from Defendants by each physician or medical facility where the physician worked, including the annual amounts paid to Defendants. The complaint also alleges the approximate number of Medicare-billed cataract surgeries each of the 12 physicians performed over the course of

a particular period of time, as well as the amount of money Medicare paid with respect to these surgeries.

Even greater detail is provided with respect to the complaint's representative example, Dr. Richard D.  The complaint alleges that, beginning in 2004, Defendants took Dr. Richard D. on at least one trip each year, and the complaint describes the destination and nature of several of these trips, how they traveled, and what expenses Defendants paid. The complaint also describes with specificity other alleged remuneration Defendants provided to Dr. Richard D., including meals and frequent flyer miles.  According to the complaint, between 2006 and 2009 and again between 2011 and 2015, Dr. Richard D. purchased the majority of his IOLs from Precision Lens.  The complaint also lists the claims that Dr. Richard D. submitted to Medicare for 38 specific cataract surgeries, including the date of each surgery, the patient's initials, the procedure code used, and the amount Medicare paid for each surgery.  And the complaint alleges that IOLs supplied by Precision Lens were used in each of these surgeries.

Defendants suggest that the complaint must allege each aspect of the causal chain with respect to each physician.  But an FCA complaint that alleges a "systematic practice" of causing fraudulent claims to be submitted need only provide representative examples of the alleged fraudulent conduct.  *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009).  Even in the fraud context, the purpose of a complaint is to provide the defendants notice of the fraudulent conduct alleged.  *Spine Imaging MRI, L.L.C. v. Liberty Mut. Ins. Co.*, 818 F. Supp. 2d 1133, 1143 (D. Minn. 2011).  Rule 9(b) is applied "in harmony with the principles of notice pleading, [such that the] higher degree

14

of notice is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *Id.* (quoting *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009)) (alteration in original).  The United States has met this standard here.

In summary, because the complaint plausibly alleges FCA claims, Defendants' motion to dismiss these claims is denied.

## II.     Common-Law Claims

Defendants also move to dismiss the common-law claims for unjust enrichment and payment by mistake.  The Supreme Court of the United States has explained that "federal law governs questions involving the rights of the United States arising under nationwide federal programs." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979); *accord United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 606 (8th Cir. 1999). But "federal common law applies only when 'there is a significant conflict between some federal policy or interest and the use of state law.' " *United States v. Bame*, 721 F.3d 1025, 1030 n.4 (8th Cir. 2013) (quoting *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994)). For federal common law to apply, the United States must identify "a specific, concrete federal policy or interest that is compromised by [state] law." *Id.* (quoting *O'Melveny & Myers*, 512 U.S. at 88) (alteration in original).  Because the United States has not identified such a conflict here, federal common law does not apply.  *Id.*  Instead, the Court must apply Minnesota law.  *Id.*

## A.     Unjust Enrichment (Third Claim for Relief)

"Under Minnesota law, 'to prevail on a claim of unjust enrichment, a claimant must establish an implied-in-law or quasi-contract in which the defendant received a benefit of

value that unjustly enriched the defendant in a manner that is illegal or unlawful.' "
*Ventura v. Kyle*, 825 F.3d 876, 887 (8th Cir. 2016) (quoting *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012)).  A plaintiff cannot maintain a claim for unjust enrichment if the plaintiff had no pre-existing contractual or quasi-contractual relationship with the defendant who is alleged to have been unjustly enriched.  *Id.*

Here, the United States does not allege that a pre-existing contractual or quasi-contractual relationship existed between the United States and either Precision Lens or Ehlen.  Even if the Court were to infer that the United States had a quasi-contractual relationship with the physicians and facilities enrolled as Medicare providers, the United States has alleged no such relationship with Defendants.

Accordingly, Defendants' motion to dismiss the United States's unjust-enrichment claim is granted.  That claim is dismissed without prejudice.

## B.  Payment by Mistake (Fourth Claim for Relief)

No court, state or federal, has articulated the elements of a common-law claim for payment by mistake under Minnesota law.  Under the Restatement (Third) of Restitution and Unjust Enrichment, a "transfer induced by [an] invalidating mistake is subject to rescission and restitution," and "[t]he *transferee* is liable in restitution as necessary to avoid unjust enrichment."  *Restatement (Third) of Restitution and Unjust Enrichment* § 5(1) (2011) (emphasis added).  "Payment by mistake gives the payor a claim in restitution *against the recipient* to the extent payment was not due."  *Id.* § 6 (emphasis added).  Here, the physicians and the medical facilities that filed Medicare claims, *not* Defendants, are the transferees or recipients of any allegedly mistaken payment made by the United States.

16

Even if Minnesota were to adopt the federal common law definition of payment by mistake, the United States fares no better here.  It is true that, when money is "erroneously paid by agents of the United States, whether the error be one of fact or of law, the [United States] may always recover the money improperly paid."  *Stone v. United States*, 286 F.2d 56, 58-59 (8th Cir. 1961) (citing *United States v. Wurts*, 303 U.S. 414 (1938)).  But this doctrine applies only to "[t]he Government's right to recover funds, *from a person who received them* by mistake and without right."  *Wurts*, 303 U.S. at 416 (emphasis added). The United States does not allege that it paid Defendants.  Rather, the United States alleges that it paid the physicians who performed the cataract surgeries.[6]

For these reasons, the United States has not stated a common-law claim for payment by mistake.  Defendants' motion to dismiss the United States's payment-by-mistake claim is granted.  That claim is dismissed without prejudice.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

---

[6]     The United States contends that payment-by-mistake claims may be brought against third parties who may have indirectly received mistaken payments.  The United States relies on *LTV Education Systems, Inc. v. Bell*, 862 F.2d 1168, 1174-75 (5th Cir. 1989), which in turn relies on *United States v. Mead*, 426 F.2d 118, 124-25 (9th Cir. 1970).  But *Mead* is distinguishable from the case at issue here.  In *Mead*, the Ninth Circuit concluded that third parties could be held liable because they signed the applications seeking the federal funds, the direct recipient of the funds purported to act on the third parties' behalf, and the third parties received benefits as a result of the transaction.  426 F.2d at 124-25. The circumstances here are distinguishable.  The United States does not allege that Defendants signed or were involved in the submission of any Medicare claim, nor does the United States allege that the physicians purported to act on Defendants' behalf.

1.      Defendants' motion to dismiss Plaintiff United States of America's intervenor complaint, (Dkt. 122), is **GRANTED** with respect to the common-law claims for unjust enrichment and payment by mistake (Third and Fourth Claims for Relief), and those claims are **DISMISSED WITHOUT PREJUDICE**.

2.      Defendants' motion to dismiss Plaintiff United States of America's intervenor complaint, (Dkt. 122), is **DENIED** with respect to the False Claims Act claims (First and Second Claims for Relief).


Dated:  October 22, 2018                                      s/Wilhelmina M. Wright
                                                             Wilhelmina M. Wright
                                                             United States District Judge