UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civ. No. 13-3003 (WMW/DTS)

United States of America,
*ex rel.* Kipp Fesenmaier,

          Plaintiffs,

        v.

The Cameron-Ehlen Group, Inc.,
DBA Precision Lens, and Paul Ehlen,

          Defendants.

**PLAINTIFF
UNITED STATES OF AMERICA'S
RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS, TO DISQUALIFY, AND
TO WALL OFF TAINTED
SOURCES**

## INTRODUCTION

After failing to obtain dismissal of the United States' Complaint-in-Intervention on its merits, Defendants now ask this Court for dismissal based on lawful recordings made during the United States' parallel criminal and civil investigations. The United States is authorized by law to record investigative communications before initiating enforcement proceedings. It executed its obligations under the law, the Minnesota Rules of Professional Conduct ("MRPC"), and Department of Justice policy throughout its investigation. Every recording at issue in Defendants' motion was made before the United States commenced civil or criminal enforcement proceedings. The United States intervened in this case in August 2017—seven months after the last recording.

Even assuming otherwise, Defendants allege no harm. The civil litigation team did not even obtain the recordings until discovery in this case, and did not use them to prepare the United States' Complaint-In-Intervention.

Without factual support, Defendants suggest that the government delayed its decision to intervene in order to make recordings. Contrary to controlling authority, Defendants argue that the conduct of government counsel violated MRPC 4.2. Absent showing any prejudice resulting from the purported violation of MRPC 4.2, Defendants seek again to have the case dismissed.

The Defendants ask this Court to do something no court has ever done—dismiss a case based on lawful recordings made by a law enforcement source during a federal government investigation. Such an unprecedented outcome would not only be directly contrary to MRPC 4.2 and controlling authority, it would impede the United States' statutory duty to fully investigate before bringing enforcement proceedings. The United States respectfully requests that the Court deny Defendants' motion.

## BACKGROUND

### A. The Federal Bureau of Investigation ("FBI") Opens an Investigation into Precision Lens and Paul Ehlen.

Precision Lens distributes intraocular lenses ("IOLs") and other products related to ophthalmic surgeries, including cataract surgeries billed to Medicare. Complaint-in-Intervention ("Compl."), ECF No. 105, ¶ 11. Sightpath provides mobile surgery services for ophthalmic surgeons. *Id.* ¶ 43. Sightpath and Precision Lens were corporate partners, with Precision Lens acting as both supplier and sales representative for Sightpath. *Id.* ¶¶ 48-50. Paul Ehlen is the founder and majority owner of Precision Lens. *Id.* ¶ 12.

In 2010, Relator Kipp Fesenmaier[1] contacted the FBI, alleging that Precision Lens and Sightpath worked together to secure business from various ophthalmologists by providing kickbacks in the form of trips, meals, and other items of value. *See* Decl. of Alethea Huyser ("Huyser Decl."), Ex. 1, ECF No. 294-1. Special Agent Mary Jo Herrett ("Special Agent Herrett") became the lead FBI investigator regarding the matter in late 2011. Decl. of FBI Special Agent Herrett ("Herrett Decl.") ¶ 3.

In approximately January 2012, Fesenmaier agreed to assist the FBI as a confidential human source ("CHS") during the investigation. *Id*. ¶ 4. Fesenmaier agreed to record his conversations with individuals who may have knowledge relevant to the investigation. *Id*. The FBI is authorized by law to consensually monitor and record a CHS's

---

[1] Fesenmaier is a former Sightpath executive. Decl. of Bahram Samie ("Samie Decl."), Ex. 2, Fesenmaier Dep. at 20:24-21:17.

conversations. *See* Samie Decl., Ex. 6, The Attorney General's Guidelines for Domestic FBI Operations (2008), § (V)(A)(4).[2]

Fesenmaier made his first FBI recording on January 18, 2012. *See* Huyser Decl., Ex. 10, ECF No. 296-6, Recording Log. Over the course of the investigation, Fesenmaier recorded 44 conversations. *Id*.[3] Fesenmaier made his last recording on January 16, 2017. *Id.*

Special Agent Herrett did not script Fesenmaier's recorded conversations. Herrett Decl. ¶ 8. On May 11, 2012, and numerous times thereafter, the FBI provided Fesenmaier instructions it refers to as "admonishments." *Id*. ¶ 6. These admonishments expressly directed Fesenmaier that he must not interfere with any attorney-client relationship. *Id*.

**B. The USAO Opens Criminal File.**

In October 2010, the USAO opened a criminal file related to the investigation. Decl. of David Genrich ("Genrich Decl.") ¶ 6. AUSA David Genrich was Herrett's criminal division point of contact at the USAO regarding the investigation until spring of 2015,

---

[2] *See also* Domestic Investigations and Operations Guide § 18.6.1, available at https://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29/fbi-domestic-investigations-and-operations-guide-diog-2011-version/fbi-domestic-investigations-and-operations-guide-diog-october-15-2011/view

[3] Defendants' representation that there are 144 recordings is inaccurate. *See* Defs. Mem., ECF No. 290 at 14. First, ECF No. 296-6 contains 147 entries. Second, no conversations take place for a majority of the recordings. *See* ECF No. 296-6 (of 147 entries, 103 entries are described as: "test session," "No Convo," "no answer," "voicemail," "no msg left," "no message left," "msg left," "left msg" or "No recording with others").

when the criminal file was transferred to AUSA John Kokkinen. Herrett Decl. ¶ 10; Genrich Decl. ¶ 14; Decl. of John Kokkinen ("Kokkinen Decl.") ¶ 3.

### C. Precision Lens Retains Counsel after February 2013 Interviews.

In February 2013, the FBI interviewed various individuals, including current and former Sightpath and Precision Lens employees, as part of the investigation. *See* Huyser Decl., Ex. 2, ECF No. 296, U.S. Supp. Priv. Log dated July 3, 2019, at 6-7.

Shortly thereafter, attorney Thomas Beimers contacted Special Agent Herrett and AUSA Genrich to advise that he had been retained to represent Precision Lens. Decl. of Thomas Beimers ("Beimers Decl."), ECF No. 293, ¶¶ 5-6. Although Beimers asserted he was counsel for the company, he asked that interviews with all Precision Lens employee be coordinated through him. *Id.*; Huyser Decl., Ex. 6, ECF No. 296-4. Beimers does not aver that AUSA Genrich assented to his request. *Id.* AUSA Genrich did not so agree. Genrich Decl. ¶ 9.

By this time, Fesenmaier had already recorded 22 of the 44 conversations at issue. *See* Huyser Decl., Ex. 10, ECF No. 296-6.

### D. The USAO Opens Parallel Civil Investigation and Relator Files *Qui Tam*.

In September 2013, Fesenmaier's counsel notified the USAO of a coming *qui tam* suit. Huyser Decl., Ex. 4., ECF No. 296-2, Plaintiffs' Supp. Priv. Log, dated April 16, 2019, at 1. The USAO opened a civil file on September 26, 2013, assigned to AUSA Chad

Blumenfield. Decl. of Chad Blumenfield ("Blumenfield Decl.") ¶ 3.[4] The USAO then conducted parallel civil and criminal investigations, with AUSAs in both divisions assigned to the matter. Samie Decl., Ex. 7; Blumenfield Decl. ¶¶ 3, 8.

On November 1, 2013, Fesenmaier filed a *qui tam* Complaint under seal, alleging misconduct by Precision Lens, Paul Ehlen, Sightpath, and others.[5] ECF No. 1, Rel. Compl. By this time, Fesenmaier had already recorded 28 of the 44 conversations. *See* ECF No. Huyser Decl., Ex. 10, ECF No. 296-6.[6]

### E. Post-*Qui Tam* Recordings.

In early 2014, Peter Gosz, a Precision Lens employee and minority owner, contacted Fesenmaier regarding a job opportunity with Precision Lens. Samie Decl., Ex. 1, Gosz Dep. 104:5-15. Fesenmaier recorded a conversation with Gosz on February 3, 2014. *See* ECF No. 296-6.

On March 3, 2014, the USAO consulted with the Department of Justice's Professional Responsibility Advisory Office ("PRAO") regarding the investigation. Genrich Decl. ¶ 12.[7]

---

[4] AUSA Blumenfield attended a meeting with Special Agent Herrett and AUSA Genrich in late 2012, but a civil file was not opened, and he did not become materially involved in the investigation until later. Blumenfield Decl. ¶¶ 3-4.

[5] Under the FCA, the United States has 60 days to make an intervention decision with respect to a *qui tam* complaint, unless it obtains extensions for good cause to extend the seal. 31 U.S.C. § 3730(b)(2).

[6] At this point, Fesenmaier had not made a recording in nearly six months, nor would he for another three months. *Id.*

[7] The United States asserts that the communication is protected by the attorney client privilege and work-product doctrine.

Fesenmaier recorded seven conversations with Ehlen in 2014. Huyser Decl., Ex. 10, ECF No. 296-6. Defendants highlight a short segment of a longer conversation occurring on June 5, 2014. Defs.' Mem., ECF No. 290, at 9-10; Huyser Decl., Ex. 12, ECF No. 294-4. In the June 5, 2014 recording, after over one hour discussing Fesenmaier's potential employment with Precision Lens, Fesenmaier inquired about whether the company was still under investigation. Huyser Decl., Ex. 12, ECF No. 294-4 at 3.[8] Fesenmaier did not ask Ehlen about Precision Lens' attorney, attorney-client relationship, or anything related to legal strategy. *Id.* Instead, Ehlen volunteered information and briefly discussed Precision Lens' lawyer, noting only that Precision Lens hired a lawyer who gathered and reviewed records, conducted interviews, presented his findings to the FBI, and advised Precision Lens that it was "squeaky clean." *Id.* Defendants' memorandum of law does not discuss the substance of any other recording in 2014. *See, generally,* ECF No. 290.

Fesenmaier recorded Ehlen one time in 2015, on July 30, 2015, and never recorded him again. *See* ECF No. 296-6. By July 30, 2015, Fesenmaier had recorded 43 of the 44 conversations referenced above. *See id.* Fesenmaier recorded no conversations in 2016 and one in 2017. *Id.*

As noted above, 22 of the 44 recorded conversations occurred *before* Defendants retained counsel. Huyser Decl., Ex. 10, ECF No. 296-6. An additional six occurred *before* the *qui tam* was filed.[9] *Id.* That leaves 16 recordings that occurred after Fesenmaier filed

---

[8] The transcript of the recording shows that Fesenmaier asked to speak privately with Ehlen in the event that another present Precision Lens employee was unaware of the government's inquiry. *Id.*

[9] It is unclear whether Defendants take issue with the six recorded conversations between

his complaint, but before the United States intervened. *Id.* Of these 16 recordings, three did

not involve a Precision Lens employee, but rather an independent contractor.[10] *See, id.* As

a result, the 13 conversations set forth below are at issue in Defendants' motion:

| Date | Recorded Individuals | Duration |
|------|---------------------|----------|
| 2/3/2014 | Gosz | 45 sec |
| 2/3/2014 | Gosz | 22 min, 10 sec |
| 3/18/2014 | Ehlen | 12 min, 7 sec |
| 3/20/2014 | Ehlen & Norling | 97 min, 36 sec |
| 5/23/2014 | Ehlen | 1 min |
| 5/25/2014 | Ehlen | 16 min, 48 sec |
| 6/3/2014 | Ehlen | 11 min, 43 sec |
| 6/5/2014 | Norling | 2 min, 58 sec |
| 6/5/2014 | Ehlen | 77 min, 36 sec |
| 11/5/2014 | Ehlen | 10 min, 23 sec |
| 12/2/2014 | Ehlen | 6 min, 8 sec |
| 7/30/2015 | Ehlen | 5 min, 39 sec |
| 1/16/2017 | Gosz | 35 min, 46 sec |

**F.  Document Subpoenas and Extension Requests.**

In September 2014, AUSA Genrich served an administrative subpoena on Sightpath,

copying AUSA Blumenfield, and noting the existence of the parallel criminal and civil

investigation to Sightpath's Attorney. Samie Decl., Ex. 7. In October 2014, AUSA

Blumenfield served a subpoena on Precision Lens, copying AUSA Genrich, and noting the

existence of the parallel investigation to Beimers. Blumenfield Decl. ¶ 8.

---

the time Beimers identified himself as counsel for the company and the filing of the *qui tam*.  Defendants make a passing suggestion that such recordings "might" also violate Rule 4.2. *See* Defs.' Mem., ECF No. 290 at 26. As discussed below, any such suggestion is incorrect.

[10]  In the case of a represented organization, MRPC 4.2 applies only to contacts with certain "constituent[s]" of the organization. MRPC 4.2 cmt. [7]. Independent contractors are not listed within the definition of "constituent." MRPC 1.13 cmt. [1].

The USAO worked with attorneys for the two corporate defendants to obtain voluminous responsive documents and spent considerable time reviewing them. Blumenfield Decl. ¶ 9; Genrich Decl. ¶ 13. These documents included, but were not limited to, e-mails, financial statements, expense reports, credit card statements and invoices. Blumenfield Decl. ¶ 9. The USAO's review of these documents resulted in the identification of over three hundred separate transactions involving items of value paid to surgeons. *Id.* Between December 2014 and March 2016, Precision Lens produced over 149,000 pages of documents, and Sightpath produced over 210,000 pages. *Id.*

In April 2015, Fesenmaier amended his Complaint to add additional defendants, bringing the total number to 19. *See* ECF No. 20, Rel. Am. Compl. The Amended Complaint added physicians alleged to have received kickbacks from Sightpath and/or Precision Lens. *Id.*

The United States sought extensions of the seal over the course of the *qui tam* to discharge its statutory duty under 31 U.S.C. § 3730 to investigate and make informed intervention decisions with respect to all the defendants. Blumenfield Decl. ¶ 9. In its extension requests, the United States advised the court of the subpoenas and corresponding document productions, witness interviews, and Fesenmaier's Amended Complaint. *See,* e.g., ECF Nos. 7-8, 11-12, 15-16, 21-22, 27-28, and 32-33.

### G. Grand Jury Subpoenas and Consensual Interviews.

In the fall of 2015, AUSA Kokkinen sought a consensual interview with a senior Precision Lens official, Christopher Reichert. Kokkinen Decl. ¶ 5. Reichert's attorney declined to have Reichert sit for an interview. *Id.* In February 2016, based on the prior

unproductive effort to obtain consensual information from Reichert, multiple witnesses received grand jury subpoenas to provide testimony in furtherance of the criminal investigation. *Id.* [11] Although the USAO operated a parallel investigation, AUSA Blumenfield was not involved in the decision to issue grand jury subpoenas and was not part of the grand jury investigation. Blumenfield Decl. ¶ 12; Kokkinen Decl. ¶ 7.

Precision Lens arranged for attorney Andy Birrell to represent its subpoenaed employees. Beimers Decl., ECF No. 293, ¶ 14. Birrell and his clients agreed to participate in voluntary interviews with prosecutors, and the grand jury subpoenas were ultimately withdrawn. Kokkinen Decl. ¶ 6. In light of the parallel civil investigation, AUSA Blumenfield participated in four voluntary witness interviews, including three interviews of Precision Lens employees, in April 2016. Kokkinen Decl. ¶ 6; Blumenfield Decl. ¶ 11. Neither Defendants nor any of the separately represented employees ever objected to AUSA Blumenfield's participation in the April 2016 interviews. Kokkinen Decl. ¶ 6; Blumenfield Decl. ¶ 11.

**H. 2016-2017 Settlement Negotiations.**

By September 2016, the United States had largely completed its investigation of Relator's Amended Complaint. Blumenfield Decl. ¶ 14. It advised the Court in a September 27, 2016 filing:

---

[11] Defendants' assertion that the government served Precision Lens grand jury subpoenas is incorrect. The subpoenas were issued to individuals, and served at their homes. Kokkinen Decl. ¶ 5.

> The United States has nearly finalized its intervention decision.   In the prior extension period, the United States made significant progress towards settlement with some of the potential defendants.   Those defendants advised the United States that a public notification of intervention would jeopardize the ongoing settlement discussions.   The United States believes that a short additional extension of the seal period will be sufficient to evaluate those settlement prospects and finalize its intervention decision with respect to all potential defendants.   The United States is also planning at least one additional witness interview, along with the receipt and review of additional documents, during the next extension period.

ECF No. 38 at 3.

The United States similarly notified the Court in its next four extension requests. *See* ECF Nos. 42, 46, 51, & 59. The United States also advised Defendants' counsel of the same, even explaining that it was taking a long time to resolve the other allegations and initiate its case against Defendants. Blumenfield Decl. ¶ 15.

Ultimately, in August 2017, Sightpath and its CEO agreed to resolve the allegations of False Claims Act ("FCA") violations for approximately $12 million.[12] Blumenfield Decl. ¶ 13. In February 2018, Dr. Jitendra Swarup agreed to settle for approximately $2.9 million. Blumenfield Decl. ¶ 13. The United States declined to intervene against the other named defendants, leaving Precision Lens and Ehlen *See* ECF No. 63. The extensions—and corresponding settlements—resulted in a considerably more streamlined case. *See* Compl., ECF No. 105.

---

[12] Sightpath and its CEO resolved allegations that they provided trips and entertainment to physicians to induce them to use its products and services in connection with eye surgeries paid for by Medicare. Blumenfield Decl. ¶ 13. Swarup resolved allegations that he received inducements. *Id.*

## I.   Final Recording in January 2017.

Precision Lens terminated Gosz's employment in late 2016. Samie Decl., Ex. 1, Gosz Dep. 99:13-100:1. Although Gosz continued to have a 5% ownership interest in Precision Lens, he was not able to act on behalf of Precision Lens. *Id.* at 12:10-18. He did not attend any board meetings, and did not communicate with, let alone oversee, Precision Lens' attorneys. *Id.* at 14:18-15:10. Indeed, Gosz and another former employee sued Precision Lens and Ehlen and were in active litigation against Defendants from October 5, 2016, until October 26, 2017. *See, generally, Christopher Reichert, Peter Gosz v. Paul Ehlen, The Cameron-Ehlen Group Inc., d/b/ Precision Lens, Precision Lens*, Case No. 27-CV-16-14692, Hennepin County District Court.

In January 2017, Gosz reached out to Fesenmaier through LinkedIn about a job opportunity. Samie Decl., Ex. 2, Fesenmaier Dep. at 282. Fesenmaier called Gosz and recorded a conversation on January 16, 2017. *See* Huyser Decl., Ex. 10, ECF No. 296-6. Fesenmaier did not make another recording in this matter. *Id*.

## J.   Civil Litigation Team Access to Recordings.

The USAO Civil Division did not receive the recordings from the FBI, listen to their contents, or produce them to Relator's counsel during the investigation. Blumenfield Decl. ¶ 16; Herrett Decl. ¶ 13. The USAO first received the recordings in the fall of 2018 in preparation for discovery. *See* Blumenfield Decl. ¶ 18; Herrett Decl. ¶ 13. The recordings were not used in the United States' intervention decision or the Complaint-in-Intervention. Blumenfield Decl. ¶ 20.

Defendants state without any factual basis that the USAO sought extensions from the Court in order to continue recordings. *See* ECF No. 290 at 7-8. In 2016 and 2017, the USAO sought seven extensions, and Fesenmaier recorded only one conversation. *Compare* Huyser Decl., Ex. 10, ECF 296-6 *with* ECF Nos. 27, 32, 37, 41, 45, 50, 58.[13] The extensions were not sought to make recordings. Blumenfield Decl. ¶ 13.

## K. Intervention & Disclosure of Recordings.

On August 14, 2017, seven months after the final recording, the United States notified the Court of its election to intervene in the action against Precision Lens and Ehlen. ECF No. 63. The United States filed its Complaint-in-Intervention on February 8, 2018. ECF No. 105.

While Defendants' first motion to dismiss was still pending before this Court, the United States agreed to begin discovery and the parties held their initial pretrial conference on October 10, 2018. *See* ECF No. 150. Before producing any recordings to Defendants, the United States allowed Relator's counsel to conduct a privilege review. Blumenfield Decl. ¶ 21. The United States disclosed the existence of the recordings to Defendants by cataloging them as "audio recordings of discussions with witnesses, primarily in connection with the criminal investigation" in its privilege log dated November 13, 2018. Blumenfield Decl. ¶ 22. The parties entered into a claw-back agreement on March 5, 2019,

---

[13] Defendants also inaccurately characterize Special Agent Herrett's earlier declaration to imply that AUSA Blumenfield was involved in 2014 consensual recordings. Defs.' Mem. at 10 (citing ECF No. 182). In that declaration, Herrett referred to in-person witness interviews conducted by agents and AUSAs, not audio recordings created by Fesenmaier. Herrett Decl. ¶ 14.

and the United States produced the recordings to Defendants on March 7, 2019. Blumenfield Decl. ¶ 24.[14]

After production, Relator clawed back one recording that contained material covered by the spousal privilege. *See* Huyser Decl., Ex. 10, ECF No. 296-6 at 2. The United States did not withhold or claw back any part of the recordings. Blumenfield Decl. ¶ 24. Defendants have not clawed back any material on any of the recordings, and have made no privilege assertions with respect to contents of any of the recordings. *Id.*

After production, Defendants requested an index of the recordings, and the United States advised Defendants and the Court that no such index existed. Blumenfield Decl. ¶ 25. Magistrate Judge Schultz ordered the United States to create an index and produce it to Defendants. ECF No. 239 at 2. As a result, the FBI created an index that the United States produced to Defendants. Blumenfield Decl. ¶ 25. At that time, there were still five months remaining in discovery and no depositions had occurred. Blumenfield Decl. ¶ 24.

---

[14] The United States was unable to advance any discovery, including production of the recordings, during a five-week lapse in appropriations. Blumenfield Decl. ¶ 23.

## ARGUMENT

All of the contacts Defendants challenge occurred during federal criminal and civil investigations, before an indictment, and before the United States intervened in this FCA case. The United States commenced civil enforcement proceedings when it intervened nearly seven months after the last recording, and has never commenced criminal enforcement proceedings. As a result, the challenged contacts are authorized by law under MRPC 4.2, and there is no basis to conclude that the government engaged in any professional misconduct. Even if the Court were to find a violation of MRPC 4.2, which it should not, dismissal, disqualification, suppression, or recusal are not appropriate remedies.

MRPC 4.2 expressly permits government lawyers and law enforcement agents to contact represented persons before the commencement of enforcement proceedings. Precedent from the Eighth Circuit reinforces the plain language of the Rule. *See, e.g., United States v. Fitterer*, 710 F.2d 1328, 1333 (8th Cir. 1983). Other courts have concluded that the government's contacts before intervening in an FCA action are ethically permissible under Rule 4.2. *See In re Amgen Inc.*, No. 10-MC-0249 SLT JO, 2011 WL 2442047, at *18 (E.D.N.Y. Apr. 6, 2011), *R&R adopted*, No. 10-MC-249 SLT JO, 2011 WL 2418815 (E.D.N.Y. June 14, 2011); *United States v. Joseph Binder Schweitzer Emblem Co.*, 167 F. Supp. 2d 862, 865-66 (E.D.N.C. 2001).

The government acted lawfully at all times. Defendants present no viable basis to find a 4.2 violation, let alone anything warranting the extraordinary relief they request.

**A. MRPC 4.2 Was Amended in 2005 to add Comment [5] Regarding Law Enforcement Contacts that are Authorized by Law.**

In 2005, the Minnesota Supreme Court adopted the most extensive amendments in the history of the MRPC. *See New Directions in Professional Conduct: The Devil Is In The Details*, Kenneth L. Jorgensen, & William J. Wernz, Bench & Bar of Minnesota, 62-Sep Bench & B. Minn. 14, *1 (2005). That change resulted in the current version of MRPC 4.2 governing this motion. The rule states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer *or is authorized to do so by law* or a court order.

MRPC 4.2. (2005) (emphasis added).

Importantly, the 2005 amendments added significantly more explanatory comments to Rule 4.2, including Comment [5], which describes communications authorized by law. Comment [5] states:

> Communications authorized by law may include communications by a lawyer on behalf of a client who is exercising a constitutional or other legal right to communicate with the government. ***Communications authorized by law may also include investigative activities of lawyers representing governmental entities, directly or through investigative agents, prior to the commencement of criminal or civil enforcement proceedings.*** When communicating with the accused in a criminal matter, a government lawyer must comply with this rule in addition to honoring the constitutional rights of the accused. The fact that a communication does not violate a state or federal constitutional right is insufficient to establish that the communication is permissible under this rule.

MRPC 4.2 cmt. [5] (emphasis added).[15]

---

[15] The comments to the MRPC have served as useful guidance throughout the history of the rules, and became even more important after they were expanded in 2005. *See e.g.,*

The 2005 amendments were based on the American Bar Association's Model Rules of Professional Conduct. *New Directions in Professional Conduct*, 62-Sep Bench & B. Minn. at *15. A decade earlier, in 1995, the ABA broadened Model Rule of Professional Conduct 4.2 to apply to communications with a represented "person," rather than a "party". Samie Decl., Ex. 3, *A Legislative History, The Development of the ABA Model Rules of Professional Conduct 1982-2013*, Garwin. A. ed., American Bar Association (2013), pp. 558-559. At the same time, it clarified the Rule's applicability to government investigations in an amended comment that is the genesis of current Comment [5]. *Id.* It did so "to acknowledge the case law that has limited the application of the 'anti-contact' prohibition in the context of pre-indictment, non-custodial contacts, principally by 'undercover' investigative agents…." *Id.* at 559. *See also* Samie Decl., Ex. 4, *The Law of Lawyering*, Hazard, G., Hodes. W, § 38.9, 2011 Supp., p. 38-20 ("The new [ABA] Comments [in 1995] acknowledged that much pre-indictment investigative work by government lawyers involves 'communication' with suspects, and, that, to the extent these exchanges are constitutionally permissible, they are 'authorized by law.'").

With the adoption of the 2005 amendment, Minnesota's Rule 4.2, like the ABA's Model Rules, explicitly addresses its limits with respect to government investigations, and provides temporal guidance on *when* the authorized by law exception applies to

---

*State v. Clark*, 738 N.W.2d 316, 340 (Minn. 2007) (consulting Rule 4.2 Comment [5]); Samie Decl., Ex. 5, Wernz, W., *Minnesota Legal Ethics, A Treatise,* v. II, p. 205 (2018) ("The comments to Rule 4.2 are exceptionally important. The comments became more detailed and important after amendments in 2002 (Model Rules) and 2005 (Minnesota)").

government investigative activities – "***prior to the commencement** of **criminal or civil***

***enforcement proceedings**.*" (emphasis added).   MRPC 4.2 cmt. [5] (emphasis added).

## B. The Contacts Occurred Before Commencement of Enforcement Proceedings and Were Authorized by Law.[16]

1. Circuit Precedent Authorizes Pre-Enforcement Investigative Communications.

The Eighth Circuit has long recognized that the government's pre-enforcement

investigative communications are ethically permissible. *See, e.g., United States v. Plumley*,

207 F.3d 1086, 1094-95 (8th Cir. 2000); *Fitterer*, 710 F.2d at 1333; *United States v. Dobbs*,

711 F.2d 84, 85-86 (8th Cir. 1983); *see also United States v. Voigt*, Case No. 13-CR-0035(2)

(PJS/SER), 2015 WL 9581740, at *1-2 (D. Minn. Dec. 30, 2015).[17]

---

[16] As a threshold matter, Rule 4.2 prohibits communications "about the subject of the representation." Defendants skip this element of Rule 4.2. In their facts section, Defendants discuss an excerpt of the June 5, 2014 recording that they appear to suggest (although do not argue) satisfies this element of the Rule. Even if their suggestion satisfies their burden as to that contact, Defendants have not done so for the 12 other post-*qui tam* recordings at issue, none of which they have put into the record on their motion. If the Court wishes to review the recordings as part of its consideration of Defendants' motion, the United States will file them under seal at the Court's request.

[17] Other federal and state courts have reached the same conclusion. *See, e.g., United States v. Elliott*, 684 F. App'x 685, 693-95 (10th Cir. 2017); *United States v. Binday*, 804 F.3d 558, 592-95 (2d Cir. 2015); *United States v. Carona*, 660 F.3d 360, 364-66 (9th Cir. 2011); *United States v. Mullins*, 613 F.3d 1273, 1288-90 (10th Cir. 2010); *United States v. Brown*, 595 F.3d 498, 514-16 (3d Cir. 2010); *United States v. Cope*, 312 F.3d 757, 773-74 (6th Cir. 2002); *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995); *United States v. Worthington*, No. 89-5417, 911 F.2d 726, 1990 WL 116618, at *3-4 (4th Cir. 1990) (Table); *United States v. Sutton*, 801 F.2d 1346, 1366 (D.C. Cir. 1986); *United States v. Tableman*, No. CRIM. 99-22-B, 1999 WL 1995192, at *2 (D. Me. Sept. 3, 1999); *In re Disciplinary Proceedings re Doe*, 876 F. Supp. 265, 267-69 (M.D. Fla. 1993); *United States v. Infelise*, 773 F. Supp. 93, 94-96 (N.D. Ill. 1991); *State v. Reavley*, 79 P.3d 270, 279-80 (Mont. 2003); *State v. Bisaccia*, 724 A.2d 836, 847 (N.J. Super. Ct. App. Div. 1999); *State v. Lang*, 702 A.2d 135, 137 (Vt. 1997); *State v. Smart*, 622 A.2d 1197, 1213-14 (N.H. 1993); *State v. Mosher*, 755 S.W.2d 464, 467-69 (Tenn. Crim. App. 1988); *State v. Irving*, 644 P.2d 389, 393-94 (Kan. 1982).

In *Fitterer*, the Eighth Circuit found no ethical violation on the part of prosecutors who wired an accomplice to record a conversation with a defendant after the defendant retained counsel. 710 F.2d at 1333.[18] The Court denied the defendant's motion to suppress, observing that "[a]t the time of the conversation with Sterry [the accomplice], Fitterer had not been indicted nor formally charged in any other way." *Id*. The Court noted the unintended and negative impacts of an alternative outcome:

> Under [defendant's] view, once the subject of an investigation retains counsel, investigators could no longer direct informants to gather more evidence. We do not believe that DR 7–104(A)(1) of the Code of Professional Responsibility was intended to stymie undercover investigations when the subject retains counsel. Our view is shared by all three circuits which have considered the effect of DR 7–104(A)(1) in situations like Fitterer's.

*Id.* at 1333.

Likewise, in *Plumley*, the Eighth Circuit affirmed the district court's decision to admit testimony from a cooperating witness obtained from a represented defendant before indictment. The court noted that it had previously held that Minnesota's rule "does not require government investigatory agencies to refrain from any contact with a criminal suspect because he or she previously had retained counsel." 207 F.3d at 1094-95 (citing *United States v. Dobbs*, 711 F.2d at 86. *See also United States v. Ingle*, 157 F.3d 1147, 1151 (8th Cir. 1998) (recognizing, in the context of the Sixth Amendment, that "formal

---

[18] The case analyzed Minnesota Disciplinary Rule 7-104(A)(1), a precursor to MRPC 4.2. *Fitterer*, 710 F.2d at 1333. The Rule, in pertinent part, stated a lawyer shall not "Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so." *Id*.

investigative actions [do not] preclude government investigators from thereafter using informants and undercover agents to elicit incriminating admissions from [a] suspect").

The Eighth Circuit is in accord with every other circuit that has addressed the applicability of the authorized by law exception. The Third Circuit observed that virtually every federal appellate court to address the issue had held that Rule 4.2 does not prohibit pre-enforcement investigative contacts. *United States v. Balter*, 91 F.3d 427, 436 (3d Cir. 1996) (citing, *inter alia, Dobbs*, 711 F.2d 84 (8th Cir. 1983)).[19] *Balter* noted that "pre-indictment investigation by prosecutors is precisely the type of contact exempted from [Rule 4.2] as 'authorized by law[,]'" and that a contrary approach would "significantly hamper legitimate law enforcement operations." *Id.* at 436. *See also Binday*, 804 F.3d at 592-93 (covert pre-proceeding investigative communications fall within the authorized by law exception to Rule 4.2); *United States v. Brown*, 393 F.3d 498, 514-16 (3d Cir. 2010) (same).

---

[19] *Balter* identified *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988), as an outlier. 91 F.3d at 436. In *Hammad*, the Second Circuit held that ABA DR 7-104(A)(1) applied to the government's pre-indictment conduct, and that a prosecutor's pretextual issuance of a grand jury subpoena violated the rule. *Hammad*. 858 F.2d at 839. The Second Circuit noted, however, that "a prosecutor is "authorized by law" to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." *Id.* Accordingly, *Hammad* is understood as a cautionary opinion about particular tactics, and not as a wholesale condemnation of pre-enforcement investigative contacts. *See, e.g., United States v. Devillio*, 983 F.2d 1185, 1192 (2d Cir. 1993); *United States v. Rahman*, No. S3 93 Cr. 181 (MBM), 1994 WL 388918 at *7 (S.D.N.Y. Jul. 22, 1994).

20

The Tenth Circuit recently noted that academic commentary supports the importance of the government's ability to pursue pre-enforcement investigative communications. *Elliott*, 684 F. App'x at 693–95 (citations omitted). For instance, Professor Pamela Karlan has observed:

> [r]ead literally, the no-contact rule could quite obviously impede the investigation of complex crime. A potential defendant could retain an attorney, announce to federal and state prosecutors that he was represented by counsel with regard to all matters, and thereby prevent all governmental operatives (including informants and undercover agents) from eliciting statements from him. Moreover, corporations and other formal entities would be able to use their regular counsel to monitor and thus perhaps deter subordinate employees' contacts and cooperation with investigators. Such preclusion would be rendered particularly effective by a singular aspect of the no[ ]-contact rule: the lawyer, not the client, must consent to the direct contact. Thus, control over waiver would rest, at least in the first instance, in the enterprise counsel, because investigators would often be unable to determine whether an individual whom they wished to contact was actually a client of an attorney who announced that "his client" did not wish to be contacted directly.
>
> A broad interpretation of the no-contact rule would provide a powerful incentive for criminal actors to seek relational representation because having an ongoing relationship with an attorney could insulate them from several of the most effective law enforcement techniques for investigating complex crime.

Pamela S. Karlan, *Discrete and Relational Criminal Representation: The Changing Vision of the Right to Counsel*, 105 Harv. L. Rev. 670, 701 (1992) (footnotes omitted). *See also* Geoffrey C. Hazard, Jr. & Dana Remus Irwin, *Toward a Revised 4.2 No-Contact Rule*, 60 Hastings L.J. 797, 811 (2009) ("[E]ffective law enforcement could be severely hampered by strict application of Rule 4.2."); 2 Restatement (Third) of the Law Governing Lawyers § 99 cmt. h (2000). Consistent with this commentary, the Tenth Circuit concluded that the "authorized by law" exception allowed the government to use an undercover informant

before indictment to elicit incriminating admissions from a defendant. *Elliott*, 685 Fed. App'x at 695.

2. Rule 4.2's Authorized by Law Exception Applies Equally in a Civil Investigation.

MRPC 4.2's authorized by law exception expressly permits contacts "***prior to the commencement of criminal or civil enforcement proceedings.***" *See* MRPC 4.2, cmt. [5] (emphasis added).[20]

Numerous courts have specifically held that the authorized by law exception applies to civil investigations. For example, in *United States v. Western Elec. Co., Inc.*, the court concluded that, because "[t]he Department of Justice is obligated by law to prosecute violations of various criminal and civil statutes," and because the violation of a civil consent decree in the case could give rise to sanctions for civil and criminal contempt, Department attorneys were "authorized by law" to engage in overt communications with certain former employees of a represented organization to ensure compliance with the

---

[20] In conjunction with the statutory obligation to diligently investigate fraud against the government, Department of Justice Policy has long encouraged parallel investigations and the efficient use of investigative resources to benefit both civil and criminal enforcement. Attorney General's Memorandum of July 28, 1997, available at https://www.justice.gov/archives/ag/ag-memo-coordinate-parallel-criminal-civil-administraative ("[I]t is essential that our attorneys consider whether there are investigative steps common to civil and criminal prosecutions, . . . [P]rosecutors should consult with the government attorneys on the civil side and appropriate agency officials regarding the investigative strategies to be used in their case*s*.") (emphasis added). *See also* Attorney General's Memorandum of January 30, 2012. Available at https://www.justice.gov/jm/organization-and-functions-manual-27-parallel-proceedings (instructing DOJ attorneys to consider using "investigative strategies that maximize the government's ability to share information among criminal, civil, and agency administrative teams to the fullest extent appropriate to the case and permissible by law").

decree. CIV. A. No. 82-0192, 1990 WL 39129, at *1 (D.D.C. Feb. 28, 1990) ("[A]bsent egregious misconduct, law enforcement authorities may engage in pre-indictment, pre-arrest, or investigative contacts with suspects known to be represented by counsel.").

Similarly, in *United States v. Teeven*, a case involving a joint civil and criminal investigation, the court relied on criminal cases to support its conclusion that the proposed overt, pre-proceeding, *ex parte* investigative communications by Department attorneys in their civil investigation fell within the "authorized by law" exception to Rule 4.2. Civ. A. No. 90-503 LON, 1990 WL 599373, at *2-4 (D. Del. Sept. 28, 1990).[21]

More recently, in *S.E.C. v. Lines*, the court applied the "authorized by law" exception to a civil enforcement investigation by the Securities and Exchange Commission. *See* 669 F. Supp. 2d 460, 464-65 (S.D.N.Y. 2009) ("Comment 5 to Rule 4.2 acknowledges that 'investigative activities of lawyers representing governmental entities . . . prior to the commencement of . . . civil enforcement proceedings' may, in some instances, constitute

---

[21] Although these cases analyzed earlier versions of Rule 4.2 and DR 7-104(A)(1) that prohibited communication with a represented "party," the courts' decisions largely were policy driven and continue to apply here. Specifically, the courts weighed the interest of a represented person or organization in avoiding uncounseled communications with other lawyers against the government's interest in investigating alleged violations of federal law. In doing so, they concluded that the government's interest outweighed the interest of the represented person or organization. *See Western Elec.*, 1990 WL 39129, at *1 ("Acceptance by the Court of the US West position that its present or former employees who might be witnesses to the company's criminal or civil violations must been deprived of counsel of their own choice and be required to rely instead or in addition on the company's counsel would be an obvious prescription for frustrating investigations into wrongdoing."); *Teeven*, 1990 WL 599373, at *4 ("At a time when so much has been mentioned with respect to the Government's obligation to regulate and control the expenditure of its revenue, the Government's interest in determining whether money is being misappropriated in this case tips the balance in favor of allowing them to conduct their ex parte interviews.").

communications that are authorized by law; communications authorized by law are exempted from Rule 4.2."). *See also, E.E.O.C. v. Autozone, Inc*., CV-06-1767-PCT-PGR, 2008 WL 5245579, at *2 (D. Ariz. Dec. 17, 2008) (Rule 4.2's authorized by law exception exempted from Rule contacts by an EEOC investigator in a civil matter).

Indeed, as the U.S. District Court for the District of Massachusetts observed in *In re Criminal Investigation of Doe*, "[i]t would be something of an anomaly to provide greater protection to persons who are represented in civil cases than those afforded to criminal defendants." Crim. No. 08-10215-RGS, 2008 WL 3274429, at *1 (D. Mass. Aug. 7, 2008).

3. The Authorized by Law Exception Applies in an FCA *Qui Tam* Investigation Because Civil Enforcement Proceedings do not Commence until Intervention.

The authorized by law exception from Rule 4.2 applies before the government's intervention in a *qui tam* case. *See In re Amgen Inc.*, 2011 WL 2442047, at *4; *Binder*, 167 F. Supp. 2d at 865-66. The rationale allowing contacts prior to the initiation of criminal or civil enforcement proceedings applies equally during the government's investigation of a *qui tam* complaint. The United States should not be prohibited from using otherwise permissible investigative techniques to enforce federal law merely because an independent private party has filed a *qui tam* complaint.

After the relator files a complaint under seal, the FCA gives the United States time to investigate the allegations and decide whether to intervene in the case. 31 U.S.C. § 3730(a), (b) ("The Attorney General diligently shall investigate a violation under section 3729."). The filing of a *qui tam* does not initiate the government's enforcement proceedings. Rather, the filing of the *qui tam* complaint initiates the government's

24

investigation. *See* 31 U.S.C. § 3730(a), (b)(2). Upon completion of its investigation, the Department of Justice elects either to intervene in the relator's case, in which event the action is "conducted by the Government," or to decline to intervene, in which event the relator has "the right to conduct the action." *Id.* § 3730(b)(4). As a result, the government's enforcement proceedings do not commence unless and until the government intervenes. *See* 31 U.S.C. § 3730(b)(4) (upon intervention, the government will "proceed with the action, in which case the action shall be conducted by the Government."). Indeed, the government might not intervene and initiate any enforcement proceedings.

This application of the authorized by law exception is consistent with the government's statutory duty to investigate an FCA complaint. 31 U.S.C. § 3730(a) (requiring the United States to "diligently" investigate a relator's claims).   "The government has a statutory right, and indeed an obligation, that exists regardless of the pendency of a sealed complaint, to conduct its own investigation." *In re Amgen Inc.*, 2011 WL 2442047, at *4. "The [FCA's] sealing provision [] does no more than stay the relator's litigation while the government discharges its independent investigative duty, and provides a mechanism for the government to extend the presumptive duration of that stay by informing the court of the need to do so." *Id.*

As a result, a *qui tam* relator's suit is not one "commenced by the United States." *Fluor Hanford, Inc. v. United States*, 66 Fed. Cl. 230, 233-34 (2005) (Major Fraud Act, which applies to suits "commenced by the United States" does not apply to a *qui tam* action where the government has not intervened because relator's filing of a complaint does not constitute filing of a complaint by the United States). *See also United States ex rel. Williams*

*v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 454-56 (5th Cir. 2005) (district court abused its discretion in dismissing *qui tam* complaint under Rule 9(b) with prejudice not only to relator but also to the United States). Even though the relator files a *qui tam* suit on behalf of the United States, the relator does not act for, and is not, the United States. *See, e.g., Vt. Agency of Nat. Resources v. United States ex rel. Stevens,* 529 U.S. 765 (2000); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 755-756 (5th Cir. 2001) (the *qui tam* portions of the FCA do not usurp Executive Branch power because the relator does not act as a government employee; rather, the relator is simply a civil litigant).

The interplay between the authorized by law exception and the government's statutory duty to investigate is highlighted in *In re Amgen*. 2011 WL 2442047. That case involved a represented corporate defendant, Amgen, which was a named defendant in multiple *qui tam* actions. *Id.* at *1-2. The government declined to intervene in one unsealed case, but had not decided whether it would intervene in other sealed cases in which Amgen was a defendant. *Id*. Amgen sought a protective order to preclude law enforcement agents from contacting current Amgen employees without its corporate counsel's consent, arguing that the contacts violated New York's Rule 4.2. *Id.* at *2.

The court rejected Amgen's motion, citing the United States Supreme Court's decision in *United States ex rel. Eisenstein v. City of New York*. 2011 WL 2442047 at *10 (citing, 556 U.S. 928, 933 (2009)). In *Eisenstein,* the Supreme Court unanimously held that the United States does not become a party to a FCA suit until it intervenes. 556 U.S. at 933. ("To hold otherwise would render the intervention provisions of the FCA superfluous, as there would be no reason for the United States to intervene in an action in which it is already

26

a party.").

The *Amgen* court reasoned: "Notwithstanding the fact that in such cases the United States is the real party in interest as a result of the private relator's unilateral decision to file a complaint, the Supreme Court has explicitly held that the United States is not a "party" to a private relator's *qui tam* action unless and until it decides to intervene."[22] *Amgen*, 2011 WL 2442047 at *10 (citations omitted). It went on to conclude that the challenged contacts are "authorized by law." *Id.* at *14-18. In doing so, the court discussed the authorized by law exception at length, relying on the ABA's decision to amend the ethical rule in 2002 to include the same temporal investigative language found in MRPC 4.2 comment [5]. *Id.*[23]

In *Binder*, another FCA *qui tam* case, agents interviewed a current employee (the customer service manager) when executing a search warrant. 167 F. Supp. 2d at 865-66. At the time a *qui tam* had been filed, but the government had not intervened and no indictment had been returned. *Id.* After the criminal case was filed, the company and its president filed motions to suppress the employee's statement and dismiss the indictment for violations of Rule 4.2. *Id.* The Court denied the motion, holding that: "no rule of professional conduct precludes pre-indictment contacts between the government and a represented party in a non-custodial setting especially in a case such as the one before the court in which the party

---

[22] The court's threshold conclusion that New York's Rule 4.2 did not apply in the first instance was based on that rule's use of "party" rather than "person." *Amgen*, 2011 WL 2442047 at *10-13. Nevertheless, the court's additional discussion of when the United States becomes a party in a *qui tam* is instructive. *See id.* at *10-13.

[23] The court noted that New York had not adopted the model rule, but it nonetheless found this commentary persuasive in determining the meaning of "authorized by law." *Id.* at *17.

connoted to the government that she was not represented by counsel." *Id*. at 866. Significantly, although the court noted that the contacted party told the government that she was not represented, which could have ended the court's analysis, the court further discussed the application of the Rule in the context of pre-intervention contacts and concluded they were permissible. *Id.* at 865. In finding no ethical violation, the court found significant that, although the *qui tam* had been filed at the time of the interview, the case remained under seal and the government had not yet intervened.[24]

4.   Defendants' Authorities are Inapposite.

Defendants' heavy reliance on *State v. Miller* is misplaced. 600 N.W.2d 457 (Minn. 1999). Importantly, *Miller*, issued in 1999, relied on a version of Rule 4.2 that lacked Comment [5]. *See also* Samie Decl., Ex. 5, *Minnesota Legal Ethics,* Wernz, W. (8th ed. 2019), p. 983 ("Because so many of the rule 4.2 issues that were once hotly contested have been resolved, by amendment or case law, lawyers should not cite older authorities, especially those before 2005, except with great caution.") (emphasis in original). An analysis of *Miller* today should begin with the updated comment.[25]

---

[24] Although *United States v. Talao*, a case cited by Defendants, involved prosecutor's pre-intervention, pre-indictment communication with an employee of a represented organization, the case is not relevant here because the Ninth Circuit did not address the authorized by law exception. 222 F.3d 1133, 1139 (9th Cir. 2000). Defendants cite the case for the proposition that Rule 4.2 applies after a *qui tam* complaint is filed, which is not the ultimate question here. Rather, the issue remains whether the communications were authorized by law. Ultimately, the *Talao* court found that an AUSA did not violate California's version of the no-contact rule in talking with an employee of a represented organization because the employee represented that the defendant sought to suborn perjury or obstruct justice. *Id.*

[25] The Court should disregard the Charles Lundberg opinion Defendants offer on the ultimate question before the Court. Legal conclusions are for the court to make and not a

Magistrate Judge Katherine M. Menendez recently discussed *Miller's* questionable applicability to cases in federal court. *United States v. Flynn*, Case No. 0:16-cr-00347-ADM-KMM, ECF No. 62 at 20 (August 11, 2017), *R&R adopted*, 2017 WL 5462184 (D. Minn. Nov. 14, 2017). In *Flynn*, the defendant relied on *Miller* and MRPC 4.2 when moving to suppress statements that he made to a federal agent during a lawful search of his residence because the agent "was unfamiliar with Minnesota's Rule of Professional Conduct 4.2." Judge Menendez concluded that "*Miller* does not represent the controlling law in this Court." *Id.* Citing *Dobbs* and *Fitterer*, Judge Menendez held that both federal precedents make clear that "the no-contact rule does not require suppression in federal proceedings whenever a government investigator communicates with a suspect who has previously retained counsel." *Id.* "The Eighth Circuit has reiterated this conclusion in the years after deciding *Fitterer* and *Dobbs*." *Id.* (citing *Plumley*, 207 F.3d at 1095).[26]

Magistrate Judge Steven Rau has similarly noted that "the interpretation of state

---

proper basis of expert opinion. *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995). "Each courtroom comes equipped with a 'legal expert,' called a judge." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997). Moreover, the opinion is faulty in several respects. First, it ignores MRPC Rule 4.2 Comment [5] entirely. Second, it presumes that civil enforcement proceedings commence when a relator files a sealed *qui tam*, without analyzing the FCA, which imposes on the United States a statutory duty to investigate allegations of government fraud while the case is under seal. Third, it relies heavily on *State v. Miller*, which is not controlling authority.

[26] Although this Court has adopted the MRPC, the Minnesota Supreme Court's interpretation and application is not binding or authoritative. *See* L.R. 83.6, 1991 Advisory Committee Note ("While discipline imposed by a state 'brings title deeds of high respect,' it is not conclusively binding on federal courts, which in substance, must satisfy themselves that the attorney's underlying conduct warranted the discipline imposed.") (quoting *Theard v. United States*, 354 U.S. 278, 282 (1957)). Contrary to Defendants' representation, enforcement is a matter for this Court alone to decide under federal law, within the unique context of parallel civil and criminal investigations.

disciplinary rules as they apply to federal criminal law practice is a matter of federal law." *United States v. Voigt*, No. 13-CR-35 (PJS/SER), 2015 WL 13731338, at *4 (D. Minn. Nov. 24, 2015), *R&R adopted*, 2015 WL 9581740 (D. Minn. Dec. 30, 2015) (internal quotations omitted).

Even so, *Miller* ultimately supports the government's position that investigative contacts with represented persons are authorized by law. *Miller*, 600 N.W.2d at 467. As the court in *Miller* recognized, "[L]egitimate investigative processes may go forward without violating MRPC 4.2 even when the target of the investigation is represented by counsel." *Miller* carved out a situation where conduct was so egregious that it "impair[ed] the fair administration of justice." *Id*. There, law enforcement questioned a defendant while blocking his attorney from accessing his client. *Id*. The court found this to be a serious ethical violation, and it suppressed the portion of the statement taken by law enforcement agents after the attorney asked that it be terminated. *Id.*

Here, Defendants cannot establish any wrongful conduct, let alone egregious behavior. Defendants challenge a confidential informant's pre-enforcement covert consensual recordings, a commonly used investigative technique approved by the Eighth Circuit. The questioning did not seek to obtain privileged information. In fact, the FBI agent carefully admonished the informant to avoid eliciting such information.

Contrary to Defendants' suggestion, the Government was not required to seek permission from the Court to conduct covert operations. The Government's independent obligation to investigate comes directly from the FCA, 31 U.S.C. § 3730(a), and is distinct from this Court's oversight of the sealed *qui tam*. "The statute does not in any way create

a judicially-supervised discovery process that begins prior to the government's decision about whether to join the case as a party plaintiff. Thus, to the extent that the court does anything at all while a relator's complaint remains under seal, one thing it assuredly does not do is supervise the government's investigation" *In re Amgen Inc.*, 2011 WL 2442047, at *4.

No attorney-client privileged material was disclosed. The AUSAs handling the civil case did not even possess, let alone listen to the recordings, in making the government's intervention decision or in drafting the Complaint. In short, Defendants cannot meet the high standard in *Miller*.

Defendants' other authorities are also inapposite. In *United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, the Eighth Circuit struck, as *ultra vires*, a now-abrogated Department of Justice regulation addressing governmental contacts with represented persons. 132 F.3d 1252, 1257-1258 (8th Cir. 1998). The contacts challenged in *O'Keefe* occurred post-intervention and were ongoing when Defendant filed a motion for a protective order. *Id.* at 1253. The government's arguments centered on the validity of the DOJ regulation. *Id*. at 1254. The Eighth Circuit's holding that the Attorney General lacked authority to promulgate the regulation negated the government's arguments. As such, contrary to Defendants' representation, *O'Keefe* did not broadly address whether pre-intervention contacts are authorized by law within the meaning of Missouri's no contact rule. *Id*. Defendants' interpretation of this case as a categorical preclusion of investigative contact after filing of a *qui tam* complaint is inaccurate.

31

*Midwest Motor Sports v. Arctic Cat Sales, Inc.* is also inapposite, because it involved private parties, not the government's authorized investigative activities. 347 F.3d 693 (8th Cir. 2003). It does not discuss the authorized by law exception or MRPC 4.2 Comment [5], which governs government investigations before the commencement of law enforcement proceedings, or cases arising under the FCA. *Id.*

In sum, the authority above makes clear that pre-intervention contacts in an FCA case are investigative activity authorized by law under MRPC 4.2. All but one of the recordings in this case occurred over two years before the government intervened, and the final recording within seven months before intervention. As a result, this Court should conclude that the United States' pre-intervention investigative contacts were authorized by law and permissible under MRPC 4.2.

## C.     The Remedies Defendants Seek Are Unwarranted.

The United States was authorized by law to make the contacts at issue here. They did so consistent with the ethical rule, with care to avoid seeking any privileged information, and in good faith. The record does support any sanction, and the motion should be denied.

Defendants seek extraordinary remedies by generally invoking this Court's inherent authority to supervise and regulate attorney conduct in its own cases. *E.g.*, *In re Snyder,* 472 U.S. 634 (1985). The Court's role in the remedies context, is not wooden, as Defendants argue. Defs.' Mem. at 28, ECF No. 290 (citing *Central Milk Producers Coop. v. Sentry Food Stores, Inc.*, 573 F.2d 988, 992-93 (8th Cir. 1978)). Rather, the weight of authority calls for the careful evaluation and balancing of factors such as (1) whether Defendants

have shown that the alleged violations of the Rules of Professional Conduct occurred (as discussed above, they have not) (2) whether there was any prejudice in the litigation, and (3) whether the remedies they seek are warranted in light of the severity of the proven violation. *See Central Milk*, 573 F.2d at 992 (denying disqualification). The application of these factors does not support Defendants' requested relief.

### 1. Defendants Have not Suffered any Harm.

Aside from describing one segment of one recording, Defendants create no record for the Court to assess harm. Rather, Defendants' request to actually use the very recordings they challenge here turns their motion on its head and suggests their assessment that they may benefit from the recordings. Defendants acknowledge, of course, that prejudice or taint must be shown before any remedy is appropriate. *E.g.*, Defs.' Mem., ECF No. 290 at 29 ("Dismissal of a case is warranted where abuses of known rules are so pervasive that it infects the fairness of the proceedings."); *see also*, *id.* at 30, 31, 32.   They do not follow through, however, to show the Court what prejudice resulted, how it taints the proceedings, and what exactly are the "fruits" of the alleged violations.

The United States does not agree with Defendants' description of the June 5, 2014 recording; the transcript speaks for itself. *See* Huyser Decl., Ex. 12, ECF No. 294-4. As noted by Special Agent Herrett, the FBI did not script the recorded conversations. Herrett Decl. ¶ 8. The FBI expressly admonished Fesenmaier not to interfere with any attorney-client relationship. *Id.* ¶ 6. The conversation, which appears to be aimed at the status of the FBI's investigation and SightPath's alleged wrongdoing, does not disclose any attorney-client communication or even any factual information about Precision Lens' involvement

in the kickback scheme. In fact, during the conversation Ehlen expressly denies any involvement. Fesenmaier's own in-the-moment conclusion that he received "interesting tidbits" does not establish that there was any confidential information sought or disclosed, or that information conveyed in this conversation has been used by the United States to the detriment of Precision Lens.

The United States conducted a broad-ranging investigation of which these recordings were a miniscule part.   The civil AUSA did not obtain the recordings until after it intervened in the case, and he collected them to evaluate them for responsiveness to Defendants' discovery requests. Blumenfield Decl. ¶ 18. Nor did he provide them to relator's counsel until discovery in this case. *Id.* ¶¶ 19, 21. The United States did not use the recordings in its decision to intervene or its Complaint filed in this matter.   *Id.* ¶ 20.

   2. Dismissal is Unwarranted.

Dismissal is an inappropriate sanction disproportionate even to the alleged ethical violations presented in Defendants' motion, let alone to the reality that the communications were authorized by law. The incompatibility of this remedy is evident on a reading of the two authorities from this district to consider attorney disqualification, both of which Defendants cite at the outset of their remedy argument. *See Gifford v. Target Corp.*, 723 F. Supp. 2d 1110, 1122-23 (D. Minn. 2010) (declining to dismiss case based on solicitation and receipt of attorney-client privileged information by plaintiff's counsel where defendant could not identify any portion of the operative complaint tainted with privileged information); *see also Arnold v. Cargill, Inc.*, No. 01-2086 (DWF/AJB), 2004 WL 2203410, at *13-14 (D. Minn. Sept. 24, 2004) (denying motion to dismiss based on receipt

of privileged material by plaintiff's counsel).

Defendants' other cases, likewise, do not support dismissal. In *United States ex rel. Bibby v. Wells Fargo Home Mortg., Inc.*, the court found that a relator's disclosure of the case to the news media in violation of the seal did not warrant dismissal. 76 F. Supp. 3d 1399, 1411 (N.D. Ga. 2015). In discussing the seal violation, the *Bibby* court begins by collecting five other district court decisions rejecting dismissal as a remedy. *See id.* at 1407. The court then rejected the defendants' argument for a *per se* rule that a seal violation mandates dismissal—adopted by only one circuit court of appeals—and instead held that facts and context should be considered and rejected defendants' motion to dismiss.   *Id.* at 1407-14. "Dismissal of a case with prejudice is considered a sanction of last resort, applicable only in extreme circumstances." *Id.* (quoting *Zocaras v. Castro*, 465 F.3d 479, 483 (11th Cir. 2006)).

*United States ex rel. Berglund v. Boeing Co.* is the only civil case Defendants cite where the court dismissed the complaint due to a party's misconduct. 835 F. Supp. 2d 1020 (D. Or. 2011). There, in a spoliation case involving truly extraordinary facts, the relator "destroyed, altered, and lied about evidence," defied a court order that he produce a hard drive for inspection, and had knowledge the evidence was relevant to the case. *Id*. at 1053. The court found Boeing was prejudiced by this intentional and deliberate misconduct. *Id.*[27]

---

[27] Defendants cite several criminal cases, some of which implicate the Sixth Amendment, and involve egregious facts. *United States v. Stein,* 541 F.3d 130, 157 (2d Cir. 2008) (affirming dismissal of criminal indictment because the government actively interfered with advancement of legal fees by defendants' former employer); *United States v. Twigg*, 588 F.2d 373, 381 (3d Cir. 1978) (reversing a conviction where government "implanted the criminal design" in his mind, "set him up, encouraged him, [and] provided the essential

Even if Defendants' arguments about misconduct in this case had a sound factual basis, which they do not, the conduct would not rise to the level of willfulness and bad faith that the district court found in *Berglund*. As discussed in detail above, Defendants' motion is limited to 13 recordings after the *qui tam's* filing, only one of which Defendants highlight. Defendants' argument that "the government maintained a sealed investigation for years so that it could repeatedly employ Relator in the filed *qui tam* action to secretly obtain and record statements" is without any factual support. Defs.' Mem., ECF No. 290 at 29. In the two years immediately preceding intervention, Fesenmaier made only one recording. Defendants present none of the prejudice found in *Berglund*. *See id.* at 1054. The notion that the case should be dismissed because of a single recording that was not intended to, and did not, seek any protected information is without basis in law.

    3.  <u>Defendants' Motion Falls Well Short of the Line for Disqualification.</u>

Motions to disqualify counsel should be subjected to "strict scrutiny" because of the potential for the opposing party to abuse them. *Macheca Transp. Co. v. Phil. Indem. Co.*, 463 F.3d 827, 833 (8th Cir. 2006) (district court abused its discretion in granting a motion to disqualify). These motions are viewed with skepticism because of their potential to be used to gain a strategic advantage rather than purely to protect the integrity of the adversary process. *Olson v. Snap Prods., Inc.*, 183 F.R.D. 539, 542 (D. Minn. 1998); *In re Corp. Res.*

---

supplies and technical expertise . . . ."); *United States v. Orozco*, 291 F. Supp. 3d 1267 (D. Kan. 2017), *rev'd by* 916 F.3d 919, 925 (10th Cir. 2019) ("[T]he district court could have pursued a more tailored and less drastic remedy [than dismissing the indictment]" that "would not have infringed unnecessarily on the government's interest in prosecuting criminal behavior.").

*Servs., Inc.*, 595 B.R. 434, 441 (S.D.N.Y. 2019); *Ambush v. Engelberg*, 282 F. Supp. 3d 58, 61-62 (D.D.C. 2017); *E.E.O.C. v. Hora, Inc.*, 239 F. App'x 728, 731 (3d Cir. 2007). Defendants bear the high burden of proving that disqualification is warranted, and only "legitimate" doubts should be resolved in favor of disqualification. *Olson*, 183 F.R.D. at 542 (denying motion to disqualify).

Because Defendants do not show that the United States violated Rule 4.2,[28] or that any privileged material was sought or disclosed, the cases they cite for disqualification are inapposite. For example, in *Gifford*, 723 F. Supp. 2d at 1122–23, (Defs.' Mem., ECF No. 290 at 29), the Court reviewed a motion for disqualification and granted it only upon a showing that the alleged contact elicited privileged material, that such material was not immediately segregated, and that access to that material tainted the proceedings. Likewise, in *Arnold*, 2004 WL 2203410, Judge Frank found the litigation was tainted when a firm retained hundreds of documents marked privileged and confidential, a witness threw out those documents in advance of a subpoena, possibly at the attorney's instruction, and where the attorney made no apparent effort to advise a former employee not to disclose privileged material.

Here, the United States admonished Fesenmaier to avoid eliciting attorney-client privilege. Defendants have not clawed back any attorney-client privileged material that they believe was disclosed during any of the recordings. Blumenfield Decl. ¶ 24. And the

---

[28] Defendants cite *United States v. Agosto,* 675 F.2d 965, 969 (8th Cir.1982), which affirmed disqualification of criminal counsel to avoid conflicts of interest that could later result in Sixth Amendment claims for ineffective assistance of counsel. This civil litigation raises no similar constitutional concerns.

attorneys representing the United States did not even obtain the recordings until discovery, and did not use them in their intervention decision or the Complaint. *Id.* ¶ 20. *Cf. In re Potash Antitrust Litig.,* Civ. No. 3–93–197, 1993 WL 543013, at *16 (D. Minn. Dec. 8, 1993), *amended* 1994 WL 2255 (D. Minn. Jan. 4, 1994) (disqualifying attorneys and dismissing complaint where there was undisputed evidence that complaint contained certain factual allegations that could not have made been absent improper disclosure of confidential information to attorneys); *see also CarboMedics, Inc. v. ATS Med., Inc.*, No. 06-CV-4601 PJS/JJG, 2008 WL 5500760, at *5-7 (D. Minn. Apr. 16, 2008) ("Given that no prohibited information was disclosed, the Court finds that, on balance, the extreme remedy of attorney disqualification is unwarranted."); *In re Wirebound Boxes Antitrust Litigation*, 724 F. Supp. 648 (D. Minn. 1989) (balancing public interest against alleged violations of professional conduct and denying motion to disqualify).

    4.  <u>The Court Should Reject Defendants' Request for Suppression and Walling Off Sources.</u>

Defendants' arguments regarding suppression are circular, confusing, and only serve to highlight that the remedies they seek do not fit the facts of this case. Their argument for quasi-suppression is, perhaps, the best example.  Defendants do not actually want to suppress the recordings, hoping instead to use helpful information in their case. Defs.' Mem., ECF No. 290 at 32. On the other hand, the AUSAs on the case did not use the recordings and did not obtain them until discovery in the civil case. The United States' complaint was based on voluminous evidence it gathered during its multi-year investigation, and not from the content of the recorded conversations. Defendants cannot

satisfy their considerable burden to justify suppressing the recordings on this record, and do not reckon with the application of the cases under these facts where the recordings were generated during a pre-enforcement government investigation and authorized by law.

Suppression was requested, and rejected, in many of the same cases discussing Rule 4.2 as applied in government investigations. In *Fitterer*, the Eighth Circuit rejected suppression, reasoning that "the investigators' conduct was 'authorized . . . by law' within the meaning of Rule 4.2, and, even if it was not, the investigators' conduct was not sufficiently egregious to warrant suppression." 710 F.2d at 1333 (internal citations omitted). The *Binder* court observed, "Research shows that no court has ever suppressed evidence in a criminal case because a prosecutor violated Rule 4.2 in the course of an investigation before the grand jury indicted the defendant." 167 F. Supp. 2d at 866. *See also Hammad*, 858 F.2d at 842 (denying request to suppress because "the government should not have its case prejudiced by suppression of its evidence when the law was previously unsettled in this area").

Even in *State v. Miller*, on which the Defendants rely so heavily, the court only suppressed only the portion of the recording that was conducted after the investigators continued their interview over the company counsel's objection. 600 N.W.2d at 468. The Minnesota Supreme Court fashioned this targeted remedy in the face of conduct it characterized as "sufficiently egregious to implicate concerns relating to the fair administration of justice." *Id. See also Midwest Motor Sports*, 374 F.3d at 698 (suppressing evidence derived from attorneys' willful collection of evidence using methods the court found contrary to the rules of professional conduct).

Defendants' attempt to stretch these holdings by calling to "wall off" the United States' access to lawfully obtained recordings and to then wall off witnesses involved in these recordings. Defendants cite no authority that would prevent government lawyers from relying on important witnesses based on recordings they had prepared in the course of a lawful government investigation. Although the Eighth Circuit in *EZ Paintr Corp. v. Padco, Inc.,* limited passing work product onto a new firm after disqualification, the court did not go so far as to restrict access to the witnesses who held the information. 746 F.2d 1459, 1463 (Fed. Cir. 1984). The United States' substantial interest in the enforcement of criminal and civil laws must outweigh Defendants' requests for sanctions.  *Lowery*, 166 F.3d 1119, 1124–25 (denying suppression). *See also Hammad*, 858 F.2d at 842.

The record reflects that the United States' actions did not violate Rule 4.2, and no sanction is warranted.

## CONCLUSION

The United States acted in good faith. Its pre-enforcement investigative contacts were authorized by law under MRPC 4.2. The USAO consulted with its ethics officials. Special Agent Herrett instructed Fesenmaier not to elicit privileged communications. Neither Relator's counsel nor United States' counsel obtained the recordings during the investigation, and only obtained them in discovery. Nothing in the record before the Court supports wrongdoing by the United States. The United States respectfully requests that Defendants' motion be denied.


Dated: September 30, 2019        ERICA H. MacDONALD
United States Attorney

s/ *Bahram Samie*

CHAD A. BLUMENFIELD
Assistant United States Attorney
Attorney ID Number 387296
BAHRAM SAMIE
Assistant United States Attorney
Attorney ID Number 392645
ANDREW TWEETEN
Assistant United States Attorney
Attorney ID Number 395190
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN   55415
(612) 664-5600

Attorneys for Plaintiff United States of America