UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civ. No. 13-3003 (WMW/DTS)

United States of America,
*ex rel.* Kipp Fesenmaier,

        Plaintiffs,

    v.

The Cameron-Ehlen Group, Inc.,
DBA Precision Lens, and Paul Ehlen,

        Defendants.

**DECLARATION OF
CHAD BLUMENFIELD**

CHAD BLUMENFIELD, for his declaration pursuant to 28 U.S.C. § 1746, states as follows:

1. I am an adult, competent, and have personal knowledge of the facts herein.

2. I am an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the District of Minnesota.

3. In September 2013, counsel for Relator Kipp Fesenmaier disclosed to me that they would be filing a qui tam complaint. Our office opened a civil file in connection with the matter on September 26, 2013, and I was assigned as the primary AUSA.

4. I had attended a meeting with Herrett and AUSA David Genrich in late 2012, but did not become materially involved in the investigation at that time.

5. On November 1, 2013, Fesenmaier filed a *qui tam* Complaint under seal, alleging misconduct by Precision Lens, Paul Ehlen, Sightpath, and others.

6. When Mr. Fesenmaier filed a qui tam Complaint regarding kickbacks by Precision Lens, Paul Ehlen, and others, I began investigating the allegations in the Complaint pursuant to 31 U.S.C. § 3730(a).

7. FBI Special Agent Mary Jo Herrett was my point of contact with the FBI regarding the investigation. At some point, though I do not recall when, I learned that Mr. Fesenmaier had been recording conversations as an FBI confidential human source to obtain information for the investigation.

8. On October 30, 2014, the United States Attorney's Office served a subpoena on Precision Lens. I served the subpoena on Mr. Beimers by email and copied AUSA Genrich on the email, noting to Mr. Beimers the existence of a parallel investigation. The United States Attorney's Office had served a subpoena on Sightpath in 2014.

9. My colleagues in the United States. Attorney's Office and I worked with attorneys for Precision Lens and Sightpath to obtain documents responsive to the subpoena. We also worked with law enforcement agents on the investigation. We spent considerable time reviewing the documents produced, which included e-mails, financial statements, expense reports, credit card statements, invoices, that pertained to over three hundred separate transactions involving items of value paid to surgeons.

10. Between December 2014 and March 2016, Precision Lens produced over 149,000 pages of documents and Sightpath produced over 210,000 pages of documents.

11. Because of our pending civil investigation, I participated in various witness interviews in this matter. That included four witness interviews conducted in April 2016, including three Precision Lens employees. Counsel to the subjects of these interviews did not object to my attendance or participation. Nor did anyone else.

12. I was not involved with any decision to issue grand jury subpoenas in this matter. .

13. I requested extensions of the Court's seal over the qui tam complaint in order to further develop the investigation with respect to all defendants named by the Relator. Later, I requested extensions of the seal to facilitate settlements with Sightpath, its CEO, Jim Tiffany, and a physician alleged to have received kickbacks from Sightpath and Precision Lens. The settlements with Sightpath and its CEO were reached in August 2017 and the settlement with the physician was reached in February 2018. The settlement proceeds totaled just under $15 million. Sightpath and Tiffany agreed to pay $12 million, and the physician agreed to pay $2.9 million. Sightpath and Tiffany resolved allegations that they provided trips and entertainment to physicians to induce them to use its products and services in connection with eye surgeries paid for by Medicare. The physician resolved allegations that he received inducements. The extensions were not sought to make recordings.

14. By September 2016, we had largely completed our investigation of the Relator's Amended Complaint.

15. At a meeting with counsel for Defendants in 2016, I advised that our investigation had largely concluded, but that we were not formally intervening because of protracted settlement discussions with other named Defendants.

16. I did not receive or listen to the recordings during the investigation of the qui tam Complaint.

17. I believed that there would have been nothing improper with me using the recordings in my investigation, but wanted to proceed cautiously.

18. I first took possession of the recordings made by Fesenmaier as part of the FBI investigation when gathering documents responsive to Defendants discovery requests propounded in this action in the fall of 2018. I collected the recordings from Special Agent Herrett because I believed we should evaluate them to determine if they were responsive to Defendants' discovery requests and our discovery obligations. Prior to this time, I had not obtained the recordings or reviewed them.

19. During the pendency of the civil investigation in this matter, I have been the primary assigned civil division AUSA. To the best of my knowledge, the USAO Civil Division did not receive the recordings from the FBI, listen to their contents, or produce them to Relator's counsel during the investigation.

20. The recordings did not play any role in the intervention decision. The recordings were not used to draft the United States' Complaint in Intervention in this case.

21. After obtaining the recordings from the FBI, I provided them to Relator's counsel to facilitate a privilege review. Neither I nor anyone in the government had provided the recordings to Relator's counsel prior to this time.

22. The United States disclosed the existence of the recordings to Defendants by cataloging them in its categorical privilege log dated November 13, 2018: "audio recordings of discussions with witnesses, primarily in connection with the criminal investigation." Privilege was temporarily asserted over the recordings because neither the government attorneys nor Relator's counsel had not listened to the recordings, and we wanted to give Relator's counsel an opportunity to review the recordings for potential privileged communications.

23. Before the Relator's review was completed, and before my colleague and I completed the government's privilege log to more comprehensively disclose and log the recordings, the government shut down due to a lapse in appropriations. My colleague working on the case and I were furloughed until appropriations were restored in February 2019.

24. The recordings were produced to Defendants on March 7th pursuant to a clawback agreement (entered into on March 5th) because the privilege review by Relator's counsel had not yet concluded, well before the close of discovery, and before any depositions. One recording was subsequently discovered to contain attorney-client privileged material and was clawed back by Relator's counsel. Neither the United States nor Defendants have sought to claw back as privileged any of the recordings.

25. Defendants sought an index of the recordings in discovery.  We investigated and learned that no such index had been prepared.  After Magistrate Judge Schultz ordered us to produce or create an index by April 30, 2019, we arranged to have an index created.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Dated:   9/30/2019

/s/Chad A. Blumenfield
Chad A. Blumenfield
Assistant United States Attorney