UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America, ex rel. Kipp Fesenmaier,

          Plaintiffs,

v.

The Cameron-Ehlen Group, Inc., and Paul Ehlen,

          Defendants.

Case No. 13-cv-3003 (WMW/DTS)

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

---

This matter is before the Court on Defendants' motion to dismiss based on alleged unethical conduct, to disqualify the Plaintiffs' attorneys who engaged in the allegedly unethical conduct, and to wall off from Plaintiffs any sources of evidence tainted by such conduct. (Dkt. 288.) For the reasons addressed below, the motion is denied.

## BACKGROUND

Defendant The Cameron-Ehlen Group, Inc., doing business as Precision Lens (Precision Lens), is a distributor of intraocular lenses and other products related to ophthalmic surgeries. Defendant Paul Ehlen is the founder and majority owner of Precision Lens. Defendants provide supplies and equipment to ophthalmologists and facilities for use in ophthalmology procedures, including cataract surgery. Relator Kipp Fesenmaier, who previously worked for a Precision Lens corporate partner, filed a *qui*

*tam* complaint in November 2013 against Precision Lens and Ehlen, among others.[1] Plaintiff United States of America investigated Fesenmaier's complaint for several years and, in August 2017, filed a notice of its election to intervene in this case.

The United States filed an intervenor complaint against Precision Lens and Ehlen on February 8, 2018. The intervenor complaint alleges that Precision Lens and Ehlen offered kickbacks to physicians in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and that, as a result of those kickbacks, false and fraudulent claims for payment were made to federal health care programs, including Medicare, in violation of the False Claims Act (FCA), 31 U.S.C. § 3729(a)(1)(B), (a)(2).[2] During discovery, Defendants learned the following information about the investigations the United States conducted before filing the intervenor complaint.

In March 2010, Fesenmaier first notified the FBI of his allegations that Defendants were providing kickbacks to physicians. The FBI interviewed Fesenmaier in December 2011 and designated Fesenmaier as a "confidential human source" shortly thereafter. At least as early as June 4, 2012, the FBI communicated with attorneys for the United States about the investigation, including communications about the FBI's "confidential human source."

---

[1] The Court subsequently dismissed the claims asserted against Defendants Sightpath Medical, Inc., and TLC Vision Corporation based on the parties' stipulation pursuant to a settlement agreement in September 2017.

[2] The intervenor complaint also alleges Minnesota common-law claims for unjust enrichment and payment by mistake. The Court granted Defendants' motion to dismiss those common-law claims in an October 22, 2018 order.

As part of the investigation, the FBI interviewed employees of Precision Lens on February 19, 2013. The next day, Precision Lens retained counsel, who notified the United States that he represented Precision Lens and that any additional communications with Precision Lens and its employees should be coordinated through counsel. But Fesenmaier continued to communicate with Precision Lens personnel, including Ehlen. Fesenmaier also reported to the FBI about these communications and, at the FBI's direction, he secretly recorded his conversations with Ehlen and other Precision Lens personnel. These secret recordings continued until January 2017. These recordings ceased nearly five years after Precision Lens retained counsel and more than three years after Fesenmaier commenced this civil lawsuit, but more than a year before the United States filed its intervenor complaint.

Defendants were unaware of Fesenmaier's recordings until March 2019, when the United States produced to Defendants 147 recordings that Fesenmaier made surreptitiously between February 2013 and January 2017. The United States subsequently produced an index of the recordings that identifies the date of, and participants in, each recording. Of the 147 recordings, 44 involve conversations. The remaining recordings involve unsuccessful attempts to reach Ehlen and others by telephone. Most relevant to the pending motion to dismiss, 13 of the recordings involve conversations with Ehlen or other Precision Lens personnel that Fesenmaier made *after* he filed his *qui tam* complaint.

Defense counsel sent a letter to the United States on May 3, 2019, seeking a justification for Fesenmaier's contacts with—and recording of—represented individuals.

The United States responded by letter that "such communications were authorized by law as governmental investigative activities [that occurred] prior to the commencement of criminal or civil enforcement proceedings" because, when the recordings were made, "the government had not brought criminal charges and had not intervened and filed its civil Complaint in this matter." Thereafter, Defendants filed the pending motion to dismiss.

## ANALYSIS

Defendants contend that counsel for the United States and counsel for Fesenmaier violated the Minnesota Rules of Professional Conduct (MRPC). As a result of this violation, Defendants argue, this case should be dismissed, Plaintiffs' counsel should be disqualified from participating in any further proceedings pertaining to this matter, and any tainted evidence or sources of evidence should be walled off from Plaintiffs.

It is undisputed that the MRPC apply both to Fesenmaier's counsel and counsel for the United States.[3] As relevant here, Rule 4.2 of the MRPC provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

---

[3] "An attorney for the Government shall be subject to State laws and rules . . . governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B(a). "An attorney who is admitted to the court's bar or who otherwise practices before the court must comply with the [MRPC]," and "[a]n attorney commits misconduct by failing to comply with the [MRPC]." LR 83.6(a); *accord* MRPC 8.5.

4

MRPC 4.2. The purpose of this rule is to facilitate "the proper functioning of the legal system by protecting a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter," including interference with the attorney-client relationship and the disclosure of information pertaining to the representation. *Id.* cmt. 1. Rule 4.2 applies to represented individuals as well as organizations such as Precision Lens, including an organization's personnel.[4] *Id.* cmt. 7. And Rule 4.2 applies to the conduct of not only attorneys, but also an attorney's nonlawyer agents, including investigative agents. MRPC 5.3, cmt. 1; MRPC 8.4(a); *see also Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693, 698 (8th Cir. 2003) (explaining that "an attorney is responsible for the misconduct of [the attorney's] nonlawyer employee or associate if the lawyer orders or ratifies the conduct"); *O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1257 (8th Cir. 1998) (affirming district court determination that government investigative agents were subject to Missouri's equivalent to Minnesota's Rule 4.2 "no-contact" provision).

It is undisputed that Fesenmaier repeatedly communicated with (and recorded conversations involving) Ehlen and Precision Lens personnel after Plaintiffs' counsel knew that Precision Lens and Ehlen were represented by counsel. The record does not indicate, however, that Fesenmaier's counsel—either directly or indirectly—communicated with represented individuals. Although Fesenmaier's counsel had some *knowledge* that this conduct was occurring, Defendants have identified no legal authority

---

[4] In particular, Rule 4.2 prohibits communications with certain "constituent[s] of the organization," which the MRPC define as "officers, directors, employees, . . . shareholders," and other equivalent positions. MRPC 4.2 cmt. 7, 1.13 cmt. 1.

5

suggesting that an attorney violates Rule 4.2 based on mere knowledge that the attorney's client is communicating with represented persons. There is no evidence that Fesenmaier's counsel directed Fesenmaier to engage in the challenged conduct. Nor is there evidence that Fesenmaier's counsel had supervisory authority over Fesenmaier, or that Fesenmaier was otherwise acting as his counsel's agent. Although Defendants argue that Fesenmaier's counsel violated Rule 4.2 by "ratifying" Fesenmaier's conduct, the cases on which Defendants rely involve attorneys' agents, not their clients. *See Midwest Motor Sports*, 347 F.3d at 698 (misconduct by retained private investigator imputed to supervising attorneys); *State v. Miller*, 600 N.W.2d 457, 464 (Minn. 1999) (misconduct by police detective imputed to prosecutor who directed and ratified detective's conduct). Because Defendants have not established that Fesenmaier's counsel violated Rule 4.2, the Court's analysis is limited to whether counsel for the United States violated Rule 4.2.

It is undisputed, and the record reflects, that Fesenmaier communicated with Ehlen and other Precision Lens personnel at the direction of counsel for the United States and their nonlawyer agents. And counsel for the United States undisputedly knew that Defendants were represented when these communications occurred. Assuming that these communications involved the subject matter of this litigation,[5] counsel for the United States violated Rule 4.2 unless, as addressed below, Fesenmaier's contacts with represented persons were "authorized . . . by law." *See* MRPC 4.2.

---

[5] At least some of the communications appear to have involved the subject matter of this litigation. But the contents of most of the recordings are not part of the record, and the United States disputes whether the recorded conversations involve privileged subject matter that is material to this litigation.

According to the United States, Fesenmaier's contacts with Ehlen and Precision Lens personnel were authorized by law—and, therefore, not a violation of Rule 4.2—because those contacts were part of a legitimate investigative process that occurred before the commencement of criminal or civil enforcement proceedings. Defendants counter that the authorized-by-law exception does not apply to the conduct of the United States in this case.

An attorney does not violate Rule 4.2 by communicating with a represented person if the attorney "is authorized to do so by law." MRPC 4.2. The commentary that follows Rule 4.2 provides, as relevant here, the following guidance about the authorized-by-law exception:

> Communications authorized by law may . . . include investigative activities of lawyers representing governmental entities, directly or through investigative agents, prior to the commencement of criminal or civil enforcement proceedings.

MRPC 4.2 cmt. 5. Consistent with this guidance, both the United States Court of Appeals for the Eighth Circuit and the Minnesota Supreme Court have recognized that government attorneys and investigators are not prohibited from having *ex parte* contact with an investigatory target who has retained counsel but has not been charged with a crime. *See, e.g.*, *United States v. Plumley*, 207 F.3d 1086, 1095 (8th Cir. 2000) (collecting cases); *State v. Miller*, 600 N.W.2d 457, 467 (Minn. 1999) (recognizing that "the 'authorized by law' exception to MRPC 4.2 . . . mean[s] that legitimate investigative processes may go forward without violating MRPC 4.2 even when the target of the

investigation is represented by counsel").[6] Here, it is undisputed that the United States has not commenced criminal proceedings against Defendants. Based on the foregoing authority, if this case were limited to a pre-indictment criminal investigation, the conduct of the United States would unquestionably be authorized by law and, therefore, not a violation of Rule 4.2. But the facts at issue in this case are *not* limited to a pre-indictment criminal investigation because this case involves a parallel civil investigation and civil proceedings. As a result, additional analysis is necessary.

The authorized-by-law exception to Rule 4.2 is not limited to criminal investigations. The exception also applies to the government's "investigative activities" conducted "prior to the commencement of . . . civil enforcement proceedings." MRPC 4.2 cmt. 5. The parties disagree about *when* the civil enforcement proceedings commenced in this case. The United States argues that, because it did not commence civil enforcement proceedings until it intervened in this case on February 8, 2018, its investigative activities were authorized by law until that date. It is undisputed that all of Fesenmaier's contacts with (and recording of) represented persons occurred *before* the

---

[6] To be sure, in *Miller* the Minnesota Supreme Court held that "when the process goes beyond fair and legitimate investigation and is so egregious that it impairs the fair administration of justice, it is not 'authorized by law.' " *Miller*, 600 N.W.2d at 467. But this aspect of the *Miller* decision has minimal relevance here for at least three reasons. First, *Miller* is not binding precedent for this Court. *See Plumley*, 207 F.3d at 1095 (observing that the interpretation of state disciplinary rules as they apply in federal court "is a matter of federal law" (internal quotation marks omitted)). Second, *Miller* predates the adoption of Comment 5 to Rule 4.2 of the MRPC, which expressly includes pre-indictment government investigative activities as conduct that is "authorized by law." *See* MRPC 4.2 cmt. 5. Third, Defendants have not demonstrated that any conduct by the United States in this case was so egregious as to impair the fair administration of justice. Indeed, Defendants effectively concede that they were not harmed as a result.

8

United States intervened. Defendants counter that civil enforcement proceedings commenced when Fesenmaier filed his *qui tam* complaint on November 1, 2013. And it is undisputed that 13 of Fesenmaier's recorded conversations with represented persons occurred after that date.

The procedures that govern *qui tam* actions provide instructive context for the analysis of this dispute. The United States is required by statute to investigate possible violations under the FCA. 31 U.S.C. § 3730(a). Either the United States or a private party may initiate a civil action alleging fraud on the United States in violation of the FCA. *Id.*, § 3730(b). When a private party initiates such an action, the United States must review the claim and decide whether to "elect to intervene and proceed with the action." *Id.*, § 3730(b)(2), (b)(4). Although a private party's FCA action is pursued *on behalf of* the United States, the United States becomes a party to an FCA action "only if [the United States] intervenes in accordance with the procedures established by federal law." *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009). Here, although Fesenmaier commenced this civil proceeding against Defendants in November 2013, the United States did not commence a civil proceeding against Defendants until it intervened and became a party to this lawsuit in February 2018.

Defendants maintain that this distinction is immaterial, arguing that "[n]othing in Comment 5 [to Rule 4.2] says that the criminal or civil enforcement proceedings must be commenced *by the United States or even suggest[s] that it is triggered only if the government intervenes*." While no such requirement expressly appears in Comment 5 to Rule 4.2, Comment 5 plainly addresses the "investigative activities of lawyers

9

representing governmental entities." MRPC 4.2 cmt. 5. Comment 5 does not address investigative activities conducted by private parties. *See id.* And when read in context, the plain language of Comment 5 strongly suggests that the phrase "commencement of criminal or civil enforcement proceedings" means commencement of such proceedings *by a governmental entity*.[7]

Moreover, this interpretation of Comment 5 to Rule 4.2 is consistent with both the statutory procedure in *qui tam* cases and the governing case law in the context of criminal proceedings. It is well-established in the Eighth Circuit that, during the period before the government has filed criminal charges, government attorneys and investigators are permitted to have *ex parte* contact with an investigatory target who has retained counsel. *See Plumley*, 207 F.3d at 1095. When comparing a criminal proceeding to a *qui tam* proceeding, the closest analogy to the government filing criminal charges is the government filing an intervenor complaint. In both instances, the timing is—to a significant extent—within the government's discretion. And both actions occur only after the government has exercised its obligation to investigate alleged wrongdoing and made the decision to invoke its enforcement authority.

Although a relator's filing of a *qui tam* complaint bears some similarities to the filing of criminal charges, it also differs in several important respects. The government has the primary responsibility to prosecute an FCA action if it elects to intervene, but nonetheless lacks control over the substance and timing of a relator's complaint. *See* 31 U.S.C. § 3730(b), (c). In some (if not most) *qui tam* cases, the government does not

---

[7] Notably, criminal proceedings may be commenced *only* by a governmental entity.

10

*begin* its investigation until after the relator's complaint is filed, which is the point when a relator is required to disclose to the government the relator's allegations and material evidence. *See id.*, § 3730(b)(2). Indeed, the government might first become aware of the allegations when the relator's complaint is filed. *See id.*

Notably, a relator's *qui tam* complaint must "be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." *Id.* "The purpose of these provisions is to protect the [g]overnment's interest in criminal matters by enabling the government to investigate the alleged fraud without tipping off investigation targets at a sensitive stage." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998) (internal quotation marks omitted); *accord State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*, 137 S. Ct. 436, 443 (2016) (explaining that "the seal provision was meant to allay the Government's concern that a relator filing a civil complaint would alert defendants to a pending federal criminal investigation" and "was intended in main to protect the Government's interests"). Congress not only contemplated that the government's investigatory activities would occur after the relator's complaint is filed, Congress also affirmatively sought to protect the government's interests in commencing or continuing such investigations, in secret, after the relator's complaint is filed. *See Yesudian*, 153 F.3d at 743; *Rigsby*, 137 S. Ct. at 443. As such, the MRPC's reference to investigative activities of the United States prior to the commencement of civil enforcement proceedings, when evaluated in the *qui tam* context, most reasonably pertains to investigative activities conducted before the United States intervenes.

The decisions of the Eighth Circuit on which Defendants rely are inapposite. In *Midwest Motor Sports*, the Eighth Circuit affirmed the district court's imposition of sanctions for violations of Rule 4.2. 347 F.3d at 698–99. But *Midwest Motor Sports* involved private parties. The case did not involve investigative activities by a governmental entity, nor did the Eighth Circuit's decision address the authorized-by-law exception to Rule 4.2. *Id.* at 697–99. In *O'Keefe*, a *qui tam* case, the Eighth Circuit affirmed the district court's issuance of a protective order that prevented the government's attorneys from engaging in *ex parte* contacts with the defendant corporation's employees. 132 F.3d at 1256–57. But *O'Keefe* is factually and legally distinguishable for at least two reasons: the *ex parte* contacts at issue in *O'Keefe* were post-intervention, and the legal question at issue was whether those contacts were authorized by law pursuant to a now-invalid federal regulation that is not implicated here. *Id.* at 1253–57. Moreover, both *Midwest Motor Sports* and *O'Keefe* predate Minnesota's adoption of Comment 5 to Rule 4.2 of the MRPC, which expressly provides that conduct authorized by law may include the government's investigative activities. MRPC 4.2, cmt. 5.

Defendants contend that Rule 4.2 should apply to investigative activities *before* the government intervenes because, without Rule 4.2's protection, "the government can manipulate the timing of its intervention to avoid the no-contact rule."[8] Applying that

---

[8] Defendants also contend that the United States may have intentionally delayed intervening in this case so as to avoid the no-contact rule. But Defendants provide no evidence to support this allegation, and the record suggests otherwise.

logic, Rule 4.2 also should govern pre-indictment criminal investigative activities because the government similarly has discretion to control the timing of criminal charges to avoid the no-contact rule. But that is not the law. It is well-established that the authorized-by-law exception to Rule 4.2 applies to the government's pre-indictment investigative activities. *See Plumley*, 207 F.3d at 1095. And in the *qui tam* context, the closest analogy to the government's decision to seek an indictment is the government's decision to intervene. It is not categorically improper for the government to exercise its discretion in deciding when to bring criminal charges or when to intervene in a *qui tam* proceeding.[9]

For these reasons, the pre-indictment and pre-intervention investigative activities conducted by the United States in this case were authorized by law and, therefore, did not violate MRPC Rule 4.2. Because Defendants have not demonstrated the existence of a

---

[9] Defendants also suggest that the government will have unfair and unfettered power if Rule 4.2 does not prohibit the investigative tactics used by the United States in this case. The Court disagrees. By concluding that the government's pre-indictment, pre-intervention investigatory activities are authorized by law, the Court's ruling does not mean that the government is subject to no ethical limitations. Courts have concluded that certain *illegitimate* investigative tactics might fall outside the authorized-by-law exception to Rule 4.2. *See, e.g.*, *United States v. Hammad*, 858 F.2d 834, 836, 839–40 (2d Cir. 1988) (concluding that use of a "sham" grand jury subpoena was not one of the "legitimate investigative techniques" that a prosecutor is authorized by law to employ); *Miller*, 600 N.W.2d at 468 (concluding that prosecutor's "systematic isolation of [a suspect] from his attorney by refusing to terminate [a] non-custodial interview despite the attorney's request and prohibiting the attorney from speaking with the client" was "sufficiently egregious to implicate concerns relating to the fair administration of justice"). Neither *Hammad* nor *Miller* is binding authority here. But even if they were, these cases are factually inapposite because Defendants have not demonstrated that the investigative techniques used in this case were illegitimate or implicate concerns as to the fair administration of justice.

Rule 4.2 violation, the Court need not address what sanctions would be warranted had such a violation occurred.[10]

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED** that Defendants' motion to dismiss, (Dkt. 288), is **DENIED**.

Dated: March 2, 2020            s/Wilhelmina M. Wright
Wilhelmina M. Wright
United States District Judge

---

[10] Even if a violation had occurred, Defendants all-but concede that they have not been harmed by the United States's conduct, and the record does not demonstrate any such harm. Moreover, even if Defendants are correct that this Court has discretion to order sanctions absent a showing of harm, the sanctions that Defendants seek—dismissal and disqualification—are disproportionate to the alleged violations in light of the record and, therefore, unwarranted.