# Full Transcript Report

## Designation Legend

✏️ Flaherty designations

✏️ Ds' Counters to Ps' Flaherty Designations

✏️ Ps' Counters to Ds' Flaherty Designations

✏️ D's Flaherty designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

## US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 1

```
01              UNITED STATES DISTRICT COURT
02                  DISTRICT OF MINNESOTA
03 ----------------------------------------------------
04 UNITED STATES OF AMERICA
05 ex rel KIPP FESENMAIER,
06          Plaintiff,
07                             VIDEO DEPOSITION OF:
08     -VS-              KEVIN T. FLAHERTY, M.D.
09                       CASE NO. 13-CV-3003 WMW/DTS
10 THE CAMERON-EHLEN GROUP, INC.,
11 dba PRECISION LENS and PAUL EHLEN,
12          Defendants.
13 ----------------------------------------------------
14             Video deposition examination of
15 KEVIN T. FLAHERTY, M.D., taken at the instance of
16 the Plaintiffs, under and pursuant to Rule 30 of
17 the Federal Rules of Civil Procedure and the acts
18 amendatory thereof and supplementary thereto,
19 pursuant to Subpoena upon the parties, before
20 Christine J. Willette, RDR, CRR, CRC, a Notary Public
21 in and for the State of Wisconsin, at the offices of
22 Willette Court Reporting, LLC, 630 Fourth Street,
23 Wausau, Wisconsin, on the 7th day of June 2019
24 commencing at 7:59 a.m. and ending at 10:28 a.m.
25
```

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 2

```
01              A  P  P  E  A  R  A  N  C  E  S

02

03  APPEARING ON BEHALF OF THE PLAINTIFFS:

04      BAHRAM SAMIE, Esq.

05      U.S. Department of Justice

06      District of Minnesota

07      600 U.S. Courthouse

08      300 South Fourth Street

09      Minneapolis, MN  55415

10      612-664-5630

11      bahram.samie@usdoj.gov

12

13  APPEARING ON BEHALF OF THE RELATOR:

14      JENNIFER M. VERKAMP, Esq.

15      Morgan Verkamp, LLC

16      35 East Seventh Street, Suite 600

17      Cincinnati, OH  45202

18      513-651-4400

19      jverkamp@morganverkamp.com

20

21  APPEARING ON BEHALF OF THE DEFENDANT:

22      JOSEPH T. DIXON, III, Esq.

23      Fredrikson & Bryon, P.A.

24      200 South Sixth Street, Suite 4000

25      Minneapolis, MN  55402-1425
```

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 3

```
01      612-492-7258

02      jdixon@fredlaw.com

03

04  APPEARING ON BEHALF OF THE DEPONENT:

05

06      ANDREW S. BIRRELL, Esq.

07

08      STEVE GASKINS, Esq.

09

10      Gaskins Bennett & Birrell, LLP

11

12      333 S. 7th Street, Suite 3000

13

14      Minneapolis, MN  55402

15

16      612-333-9500

17

18      abirrell@gaskinsbennett.com

19

20      sgaskins@gaskinsbennett.com

21

22

23  ALSO PRESENT:  Jon Hansen, CLVS

24                  Megan Sczygelski, video intern

25

26

27              The original transcript of the

28  deposition of DOUGLAS T. EDWARDS, M.D., was filed

29  with Attorney Samie.

30

31

32

33

34
```

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 4

01              I N D E X   P A G E

02

03            E X A M I N A T I O N

04                                          PAGE

05

06 KEVIN FLAHERTY, M.D.

07     EXAMINATION BY MR. SAMIE ................... 9

08     EXAMINATION BY MR. DIXON ................... 133

09     FURTHER EXAMINATION BY MR. SAMIE ........... 146

10     FURTHER EXAMINATION BY MR. DIXON ........... 148

11     ---------------------------------------

12              E X H I B I T S

13                                      MARKED

14 Exhibit 18 January 31, 2005, letter from ..... 52

15           Pete Gosz to Kevin Flaherty

16 Exhibit 19 May 12, 2006, letter from ......... 55

17           Pete Gosz to Kevin Flaherty

18 Exhibit 20 US Bank credit card statement ..... 64

19 Exhibit 21 Merrill Lynch credit card ......... 79

20           statement

21 Exhibit 22 Email exchange between Douglas .... 85

22           Edwards, Peter Gosz, and others

23 Exhibit 23 Text message screen shots ......... 95

24 Exhibit 24 Invoice from Precision Lens ....... 100

25 Exhibit 25 Email exchange between Kevin ...... 112

26           Flaherty, Peter Gosz, and others

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**
US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 5

01  EXHIBITS (continued)

02                                                    PAGE

03  Exhibit 26 Precision Lens expense report ..... 112

04             for Pete Gosz, month ending

05             June 2001 [sic]

06  Exhibit 27 Precision Lens expense report ..... 120

07             for Gary Scheidegger, month ending

08             February 2012

09  Exhibit 28 Precision Lens expense report ..... 129

10             for Pete Gosz, month ending

11             June 2012

12  Exhibit 29 Precision Lens expense report ..... 131

13             for Pete Gosz, month ending

14             September 2012

15  Exhibit 30 Handwritten note from patient ..... 151

16  ---------------------------------------

17                  O B J E C T I O N S

18                                        PAGE   LINE

19  BY MR. DIXON ........................... 15    22

20  BY MR. DIXON ........................... 18    14

21  BY MR. DIXON ........................... 18    24

22  BY MR. DIXON ........................... 20    8

23  BY MR. DIXON ........................... 20    14

24  BY MR. DIXON ........................... 28    14

25  BY MR. DIXON ........................... 29    25

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 6

01  OBJECTIONS (continued)

02                                              PAGE  LINE

03  BY MR. DIXON ............................. 33    24

04  BY MR. DIXON ............................. 35    21

05  BY MR. DIXON ............................. 36    8

06  BY MR. DIXON ............................. 36    12

07  BY MR. DIXON ............................. 41    22

08  BY MR. DIXON ............................. 42    3

09  BY MR. DIXON ............................. 47    23

10  BY MR. DIXON ............................. 54    8

11  BY MR. DIXON ............................. 54    18

12  BY MR. DIXON ............................. 55    6

13  BY MR. DIXON ............................. 56    9

14  BY MR. DIXON ............................. 56    14

15  BY MR. DIXON ............................. 57    14

16  BY MR. DIXON ............................. 58    19

17  BY MR. DIXON ............................. 61    17

18  BY MR. DIXON ............................. 65    23

19  BY MR. DIXON ............................. 66    14

20  BY MR. DIXON ............................. 79    2

21  BY MR. DIXON ............................. 89    23

22  BY MR. DIXON ............................. 90    4

23  BY MR. DIXON ............................. 91    4

24  BY MR. DIXON ............................. 105   11

25  BY MR. DIXON ............................. 123   19

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 7

```
01  OBJECTIONS (continued)

02                                              PAGE LINE

03  BY MR. DIXON ........................... 130   16

04  BY MR. DIXON ........................... 130   25

05  BY MR. SAMIE ........................... 140   5

06  BY MR. SAMIE ........................... 143   1

07  BY MR. SAMIE ........................... 143   18

08  BY MR. SAMIE ........................... 144   24

09  BY MR. SAMIE ........................... 145   25

10  BY MR. SAMIE ........................... 146   6

11  BY MR. SAMIE ........................... 148   10

12      ----------------------------------------

13          P R O D U C T I O N   R E Q U E S T S

14                           NONE

15

16

17

18

19

20

21

22

23

24

25
```

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 8

```
01              P R O C E E D I N G S

02

03              VIDEOGRAPHER:  Good morning.  We are on

04    the record.  My name is Jon Hansen, CLVS.  I am from

05    Henderson Legal Services.

06              Today's date:  June 7, 2019.  The time

07    is 7:59.  This deposition is being held in Wausau,

08    Wisconsin.

09              The caption of the case:  United States

10    of America versus the Cameron-Ehlen Group, Inc.,

11    et al., United States District Court for the District

12    of Minnesota.  Case number:  13-CV-3003 WMW/DTS.

13              The witness this morning is

14    Dr. Kevin Flaherty.

15              At this time, if counsel could please

16    state your appearances for the record, after which

17    our reporter will swear in the witness, and we can

18    proceed.

19              MR. SAMIE:  Assistant U.S. Attorney

20    Bahram Samie appearing on behalf of the United

21    States.

22              MS. VERKAMP:  Jennifer Verkamp

23    appearing on behalf of relator.

24              MR. DIXON:  Joe Dixon here for Paul

25    Ehlen.  Also here on behalf of Cameron-Ehlen Group.
```

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 9

```
01              MR. BIRRELL:  Andy Birrell and
02  Steve Gaskins representing Dr. Flaherty.
03
04              KEVIN T. FLAHERTY, M.D., called as a
05  witness in this action, was sworn and testified as
06  follows:
07              THE WITNESS:  I do.
08
09              EXAMINATION BY MR. SAMIE:
10      Q.  Good morning, Dr. Flaherty.
11      A.  Good morning.
12      Q.  Have you ever had your deposition taken
13  before?
14      A.  I have been deposed on behalf of some of my
15  patients before, yes.
16      Q.  Okay.
17      A.  I've never been sued.
18      Q.  Okay.  Well, I'm just going to go through a
19  couple just general background best practices --
20      A.  Sure.
21      Q.  -- for a deposition.
22              Basically, as I'm sure you can imagine,
23  I'm going to be asking you some questions today.
24  Counsel for defendants may also be asking you some
25  questions.  And I'm going to be asking that you
```

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 10

01  provide complete and truthful answers to the best of

02  your ability to those questions.

03             It's a little bit of an unusual

04  conversation because there's a court reporter present

05  here taking down everything that we're saying.  And

06  so it's important for us to try our best to have a

07  clear record.

08             So that means, when you give answers,

09  try to give audible answers, like yes or no or --

10  instead of an uh-huh, huh-uh or other nonverbal

11  gestures.

12             Does that make sense?

13     A.  Yes.

14     Q.  And then also, along the same lines, for the

15  court reporter's ability to get everything down, I'm

16  going to do my best to wait for you to finish your

17  answer before I jump in with another question, and I

18  ask that you do the same.  Let me finish my question

19  before you start your answer.

20             Does that work for you?

21     A.  Yes, it does.

22     Q.  To the extent that I ask something that

23  doesn't make sense or that you -- that you need

24  clarification on, I ask that you please let me know

25  so that I can try to clarify that.

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 11

```
01              Otherwise, is it fair to assume, if you
02  answer it, that you understood the question?
03      A.  I'd hope so.
04      Q.  Okay.
05              MR. DIXON:  And I may need a beat
06  between the answer and the question to interpose an
07  objection, just --
08              MR. SAMIE:  Right.
09              MR. DIXON:  -- because I get to
10  answer -- make an objection on behalf of the
11  defendants.  So you've got to give me one beat
12  between your answer and the question, just to give me
13  an opportunity to do that.
14              THE WITNESS:  Okay.
15  BY MR. SAMIE:
16      Q.  So -- so there may be objections that come
17  up in -- during the course of the deposition.  Unless
18  you are specifically directed not to answer the
19  question, I ask that, after the objection is made,
20  that you still provide an answer to the question.
21      A.  Uh-huh.  Okay.
22      Q.  Okay.  Great.
23              Have you talked to the defendants'
24  attorneys to prepare for this matter?
25      A.  No.
```

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 12

```
01      Q.  No?

02              For this deposition?

03      A.  No.

04      Q.  Have you talked to defendants' attorneys at

05 all --

06      A.  No.

07      Q.  -- with respect to this litigation?

08      A.  No.

09      Q.  Have you talked to Mr. Ehlen about this

10 litigation?

11      A.  No.

12      Q.  No?  Okay.

13              You are an ophthalmic surgeon?

14      A.  Correct.

15      Q.  You're employed at the Eye Clinic of

16 Wisconsin?

17      A.  Yes.

18      Q.  I'm going to refer to that as "ECOW."

19      A.  That's what we call it, too.  "E-COW" [ph].

20      Q.  E-COW?

21      A.  E-COW.  E-COW.

22      Q.  Oh, okay.  All right.  We are in Wisconsin

23 after all.

24              So you also perform cataract surgery --

25 excuse me.  You perform cataract surgeries?
```

 D's Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 13

01    A.  I do.

02    Q.  Do you perform the majority of those

03 surgeries at a surgical center?

04    A.  Now the majority are performed in my ASC at

05 our office, but I also perform the surgeries at

06 hospitals:  Rhinelander hospital, St. Mary's hospital

07 in Rhinelander, and Langlade Memorial Hospital in

08 Antigo are the three locations where I provide

09 surgical services currently.

10    Q.  You said -- you said Rhinelander --

11    A.  St. Mary's Hospital in Rhinelander.

12    Q.  Okay.

13    A.  And the Aspirus Hospital in Antigo,

14 Wisconsin, are the current places where I do surgery.

15 Although, over the years, I've operated in different

16 locations.

17        I used to do surgery in Merrill,

18 Wisconsin.  I used to do surgery in Stevens Point,

19 Wisconsin.  But over the years -- our rotations have

20 shifted over the years for different locations.  Not

21 every ophthalmologist goes to every location where

22 the eye clinic provides services.

23    Q.  Okay.  Understood.

24        You mentioned the ASC.  Is that

25 ambulatory surgical center?

🖉 Ps' Counters to Ds'
Flaherty Designations      🖉 D's Flaherty
                             designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 14

01     A.   Ambulatory surgery center.

02          We have our own now at our -- at the

03 Eye Clinic of Wisconsin that we opened a few years

04 ago.

05     Q.  That is called the EC Laser --

06          (Admonition by court reporter.)

07     Q.  What is it called?

08     A.  It's, yes, the Eye Clinic of Wisconsin Laser

09 Surgery Center.

10     Q.  Okay.  So I'll probably just refer to that

11 as the "ASC" or the "surgery center" during the

12 course of the -- of the deposition, or "ECLSI."

13     A.  Perfect.

14     Q.  Okay.  What percentage of your cases are

15 cataract surgeries?

16     A.  I do more cataracts than any other surgical

17 procedure.  But I also do corneal transplant, and I

18 do oculoplastic reconstructive surgery.

19          I would estimate that about 70 to 80

20 percent of my surgeries are cataract operations and

21 about 30 percent are other procedures.

22     Q.  Okay.  What percentage of your cataract

23 cases are billed to Medicare?

24     A.  Those patients who are Medicare age and have

25 Medicare as their insurance are billed to Medicare.

 D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 15

01 If people have private insurance, it's certainly

02 billed to their private insurance.

03          Some patients are self-pay.  Some

04 patients have different benefits.  So whatever

05 their -- their insurance is is who we bill it to.

06          And so if they have Medicare, we bill

07 to Medicare.

08     Q.  Sure.

09     A.  So all the patients who have Medicare as the

10 insurance are -- are billed to Medicare.

11     Q.  Right.

12          So I'm asking roughly what percentage

13 of the cataract cases that you do are billed to

14 Medicare.

15     A.  The majority.

16     Q.  The majority --

17     A.  Being over 50 percent for sure.

18     Q.  -- over 50 --

19          (Admonition by court reporter.)

20 BY MR. SAMIE:

21     Q.  75 percent?

22     A.  It --

23          MR. DIXON:  Objection.  Foundation.

24          THE WITNESS:  It probably varies from

25 year to year.  I don't know the exact number.  But,


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 16

```
01  certainly, the majority of people who develop
02  cataracts are in the Medicare age population.  So
03  more of those people require cataract surgery than
04  people who are 40 or 50 years old.
05  BY MR. SAMIE:
06      Q.  Okay.  Do you seek approval from the federal
07  government to engage -- to bill Medicare for -- for
08  payment?                                    Ps: 402/403,602
09      A.  It -- that has varied over the years.
10          It used to be -- I've been in practice
11  for 30 years.  And many years ago, every single
12  cataract had to be preapproved by Medicare before you
13  could schedule it.  That's not currently the case.
14          I think the federal government found it
15  to be very cost-ineffective to do it because they
16  were approving essentially all of them as long as
17  they met the Medicare criteria.
18          There are certain criteria that have to
19  be met for you to do a cataract operation on a
20  Medicare patient:  a certain level of visual acuity,
21  a certain number of complaints with regard to their
22  visual symptoms.
23          So there are criteria.  And we know
24  those criteria.  And we won't schedule someone -- I
25  tell patients all the time, "You don't meet Medicare
```

 Flaherty
designations

🖍 D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 17

01 criteria.  So we -- we can't do your cataract surgery
02 at this point.  We'll wait until it gets worse and
03 then perhaps come back in a year or so.  Maybe your
04 vision will have fallen off to the point that you
05 qualify for Medicare cataract surgery."
06      Q.  Sure.
07           So going back to my question is, do
08 you, though -- do you have to, as -- as a physician,
09 have to get approval from CMS to bill Medicare as a
10 provider?
11           Do you have to do some sort of an
12 enrollment form to become an approved provider to
13 bill Medicare?
14      A.  Yes.
15           There -- there -- you certainly have to
16 have Medicare's requirements.  You have to have
17 licensure, you -- state licensure.  You have to, I
18 think, be enrolled in the Medicare program.
19           Some physicians have chosen not to
20 participate in Medicare.  We participate with
21 Medicare at the eye clinic.
22      Q.  Right.
23           In fact, you said a majority of your
24 cases are probably Medicare cases.
25      A.  Majority of cataracts, yes.


D's Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 18

01    Q.  And so when you are applying for approval to
02 be -- to bill Medicare, do you certify to Medicare
03 that you will not accept any sort of kickbacks in
04 conjunction with the claims that you submit to
05 Medicare?
06    A.  I -- I don't know that -- that I've ever
07 seen any language like that, but that certainly would
08 seem logical.
09    Q.  Okay.
10    A.  I -- I'm not aware that -- any particular
11 language that says that, but maybe it -- maybe it's
12 out there someplace.  I don't know.
13    Q.  Do you believe you are not supposed to
14 accept any sort of kickbacks in conjunction --
15         MR. DIXON:  Objection.  Form.
16         THE WITNESS:  Yeah, of course.  I mean,
17 that would be wrong.
18         MR. SAMIE:  Well, let me just finish my
19 question, please, before we get an objection.
20 BY MR. SAMIE:
21    Q.  I was asking, do you believe that you are
22 not allowed to accept kickbacks in relationship to or
23 in conjunction with a claim that you billed to
24 Medicare?
25         MR. DIXON:  Objection.  Form.



Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 19

```
01              THE WITNESS:  I think there are some
02  nuances with regard to Medicare's billing practices.
03  And I can give you a specific example.
04              When an optometrist sees a patient who
05  has a cataract and sends the patient to me for a
06  cataract operation, there's a way that it's billed as
07  co-management.
08              And I do some someone's cataract
09  surgery, sent by a local optometrist who might be in
10  the UP.  I do that cataract operation in Wausau or
11  Rhinelander.  And then the patient indicates -- they
12  fill out a form pre-operatively that says, "I want my
13  postoperative care provided by my optometrist."
14              And we fill out paperwork, and the
15  optometrist gets paid 20 percent of the surgical fee.
16  It's a legalized kickback that the government has
17  sanctioned, essentially, for an optometrist to do
18  postoperative care and get paid for it.
19  BY MR. SAMIE:
20      Q.  Okay.
21      A.  So I think that's a bit of a kickback to an
22  optometrist referring, which I don't like.  I think
23  it's a bad federal policy, but it exists, and we do
24  participate in it.
25      Q.  Okay.  But, generally speaking, kickbacks
```


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 20

```
01  like gifts that you would be receiving or things of

02  that nature, do you believe that you're supposed to

03  be accepting --

04      A.  Of course not.

05      Q.  -- accepting those types of --

06          Do you believe that you're supposed to

07  be accepting those types of kickbacks in conjunction

08  with your Medicare service?

09          MR. DIXON:  Objection.  Form.

10          THE WITNESS:  Certainly not.

11  BY MR. SAMIE:

12      Q.  Okay.  And do you understand that Medicare

13  claims would not be payable if -- if they were

14  tainted by illegal kickbacks that you received?

15          MR. DIXON:  Objection.  Foundation.

16          THE WITNESS:  Yeah.  That makes

17  sense.

18  BY MR. SAMIE:

19      Q.  Okay.  So from 2013, the beginning of 2013

20  to the present time, have you been performing the

21  majority of your surgeries at the ASC ECLSI?

22      A.  Almost every surgery I do in Wausau is done

23  at the ASC.

24          The only times I operate at the

25  hospital are when I'm on call and there's an
```


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 21

01  emergency situation where someone comes in with

02  trauma and the patient is admitted as an inpatient to

03  the hospital.

04              And I have to still perform surgery at

05  the hospital occasionally, rare occasions.  But, yes,

06  elective surgery done in Wausau, all of it's done at

07  the ASC.

08        Q.  Okay.  So the majority of the cataract

09  surgeries you perform are performed at the ASC?

10        A.  All the cataract surgery I perform in Wausau

11  is performed at the ASC.

12        Q.  When we -- when you lump in all of the

13  cataract surgeries that you do generally, are the

14  majority of those done at the ASC?

15        A.  Yes.

16        Q.  Okay.

17        A.  I have much more operating time in Wausau

18  than I do in the satellite offices.

19        Q.  Before 2013, say from 2006 to 2012, the

20  majority of the cataract surgeries you performed,

21  those were at the Wausau Surgery Center?

22        A.  Yes.  In Wausau.

23        Q.  Okay.  And you mentioned that the -- the

24  A- -- the ASC ECLSI, that is -- that was created by

25  surgeons with the ECOW; right?

 Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 22

01     A.  Right.  We own it.

02     Q.  When -- when you were at -- when you were

03  doing surgeries at the Wausau Surgery Center, did you

04  play any role in deciding what intraocular lens you

05  would use in your surgeries, your cataract

06  surgeries?

07     A.  The surgeon always has the choice of what

08  lens to use.

09     Q.  Okay.  Did you also play a role in

10  negotiating what the price of that lens would be when

11  you were at the Wausau Surgery Center?

12     A.  I -- I never had any price negotiation with

13  anyone.

14              I -- as a group, we always tried to get

15  the best prices for our patients on everything.

16     Q.  So as a -- as a group -- but you were

17  operating at the Wausau Surgery Center; right?

18     A.  Right.

19     Q.  And there were a number of different players

20  at that facility; right?

21     A.  Right.

22              It was a multi-specialty facility,

23  where they did ear, nose and throat surgery, plastic

24  surgery --

25     Q.  Sure.

 Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 23

01      A.  -- general surgery, eye surgery.  They did a

02 number of other -- a number of other procedures.

03      Q.  Okay.  So --

04      A.  I -- I had no decision-making in terms of

05 what they were negotiating.

06           We -- we tried to be advocates for our

07 patients, wherever we worked, to try to get the best

08 prices for our patient.

09           We would -- we would say, "Maybe you

10 could approach them and see if you can get a better

11 deal on the lenses," you know.  To -- talk to the

12 management of the surgery center to have them

13 negotiate for the pricing --

14      Q.  Okay.  So the management --

15      A.  -- with the distributors.

16      Q.  So the management for the surgery center

17 was -- those were folks that were outside of ECOW --

18      A.  Yeah.  Not our employees --

19      Q.  -- not your people.

20      A.  -- no.

21      Q.  And they were the ones that --

22           MR. DIXON:  Wait.  We have to slow down

23 for the court reporter here so we get a good record

24 and I have an opportunity to ask -- to say

25 objections.  So please slow down.  Okay?

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

## US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 24

```
01              THE WITNESS:  Okay.
02              I'm sorry.  I speak rapidly.
03              MR. DIXON:  That's okay.
04  BY MR. SAMIE:
05      Q.  The people -- the management that was making
06  the ultimate purchasing decisions, those were not --
07  at the Wausau Surgery Center, those were not ECOW
08  people.
09      A.  Correct.
10      Q.  Okay.  And so those were -- those
11  people were the ones negotiating the price of the
12  products that were -- that were ultimately used in
13  these surgeries that you were performing.
14      A.  Yes.
15      Q.  And that your colleagues -- your ECOW
16  colleagues were performing.
17      A.  Yes.
18      Q.  Okay.  And that includes cataract surgeries?
19      A.  Yes.
20      Q.  Okay.  And that includes both intraocular
21  lenses as well as viscoelastics?
22      A.  Yes.
23      Q.  Okay.  So would you advise those management
24  folks and would your colleagues -- well, let's just
25  start with you.
```

Ps: 402/403



D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 25

01          Would you advise those management folks

02  what intraocular lens you preferred to use, and then

03  they would go out and negotiate the price that would

04  be obtained?

05      A.  I've used lenses from a manufacturer that

06  used to be known as Allergan since I came back and

07  start practicing in the Wausau.

08          I've tried a few other brands over the

09  years, but I've been very satisfied with that

10  particular type of lens, that design of lens.

11          That particular company has gone

12  through several iterations:  It was Allergan Medical

13  Opticals, then it became Abbott, and now that lens

14  that I use is -- Johnson & Johnson owns the company.

15          So it's -- but it's essentially just

16  different generations of that same lens.  And I got

17  introduced to it during my fellowship, and I liked

18  it.

19          And I've got good -- we track our

20  outcomes.  And you want to have predictability for

21  your patients.

22      Q.  Sure.

23      A.  So based on outcomes, I've been happy with

24  the results of that lens.  So it's -- I've used it

25  for many, many years.

Ps: 402/403,
25:1-25:25

 D's Flaherty designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 26

```
01              When we first started in Wausau, there
02  was -- the lens came, I think, from a different
03  distributor.  I mean, Precision Lens wasn't even in
04  the picture years ago.  And then they became the
05  distributor for it, and that's how we got involved
06  with them selling the lenses to the places we
07  worked.
08       Q.  Right.  Okay.  We're jumping all over the
09  place.
10       A.  Okay.  Sorry.
11       Q.  So just try to answer the question that
12  I'm -- that I'm asking.
13       A.  I'm trying.
14       Q.  No.  And I appreciate that.  It -- I just
15  want to kind of stay on track here.
16              So the lens you're referring to, that's
17  the Z9 --
18       A.  The current lens, the designation is the
19  Z9002.
20       Q.  Okay.  And it's had that name for quite some
21  time?
22       A.  For some years.
23              But it -- there was -- initially, it
24  was called an SI18, then an SI30, then an SI40.
25  Then a -- a -- and it's -- I -- I can only think of
```

Ps: 402/403
26:1-7

Ps: 402/403
26:14-25
27:1-4


D's Flaherty designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 27

```
01   the -- the name we -- we jokingly called it.  But
02   there was another --
03        Q.  Okay.
04        A.  -- variant of it and then now the Z9002.
05        Q.  So -- so this is your lens that you -- of
06   choice; right?
07             And my question is, you would then
08   relay that preference to -- and this is -- let me
09   just back up.
10             While you were at the Wausau Surgery
11   Center performing surgeries there, this lens was your
12   lens of choice.  You would relay that information to
13   the management folks for the Wausau Surgery Center,
14   that this is what you wanted to use, and then they
15   would go out and negotiate the price for that?
16        A.  I would not relay it.
17             I would choose the lens in my office.
18   My staff would give us printouts, calculated powers,
19   to predict what power lens would be appropriate for
20   the patient based on the length of their eye, the
21   shape of their cornea, and how they want to see
22   afterwards:  if they want good distance vision, close
23   vision, what their preference is.
24             And I would choose the power of the
25   lens.  The lens type is chosen.  I would choose the
```

 Flaherty
designations

D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 28

01  power of the lens, and then that -- my office would

02  relay that to the surgery center, saying "Please

03  order these lenses for Dr. Flaherty's cases coming up

04  on such and such a date."

05      Q.  Okay.

06      A.  That's how it worked.

07      Q.  But those -- they didn't negotiate a price

08  per surgery.

09      A.  No.  I don't -- I don't believe so.

10      Q.  Okay.  So there was a negotiated price with

11  the vendor as to what --

12              MR. DIXON:  Ob- --

13  BY MR. SAMIE:

14      Q.  -- this generally would cost?

15              MR. DIXON:  Objection.  Foundation.

16  BY MR. SAMIE:

17      Q.  It was -- please answer.

18      A.  It -- they -- yes, I'm sure they had a -- a

19  negotiated price.

20      Q.  Okay.  And so -- and you didn't play a role

21  in that --

22      A.  I did not.

23      Q.  -- price negotiation.

24          Okay.  The same -- is the same true for

25  the visco that you would use?


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 29

```
01        A.   The same is true.
02        Q.   Okay.  Did ECOW have any sort of contracts
03  or agreements with Precision Lens about what lenses
04  it would use for surgeries at the Wausau Surgery
05  Center?
06        A.   Not that I'm aware of.
07        Q.   Okay.  Did it have any contracts or
08  agreements with Precision Lens about what
09  viscoelastic would be used -- or viscoelastics would
10  be used for surgeries at the Wausau Surgery Center?
11        A.   Not to my knowledge.
12             Though I do know that we did try to --
13  we tried different viscoelastics over the years in
14  different locations.
15             Like, when Ascension bought St. Mary's
16  Hospital in Rhinelander, they wanted to change
17  viscoelastics, just like they wanted to change
18  lenses.  And so we had to bring it forward if we
19  wanted to use a product that we thought was inferior.
20             They -- I mean, just crazy little
21  stuff.  They changed the gloves, the masks, hats.
22        Q.   So those kinds of decisions, the
23  viscoelastics to use, was that a clinic-wide decision
24  that you would make a decision, these viscoelastics
25  we would use, and everyone would use those?
```

Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

D's Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 30

01            MR. DIXON:  Objection.  Form.

02            THE WITNESS:  No.  Because different

03   surgeons use different viscoelastics from time to

04   time.

05            One of my colleagues, who's retired

06   now, Dr. Parmley, he used a viscoelastic that I

07   didn't think protected the cornea as well.  And he

08   chose to use it.  You know, I don't know why he liked

09   it.  I think it was -- there was more in the syringe

10   or something.  So he had more of the medicine in case

11   he needed it during his surgeries.  So he had a

12   larger supply of viscoelastic to use during his

13   surgeries.

14            I didn't feel we needed that much.  And

15   I liked the protection that the viscoelastics that I

16   was using provided.

17   BY MR. SAMIE:

18       Q.  Okay.  What about from the -- the vendor?

19   Did -- from 2006 to 2013 -- excuse me, to the end of

20   2012, during your time at the -- performing surgeries

21   at the Wausau Surgery Center, did -- did your

22   practice only use viscoelastics that were obtained

23   through Precision Lens?

24       A.  I don't know.

25       Q.  What about you?


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 31

01    A.  I don't know, either.  I don't know where
02 the viscoelastics came from that I was using all the
03 time.  I really don't.
04    Q.  What viscoelastics were you using during
05 that time period?
06    A.  One called DuoVisc.
07    Q.  Who makes that?
08    A.  I think that might be Alcon.
09    Q.  Okay.  And what -- how long did you use that
10 for?
11    A.  I -- I used it for a long time.  Many
12 years.
13    Q.  When did you stop?
14    A.  When they got something that was equivalent.
15 HEALON EndoCoat and HEALON GV.
16    Q.  So --
17    A.  And that's a -- it's -- I use two different
18 viscoelastics during surgery.  There's a --
19    Q.  Sorry.
20    A.  There's one type that protects the cornea at
21 the beginning of the case --
22    Q.  Uh-huh.
23    A.  -- and there's another type that you use to
24 balloon up the capsular bag before you put the lens
25 in.



Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 32

01          So there are two different types:
02 one -- one is a cohesive viscoelastic, one is a
03 dispersive viscoelastic.
04     Q.  Right.  Right.
05     A.  So there's two different products.
06     Q.  Okay.  So the -- and the DuoVisc provides
07 for both of those.
08     A.  Right.
09     Q.  Right.  Okay.
10          And then --
11     A.  Two different products.
12     Q.  Two different -- two different products, but
13 it's the same --
14     A.  I think they're --
15     Q.  -- box.
16     A.  They come in a box, yeah, bundled
17 together.
18     Q.  Okay.  And so at some point, you switched
19 from the DuoVisc to this HEALON EndoCoat product?
20     A.  That's what I'm using now.
21     Q.  That -- and you've been using that since?
22     A.  Yeah.
23     Q.  Okay.  And -- and that -- you switched when
24 that product came on the market?
25     A.  I -- I don't remember exactly what I


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 33

01   switched.  I just know that I always wanted a good

02   cohesive and a good dispersive viscoelastic --

03       Q.  Sure.

04       A.  -- together.

05           And I left it to the surgery center in

06   Wausau or our ECLSI to tell me whatever they can get

07   the best deal on.

08           I don't -- I'm not -- I wasn't

09   negotiating prices.  I just wanted to have a good

10   product to use for my patients.

11       Q.  No.  I understand that.

12           But -- but you -- but you were using

13   this when it -- when it came on the market.  That's

14   when you -- I think that's what you --

15       A.  When what came on the market?

16       Q.  That -- sorry.  That was a terrible

17   question.  I'll strike that.

18           So the HEALON EndoCoat product, that

19   visco, you switched over to that once that became

20   available?

21       A.  I don't know when it became available.

22       Q.  I'm not asking when it came available.

23           I'm asking, did you make the switch

24   when it came available?

25           MR. DIXON:  Objection.  Form.


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 34

01          THE WITNESS:  I -- obviously, I'm using

02  it; so it's available.

03          So I -- but I didn't -- I don't know --

04  I -- I switched when they -- when the ASC and the

05  surgery center said, "We've got" -- you know, "Try

06  this.  You know, it's -- it's going to cost us less

07  money.  We'll" --

08          And -- and I tried it on a couple

09  cases.  Yeah, corneas look great the next day.  I'm

10  happy to use it.

11  BY MR. SAMIE:

12      Q.  And you've been using it ever since.

13      A.  Yeah.

14      Q.  Okay.  Did your colleagues do the same

15  thing?

16      A.  I think some of them have.  I don't know

17  what they all use.

18          Like I said, one of my colleagues,

19  who's now retired, he used a product that I thought

20  was inferior.

21      Q.  Do you know what Dr. Hattenhauer used?

22      A.  I -- I don't.

23          I -- I know he's used DuoVisc.  And I

24  think -- I know he uses -- I think he uses two

25  different products, like I do.  I'm quite sure of

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 35

```
01  that.  But I'm not sure.
02      Q.  In the sense that he uses the --
03      A.  A cohesive and a dispersive --
04      Q.  -- cohesive and --
05      A.  -- viscoelastic.
06          MR. DIXON:  I'm going to --
07          (Admonition by court reporter.)
08          MR. SAMIE:  I'll try to help as well.
09  BY MR. SAMIE:
10      Q.  The -- Dr. Hattenhauer uses both a cohesive
11  and a dispersive visco?
12      A.  I believe so.
13      Q.  Okay.
14      A.  I think -- I know you're going to have an
15  opportunity to talk to him.  You can ask him.
16      Q.  Okay.
17          Dr. Edwards, do you know what visco he
18  uses?
19      A.  I think he also uses a dual product.
20      Q.  And does he use the HEALON EndoCoat
21  product?
22          MR. DIXON:  Objection.  Foundation.
23          THE WITNESS:  I -- I don't know for
24  certain.  I believe so.
25  BY MR. SAMIE:
```

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 36

01    Q.  Okay.  And would he have made that switch

02 around the same time you made that switch?

03    A.  I have no idea.

04    Q.  Well, you indicated that some of

05 your partners --

06    A.  Do you want me to speculate?

07    Q.  Well, I think you said that some of your

08 partners made that switch around that same time.

09         MR. DIXON:  Objection.  Misstates --

10 BY MR. SAMIE:

11    Q.  So I'm just asking.

12    A.  I --

13         MR. DIXON:  Objection.  Misstates the

14 testimony.  Objection.  Form.

15         THE WITNESS:  I -- I -- I don't know

16 a -- when any of my colleagues started using a

17 product.

18         What we typically do at our AC -- and I

19 only speak to what we do at our AC -- is we try to

20 track the cost of care.  We track what a lens costs,

21 what viscoelastic costs, how much time in the OR,

22 what drugs are used.  And we try to make it as

23 cost-effective for every patient.

24         So we -- we look at the cost per case

25 for every surgeon.  And we try to keep the costs in

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 37

01 line for every surgeon so that we -- we don't

02 overspend.

03 BY MR. SAMIE:

04     Q.  The -- the HEALON EndoCoat product, that is

05 a product that was manufactured by AMO?

06     A.  I don't know if -- if Abbott was the

07 manufacturer or Allergan.  I don't know who the

08 manufacturer is.

09     Q.  Okay.  But it's -- it's within that chain,

10 the Allergan, AMO, Johnson & Johnson?

11     A.  I believe so.

12     Q.  Okay.  And was that -- has that product

13 always been provided, for your surgeries, through

14 Precision Lens?

15     A.  I don't know.

16     Q.  Do you know, for any period of time, if

17 Precision Lens was providing that product?

18     A.  I -- I know that Precision Lens did provide

19 viscoelastics to us.  But I don't know what time

20 period, what volume, what products exactly.  I

21 don't.

22     Q.  Okay.  So moving on to the surgical center,

23 which -- which you all built, the ECOW built --

24 right? -- did Precision Lens supply the HEALON

25 EndoCoat viscoelastic to ECOW for those surgeries?


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 38

01      A.  I -- I don't know for certain, but I believe

02  that many of the products we used in surgery come

03  from Precision Lens.

04          They are -- have been a reliable

05  distributor, supplier for us.  They're close

06  geographically, in Minneapolis.  We can get a lens at

07  the last, you know, minute.

08          Say, "We got a case added on tomorrow.

09  Can you get us a lens over here tomorrow?"  So

10  they've been very reliable in getting us products in

11  a timely fashion.

12      Q.  Okay.  Since you started -- and I'm focusing

13  this on intraocular lenses and viscoelastics.

14      A.  Uh-huh.

15      Q.  But since your time at ECLSI, doing

16  surgeries there, have you used predominantly products

17  that were manufactured by AMO?

18      A.  Predominantly; though sometimes you need a

19  specialty lens that they don't have or --

20      Q.  Understood.

21      A.  Yeah.

22          So I'd say the majority -- my -- my

23  first-choice lens for routinely cataract surgery is

24  the lens that was previously Allergan, the name, now

25  Johnson & Johnson.


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 39

01    Q.  Okay.  Is your understanding that Precision

02 Lens is the exclusive provider or distributor for AMO

03 products?

04    A.  I think they were.

05         I don't know if they still are, but I

06 believe they were.

07    Q.  Okay.  At least through the end of 2015,

08 they were?

09    A.  I -- I believe so.

10         When -- when --

11    Q.  Okay.

12    A.  When I began, they -- I don't think they

13 were.  But that's 30 years ago.

14    Q.  And we're not going to go back that far.

15         Well, actually, now that you brought

16 that up, how did they come -- do you know how they

17 came to become the distributor of that product?

18    A.  I don't.

19         I think it's interesting that one of

20 the early employees of Allergan subsequently ended up

21 working for Precision Lens many, many years later.

22    Q.  Who's that?

23    A.  Gary Scheidegger.

24    Q.  Gary Scheidegger, okay.

25    A.  Yeah.  It was weird.

 Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 40

01                But he was selling us lenses when I

02  started in the late '80s.  And then I believe --

03      Q.  For Allergan?

04      A.  For Allergan.

05                And then Precision Lens, I -- became

06  the sole distributor, I believe, for the lens that I

07  wanted.  So we had to go through Precision Lens.

08      Q.  Roughly when did that happen?

09      A.  Probably in the '90s.  Sometime in the

10  '90s.

11      Q.  '90s?  Okay.

12                And that was -- that's -- that's been

13  the case, as far as you know, since then?

14      A.  (Nods head.)

15      Q.  Okay.

16                I'm sorry.  Yes?

17                We need an audible answer.

18      A.  Yes.

19      Q.  Yes, okay.

20                When did you first meet Paul Ehlen?

21      A.  I don't remember.

22                I've known Paul for -- it's got to be

23  20 years.  A long, long time.  I think close to 20

24  years.

25                I remember meeting him at -- at -- at


Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 41

01  an American Academy of Ophthalmology convention.

02          I think he probably just showed up at

03  the clinic; said, you know, "I'm going to be your

04  distributor of lenses now."

05          I don't -- I don't really recall the

06  first time I met him.  I just -- I've known him a

07  long, long time.

08      Q.  Okay.  But you met him through a

09  business-related --

10      A.  Yes.  Through --

11      Q.  -- event.

12      A.  He either called on the clinic, saying, "I'm

13  going to be providing lenses, you know, for these

14  companies."

15          But then I -- you know, the -- the reps

16  would be at the annual meeting -- at the meetings

17  too, whether it be an annual meeting for the eye

18  societies or it would be national meetings.

19          So I really don't remember the first

20  time I met him.

21      Q.  You would -- you wouldn't have met him if

22  you weren't an ophthalmologist.

23          MR. DIXON:  Objection.  Foundation,

24  form.

25          THE WITNESS:  I don't know.  Though --

 Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 42

01 I don't know if I would have met him.

02 BY MR. SAMIE:

03     Q.  It's unlikely?

04              MR. DIXON:  Objection.  Form.

05              THE WITNESS:  I -- I'm not sure if

06 it's even that unlikely, because one of his

07 associates is a friend of my brother-in-law over in

08 Minnesota, and they play golf together.

09 BY MR. SAMIE:

10     Q.  Okay.  Has Precision Lens or Paul Ehlen ever

11 taken you on a trip?

12     A.  I have traveled with Paul and Pete before.

13 I would -- so I've flown on Paul's plane before.

14              But I would say -- taken me on a trip?

15 We shared a trip.  I -- I would say, more precisely,

16 Paul and Pete joined our guys' ski trip for a couple

17 of years.

18     Q.  Okay.  And you say "Pete," is that

19 Pete Gosz?

20     A.  Pete Gosz.

21     Q.  All right.  And Pete Gosz was a -- in a

22 sales capacity for Precision Lens?

23     A.  He worked -- he worked with Paul at

24 Precision, that's right.

25     Q.  And he -- he was the main salesperson that

 Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

**Transcript of Flaherty, Kevin**

Page 43

01  was working with your clinic?

02       A.  I -- I saw Pete more than I saw Paul.  He

03  would show up at our -- the -- to bring stuff over to

04  the clinic, yes.

05       Q.  Okay.  Was your interaction, as far as with

06  Precision Lens folks, predominantly with -- with

07  those two individuals?

08       A.  Yes.

09       Q.  So you said that this trip that you've --

10  you've traveled together with -- with them.

11       A.  I have.

12       Q.  Okay.  So how many times have you traveled

13  with anyone from Precision Lens?

14       A.  Well, probably -- I -- well, I've played

15  golf with Pete Gosz.  He came over here.  I took him

16  to the country club and played golf with him on -- on

17  my expense in Wausau.

18               I've driven him up to my house before;

19  you know, I've taken Pete and Paul to my house for

20  drinks and food.

21               So I've known them for a lot of years.

22  I've traveled on Paul's plane to Colorado skiing with

23  Pete.

24       Q.  Well, let's say this:  How many times have

25  you gone out of state, out of the state of Wisconsin,

Ds: 403/
sanctions,
43:24-44:18


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 44

01  with -- with Paul Ehlen, with anyone from

02  Precision Lens?

03      A.  I would say probably four times, maybe five

04  times.

05      Q.  Okay.  What --

06      A.  We --

07      Q.  What were those four times or five times?

08      A.  Well, many, many years ago, Paul flew over

09  here to Wausau.  And he had just gotten a new plane,

10  and we flew to Chicago together.

11              This was before Meigs Field was

12  destroyed.  So that would be about 2000 and -- I

13  don't know.  I think Meigs went -- when did it go

14  down?  1999 or something like that?

15              We flew to Chicago together years ago.

16              I've traveled commercially with Pete to

17  go skiing; commercial air travel.  And I've been on

18  Paul's jet a couple times to go to Colorado.

19      Q.  Okay.  So I have this trip to -- you flew to

20  Chicago with Paul.

21              Was that on a commercial flight?

22      A.  No.

23              He had just gotten a new jet.

24      Q.  This was his new jet?

25      A.  Yeah.


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 45

01              And he was having fun with it.

02     Q.  Okay.

03     A.  Said, "Let's -- let's fly to Chicago."

04     Q.  And you think that was in the early 2000s?

05     A.  No.  It was -- well, Meigs Field was still

06 in operation.

07              I think it was probably -- I think it

08 was probably 1997 --

09     Q.  Okay.

10     A.  -- '98.  Something like that.

11              Meigs Field was destroyed in the middle

12 of the night by the mayor.

13     Q.  Okay.

14     A.  And we landed at Meigs Field.

15     Q.  The -- and then you traveled commercial with

16 Pete Gosz --

17     A.  Uh-huh.  We went skiing in Colorado.

18     Q.  How many times?

19     A.  Well, we didn't -- we -- just when -- one

20 time, he -- he flew out to Color- -- well, we didn't

21 travel together.  But we were -- we were on the same

22 flight from, like, Minneapolis one time.  I was on

23 the same flight with him from Chicago one time coming

24 home from a meeting.

25              But, I mean, we weren't -- we didn't --

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 46

01 he didn't pay for my ticket.  I didn't pay for his

02 ticket.  We just traveled on the same plane.

03     Q.  Yeah.

04         And I'm trying to identify --

05     A.  Yeah.

06     Q.  -- how many different --

07     A.  Yeah.

08     Q.  -- times you guys went on a trip together --

09 right? -- so --

10     A.  We were going to the same meeting.  That was

11 at the -- like, the academy in Chicago one time.  I

12 think maybe New Orleans.  We were coming back from

13 New Orleans one time, we were on the same flight.

14     Q.  But --

15     A.  But we weren't traveling together --

16     Q.  All right.  I --

17     A.  -- we just were coming back at the same

18 time.

19     Q.  -- I understand that.

20     A.  Yeah.

21     Q.  Is that -- the -- so the Chicago -- you once

22 both flew to the same event in Chicago.  That was an

23 academy event.  Is that -- is that accurate?

24     A.  No -- well, yeah.  I mean, we've been to the

25 academy event.

**Transcript of Flaherty, Kevin**

Page 47

01          But the -- the reference I was talking

02    about, when we flew down to Chicago, that was just

03    went down there and just had dinner and hung around

04    one day, one night.

05        Q.  Okay.  So you and Mr. Gosz flew out to

06    Chicago -

07        A.  No.

08          Pete -- Paul -- Pete was not on that.

09        Q.  Oh, you --

10        A.  Just Paul --

11        Q.  -- and Paul, okay.

12        A.  -- Paul and his wife, Katie; my wife and --

13        Q.  This is the Meigs Field trip?

14        A.  Yeah.

15        Q.  Okay.  All right.

16        A.  1997.

17        Q.  Sure.

18          Past -- and I'm moving past that.

19        A.  Yeah.

20        Q.  I'm talking about the -- the commercial

21    travel with Pete that you brought up.

22          How many times did you do commercial

23    travel with Pete Gosz?

24          MR. DIXON:  Objection.  Form.

25          THE WITNESS:  When we went skiing

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 48

01  together in Colorado on another men's trip when Paul

02  didn't go.

03  BY MR. SAMIE:

04      Q.  When was that?

05      A.  Probably a couple years after these trips

06  that you referenced.

07      Q.  So --

08      A.  Probably 2013.

09              The -- the things that's -- the -- the

10  facts is that we've gone skiing with a group of guys

11  many, many times for many years.

12      Q.  We're going to get to this.

13      A.  And this was -- this was one of the times

14  I'm referencing, when we were going out to go skiing.

15  And Pete flew commercial, I flew commercial, Matt

16  flew commercial --

17      Q.  Sure.

18      A.  -- to go to the same -- same guys' event.

19      Q.  Okay.  And we'll get to that.

20      A.  Okay.

21      Q.  I'm just trying to identify the different --

22      A.  All right.

23      Q.  -- the different trips so we get a grasp.

24      A.  Sure.

25      Q.  And then I'm going to do a deep dive into

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin
### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 49

01  some of these.

02              So other than this ski trip that

03  Pete Gosz came on that Paul Ehlen wasn't present

04  for --

05      A.  Uh-huh.

06      Q.  -- were there any other trips or travel that

07  you took with Pete Gosz?

08      A.  No.

09      Q.  Okay.  Are there any other -- well, and then

10  you mentioned the -- Paul's jet to Colorado.  That's

11  the part --

12      A.  That's -- that's the ski trips that you're

13  going to talk to me about later.

14      Q.  And those are in 2010 and 2011?

15      A.  Correct.

16      Q.  January of 2010, January of 2011?

17      A.  Correct.

18      Q.  Did you ever take any other trips on -- on

19  Paul Ehlen's plane?

20      A.  No.  Just those two.

21      Q.  Just those two and the Chicago one?

22      A.  Right.

23      Q.  Those are the only three times you've ever

24  been on a Paul Ehlen plane?

25      A.  One of his planes, yes.

Ds: 403/
sanctions,
49:09-49:25


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

## US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Ds: 403/sanctions Page 50-  Page 50  50:23

01      Q.  One of his planes, okay.

02              Did you take any other trips with

03  Paul Ehlen to Beaver Creek in Colorado other than the

04  2010 and 2011 trips?

05      A.  Yes, I believe I did.

06      Q.  When were those?

07      A.  Not sure of the years.

08      Q.  Okay.  Did you take any other trips to -- to

09  Beaver Creek with Pete Gosz other than the 2010, the

10  2011, and then this one that you said happened a

11  couple years ago?

12      A.  I believe Pete went skiing with us twice

13  when Paul was not there.

14      Q.  Twice when Paul was not there?

15      A.  Yeah.

16              Both times on commercial -- commercial

17  flights for him.

18      Q.  And one time, you said, was after the 2010

19  and 2011 trips.  What about the other?

20      A.  I think they were probably -- I think they

21  were probably both after.

22      Q.  Both after?

23      A.  Yeah.  I do believe so.

24      Q.  Okay.

25      A.  I'm -- it's -- I mean, we're talking eight,


Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 51

01 nine years ago.

02           There's a big group of guys.  And

03 sometimes the makeup would change from year to year.

04 So I don't -- you know, Pete and Paul just happened

05 to join our group a couple of years.

06     Q.  Okay.  The -- so other than these trips that

07 you identified, can you think of any other trips or

08 travel that you took with somebody from

09 Precision Lens?

10     A.  No.

11     Q.  Okay.

12     A.  None.

Ds: 401/403/ sanctions, 52:15-54:08

13     Q.  What about hunting in White Lake?

14     A.  Never done it.

15     Q.  You've never gone hunting with Paul Ehlen

16 or --

17     A.  Never have.  Nope.  Never.

18     Q.  Have you ever gone fishing?

19     A.  Never have.  Not with Paul Ehlen.

20     Q.  Have you ever gone fishing with anyone with

21 Precision Lens?

22     A.  No.

23     Q.  Okay.  Have you ever gone to the Big

24 Narrows --

25     A.  No.


Flaherty designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 52

```
01      Q.  -- for a fishing trip?

02      A.  No.

03      Q.  All right.  So this is going to sound a

04 little weird to you, but I'm showing you Exhibit 18.

05              MR. SAMIE:  18 is what we're on?

06              (Exhibit 18 marked for

07 identification.)

08              MR. DIXON:  18?

09              MR. SAMIE:  Yeah.

10 BY MR. SAMIE:

11      Q.  Have you seen this document before?

12      A.  No.  I don't remember seeing it.

13      Q.  What's that?

14      A.  I don't remember ever seeing it before.

15      Q.  Okay.  So this is a letter that's dated from

16 January 31, 2005, and it's addressed to you from

17 Pete Gosz.

18      A.  Uh-huh.

19      Q.  Did you periodically receive letters from

20 Mr. Gosz?

21      A.  I -- I don't recall receiving a letter from

22 him.

23      Q.  You don't recall receiving any letters from

24 him --

25      A.  I don't.
```

Ds: 401/403/ sanctions, 52:15-54:08


Flaherty designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 53

01     Q.  -- at any time?

02     A.  I don't.

03          But I'm -- I don't process my mail very

04 well, as anyone in my office can attest.

05     Q.  Okay.  Do you think that it's possible that

06 this was drafted and sent to you?

07     A.  It is possible, yeah.

08     Q.  Okay.  So getting into the content here, it

09 says, "Kevin:  It was such a great time in Beaver

10 Creek.  It's truly the only way to travel."

11          Do you -- so this being dated

12 January 31, 2005, did you take a trip with Pete Gosz

13 to Beaver Creek sometime before this date?

14     A.  I -- possibly.

15     Q.  Possibly?

16     A.  I mean -- yeah.  I mean, probably, I would

17 say.  Based on this, I must have.

18     Q.  Okay.  So when do you think that would have

19 been?

20     A.  Probably January of '05.

21     Q.  January of '05.

22     A.  We -- when we traveled, we put this guys'

23 trip together, it was almost always early January --

24     Q.  Okay.  So --

25     A.  -- when we did these guys' trips, like I

 Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 54

01 said, for many years.

02     Q. So it says "It is truly the only way to

03 travel."

04     Do you remember anything about how you

05 would have traveled to get there that would have been

06 noteworthy?

07     A. You know, I can speculate if you want me

08 to.

09     MR. DIXON: Objection. Form.

10 BY MR. SAMIE:           Ds: 401/403, sanction

11     Q. Please.           54:10-54:18

12     A. You know, possibly we went with Paul that

13 time.

14     Q. It's possible that you did do a trip earlier

15 with Paul Ehlen?

16     A. Very possible, yeah.

17     Q. And -- and that you may have also gone on

18 his private -- private plane at that time?

19     MR. DIXON: Objection. Form.

20 Foundation.

21     THE WITNESS: It -- it's definitely  Ds: 401/403,

22 possible, yeah.               sanction

23     Like I said, I -- I've skied with --  54:21-55:06

24 with them several times over the years.

25 BY MR. SAMIE:


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 55

01     Q.  You've skied with them several times over

02 the years.

03          But you think it's possible that you

04 may have gone with Paul Ehlen one more time, in

05 addition to the 2010 and 2011 trips that we've

06 identified?

07          MR. DIXON:  Objection.  Form.

08          THE WITNESS:  Very -- very -- very

09 possibly, yeah.

Ds: 401/403, sanction 55:08-55:09

10 BY MR. SAMIE:

11     Q.  Okay.

12     A.  Yeah.

13     Q.  And that -- also on one of his private

14 planes?

15     A.  Probably.

16     Q.  Okay.  So there's -- the next paragraph, "I

17 truly appreciate all your business support."

18          What did you understand that to mean?

Ds: 401/403, sanction 55:16-55:20

19     A.  That he's glad that we do business with

20 Precision Lens.

21          "Moreover, your friendship."

22     Q.  Okay.

23          (Exhibit 19 marked for

24 identification.)

25 BY MR. SAMIE:


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 56

01     Q.  Showing you Exhibit 19.  So this is another

02  letter.

03              Do you recall seeing -- receiving this

04  letter?

05     A.  No, I don't.

06     Q.  Okay.  But, again, same questions:  Do you

07  think it's possible that Mr. Gosz --

08     A.  I'm sure he sent it if it -- if there's a

09  record.

10              MR. DIXON:  Objection.  Foundation.

11  BY MR. SAMIE:

12     Q.  Okay.  It's likely that you may have

13  received the letter and then, at some point, tossed

14  in the waste basket.

15              MR. DIXON:  Objection.  Foundation.

16              THE WITNESS:  I don't know if I

17  received it or not.

18  BY MR. SAMIE:

19     Q.  Okay.  So this is dated May 12, 2006.  And

20  the -- so the Bates number on this is PL0042521.

21              MR. SAMIE:  And just for the record, 18

22  was -- or excuse me.  17 was PL0042349.

23  BY MR. SAMIE:

24     Q.  Do you usually save your correspondence that

25  you get?


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 57

```
01      A.  No.

02      Q.  No.

03              What is your general practice with mail

04 that you get?

05      A.  In the garbage can.

06      Q.  Yeah.  I'm the same way.

07              "Kevin" -- looking at this -- looking

08 at this letter here, it says, "Kevin:" -- and it's --

09 again, this is from Pete Gosz.  "It was a pleasure

10 visiting with you at dinner.  Thank you for bringing

11 the photos from Beaver Creek.  I really appreciated

12 that."

13              So this is now 2006 in May.  It sounds

14 like you went to dinner with Mr. Gosz.

15              MR. DIXON:  Objection.  Form.

16              THE WITNESS:  I must have.

17 BY MR. SAMIE:

18      Q.  Okay.  And it's referring to photos from

19 Beaver Creek.

20              Is it possible that -- that you went on

21 a trip earlier in 2006 with Mr. Gosz to Beaver Creek?

22      A.  I don't know if I did or not.

23              I -- I've gone skiing almost every

24 January for many, many years.  And like I said, Pete

25 and Paul came on a couple of our guys' trips --
```


Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 58

01      Q.  Uh-huh.

02      A.  -- and he may have been on a trip.

03              There was a memorable photo that I took

04  of Pete with a professional golfer, Phil Mickelson.

05  We saw him at lunchtime.  And there was a picture of

06  the two of them together that I had framed and gave

07  to Pete --

08      Q.  Oh, that's nice.

09      A.  -- of he -- he and Phil Mickelson at a

10  lunch -- at a lunch restaurant called Beano's.

11      Q.  Do you think that that might have been the

12  picture that he's talking about here?

13      A.  Probably.

14      Q.  Okay.

15      A.  Because I -- I had it made in an 8-by-10 and

16  gave it to him.

17      Q.  Okay.  And so you would have had time, from

18  a January photo being taken, to get this to him by

19  May.

20              MR. DIXON:  Objection.  Foundation.

21              THE WITNESS:  I -- yes.  I mean, unless

22  I was really lackadaisical.

23  BY MR. SAMIE:

24      Q.  Sure.

25              So this one, though, doesn't mention

 Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 59

01 anything about the only way to travel.

02             Do you remember anything about if

03 Paul Ehlen was on that trip?

04     A.  I -- I don't.  I really don't recall.

05     Q.  Do you remember how you got there?

06     A.  I -- I don't even know for certain that this

07 was the year that -- that there were -- they were

08 another -- a trip with us.  I don't.

09     Q.  Okay.  So it says here, in the next

10 paragraph, "I am hoping that our ideas of Viscoat to

11 Amvisc will work for you."

12             What do you understand that to mean?

13     A.  It looks like he's trying to get me to

14 switch from a product that -- that I'm using, the --

15 like I said, the -- the dispersive, to a different

16 type of viscoelastic.

17             So -- but I obviously was using

18 something I thought was better for my patients at the

19 time.

20             So he was -- I -- I probably -- based

21 on the second line of that paragraph, "I will have a

22 dispersive product by the end of the year and will

23 bring that around for you to try" -- "evaluate."

24             He's trying to -- he's trying to gain

25 our business with a product that would be equal to


Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 60

01  the product I was using that, obviously, they

02  probably weren't selling.

03      Q.  I see.  Okay.

04          So it says "I am hoping that our ideas

05  of Viscoat to Amvisc will work for you."

06          Are those two dispersive visc- --

07      A.  They're different.  Yeah, different

08  agents.

09      Q.  They're different --

10      A.  Amvisc is the one product that's -- that's

11  not two separate products.

12      Q.  Okay.  It's a combined?

13      A.  It's a combined -- no, it's not a combined.

14  Amvisc is not a combined product.

15      Q.  It's not a combined --

16      A.  Not a combined product, right.

17          Viscoat is the -- is the protective

18  viscoelastic, the cohesive type.

19      Q.  Yes.

20      A.  And Amvisc is -- is just one.  They're --

21  they're trying to say it would work for both.

22          And that's what my colleague --

23      Q.  I see.

24      A.  -- used forever.  And I didn't -- I didn't

25  like it as much.

 Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 61

01      Q.  Okay.  Okay.  But it looks like -- it says,

02  "I appreciate your willingness to try it."

03              It looks like you are going to try it.

04      A.  I probably told him if he brought something

05  as good for less money for the surgery center, for

06  whoever was buying it, I would be willing to try it.

07      Q.  Okay.

08      A.  You know, I'm always trying to be

09  cost-effective.

10      Q.  Okay.  Do you remember who -- who

11  manufactures Viscoat?

12      A.  I don't know who manufactures Viscoat.  I

13  think that's Alcon, but I -- I'm not positive.

14      Q.  What about Amvisc?

15      A.  That might be somebody else.

16      Q.  AM -- is that probably AMO?

17      A.  That could be AMO.  Amvisc --

18              MR. DIXON:  Objection.  Foundation.

19              THE WITNESS:  Amvisc probably is -- I

20  don't know.  I really don't know.

21  BY MR. SAMIE:

22      Q.  Okay.  Is -- is Viscoat part of the

23  DuoVisc?

24      A.  Yes.

25      Q.  That's kind of --

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 62

```
01      A.  That's -- that's --

02      Q.  -- one-half of the box?

03      A.  Correct.

04      Q.  Okay.  So it seems like, in 2006, you're

05  still using -- predominantly using the DuoVisc.

06      A.  Right.

07      Q.  All right.  So sometime after that is when

08  you changed over to the HEALON EndoCoat?

09      A.  Yeah.

10      Q.  Okay.  Did you ever go to a wine tasting

11  event put on by Sightpath and Precision Lens?

12      A.  No.

13      Q.  No?

14      A.  (Shakes head.)

15      Q.  Okay.  Did you -- did you go on a trip in

16  January 2007 to Beaver Creek with Paul Ehlen?

17      A.  I -- I don't know.  I am not sure.  May- --

18  possible.

19          Like I said, Paul went on a couple

20  trips with us.

21      Q.  Annually, you said you go --

22      A.  With a whole group of guys.

23      Q.  -- with a whole group of guys.  And

24  that's -- is that always in January?

25      A.  Yeah.
```

 Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

**Transcript of Flaherty, Kevin**

Page 63

```
01      Q.  And that's kind of a thing you do.

02      A.  For many, many years.

03      Q.  Can you think of any year that you didn't do

04 it?

05      A.  Yes.

06            This -- this year, we didn't do it

07 because the dates didn't work between Matt and Ian

08 and I.  We're the three that have gone pretty much

09 every single year.  Ian, because he owned the condo

10 that we stayed at, which he sold, at Beaver Creek.

11      Q.  Okay.

12      A.  Matt, because we ski together all the

13 time.

14      Q.  Sure.

15            And when you -- when you say "this

16 year," you mean 2019?

17      A.  2019, I did not.

18            I went -- instead of with the guy trip,

19 I went with my kids and family, and I did it in

20 February.

21      Q.  Oh, great.

22      A.  But I went to Beaver Creek again, yes.

23      Q.  Okay.  So -- but going back --

24      A.  That's the first year in many, many, many

25 years that we didn't do it.
```

 Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

**Transcript of Flaherty, Kevin**

## Flaherty, Kevin
**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 64

01      Q.   Okay.  So it's like- -- so it's likely, in
02  2007, you also went to --
03      A.   Yeah.  Yeah.
04      Q.   Okay.
05               (Exhibit 20 marked for
06  identification.)
07  BY MR. SAMIE:
08      Q.   Showing you Exhibit 20.  So this is -- this
09  is a credit card statement that was produced to us
10  from Precision Lens.  It's Bates-stamped PL0002949.
11  And it's a -- it's a statement -- a January statement
12  for activity from December 12, 2006, through
13  January 9, 2007.  And the statement is for
14  Cameron-Ehlen Group, Incorporated, for Paul Ehlen.
15               Do you see that --
16      A.   I do.
17      Q.   -- at the top there?
18      A.   Uh-huh.
19      Q.   Okay.  I assume you haven't seen this
20  document before.
21      A.   I have not.
22      Q.   I'm still going to ask you just a question
23  or so about this.
24               If you go to the second page.
25      A.   Okay.

 Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 65

01      Q.  Do you see the dates -- transaction dates of

02  1-5?  A lot of these are posting on 1-8 and 1-9.

03           But maybe a reference number would be a

04  better way to do this.  Reference number 627- --

05  excuse me.  3328.

06           Do you see that?

07      A.  Reference number 33- -- yes, I do.

08      Q.  So that -- the transaction date on 1-6.  So

09  January 6, 2007.

10      A.  Okay.

11      Q.  It says "BC lift ticket."

12      A.  Yep.

13      Q.  "RC" in parentheses.  And then it says

14  "Beaver Creek, Colorado."

15      A.  $86 -- or $85, not 86.

16      Q.  $85.

17      A.  Yeah.

18      Q.  And then, in the notation there, it's

19  written "ski trip."

20      A.  Okay.

21      Q.  Okay.  Do you think, after looking at this,

22  that it's likely that, in January of 2007, Mr. Ehlen

23  was also on this ski trip at that time?

24           MR. DIXON:  Objection.  Form.

25  Foundation.

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 66

01          THE WITNESS:  Yeah.  He probably was.

02 It looks like he bought his own lift ticket.

03 BY MR. SAMIE:

04    Q.  Okay.  And -- and do you have any

05 recollection of traveling on his private flight in

06 2007?

07    A.  I -- I'm not sure if we traveled separate or

08 not, or if it was commercial.  I don't -- I really

09 don't recall.

10    Q.  Did -- are you -- do you know -- Paul Ehlen,

11 as far as you know -- have you seen him fly

12 commercially within the -- within the states?  Or

13 does he typically fly his private plane?

14    A.  I -- I know he's --

15          MR. DIXON:  Objection.  Foundation.

16          THE WITNESS:  I'm not -- I don't

17 know.

18 BY MR. SAMIE:

19    Q.  I'm just asking what you've observed.

20          Have you ever seen him take one of

21 these trips without his private plane?

22    A.  I -- I know I've seen Paul at the meetings

23 around the country.  And I've asked him if he

24 traveled commercially or on his own plane.  And I

25 recall, on occasion, where he said, "I came

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 67

01 commercial."

02          I don't recall -- I don't remember

03 exactly when.

04     Q.  That's fine.

05     A.  But that --

06     Q.  For --

07     A.  I've had --

08     Q.  Sorry.

09     A.  -- a conversation that he said he flew

10 commercial.

11     Q.  Okay.  And that was for a meeting, you

12 said?

13     A.  Yeah.  Some -- when I ran into him

14 someplace.

15     Q.  Okay.  So 2008 and 2009, did you -- you

16 never went on a trip to White Lake for hunting?

17     A.  Never.

18     Q.  So in 2010, you --

19     A.  I can, perhaps, save you a lot of questions.

20          I never did anything with Paul;

21 hunting, fishing, anything.  The only times that

22 we've ever gone on trips together is when he and Pete

23 joined our ski trip on a couple of -- a couple times.

24     Q.  Okay.

25     A.  Okay?

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 68

```
01      Q.  Well, then let's go -- let's go to this 2010
02 ski trip.
03                This was, again, in January of 2010.
04      A.  Okay.
05      Q.  It was -- is that right?
06      A.  Yeah.  That's -- we go in January.
07      Q.  You go in January.
08                Did -- and Mr. Ehlen flew you on his
09 private plane for that trip?
10      A.  We -- we flew on his plane together, that's
11 correct.
12      Q.  Okay.  And so walk me through the logistics
13 of that.  Did you get picked up in Wausau?  Get flown
14 to Colorado?  Or -- and back?  You know, what were
15 the logistics of the plane?
16      A.  Yeah.
17                In 2010, he keeps his planes at the
18 Flying Cloud airport, I believe.  And he flew from
19 there over to Wausau, picked up the owner of the
20 condominium where we were staying, Ian Swift --
21      Q.  Uh-huh.
22      A.  -- Matt Hattenhauer, myself, and Joe Mella,
23 a local attorney in town here; Keith Kocourek, a car
24 dealer who is also a skier.  People who, you know,
25 ski together.  A group of guys who go skiing
```


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 69

01 together.

02          And he came over here, picked us up.

03 We flew from here to Eagle County Airport and --

04 arrived in Eagle County.

05          I can't remember, that year, if -- Ian

06 had an old Chevy Tahoe or something he kept at the

07 airport, or if he had one of his friends pick us up

08 and take us to where Ian owned the condo in Beaver

09 Creek.

10          And then, when we left, we left from

11 the condo, back to Eagle, and flew back to Wausau.

12 And he dropped us in Wausau.

13     Q.  Okay.  So -- so that year, you don't think

14 you took some sort of a shuttle?  Or you're not

15 sure?

16     A.  I -- I'm not sure.

17     Q.  How -- how long is the drive from Eagle to

18 Beaver Creek?

19     A.  Fifteen minutes.

20     Q.  Fifteen minutes, okay.

21     A.  (Nods head.)

22     Q.  Okay.  So you have flown to Beaver Creek

23 commercially as well as with a private aircraft.

24     A.  Yes.  Many times.

25     Q.  What -- what are the -- I guess what are the

 Flaherty
designations

✎ Ps' Counters to Ds'
Flaherty Designations

**Transcript of Flaherty, Kevin**

## Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 70

01  logistics of flying there commercially?  How do you

02  get from Wausau to Beaver Creek?

03      A.  There was a -- a direct flight from

04  Minneapolis to Vail Eagle that Delta had.

05      Q.  Uh-huh.

06      A.  And so we'd fly from Wausau over to

07  Minneapolis, or drive.  A couple times we drove to

08  Minneapolis and parked at the airport and then

09  drove -- and then flew to Eagle and then took the --

10  a shuttle from the Eagle County Airport to -- to

11  Beaver Creek.

12      Q.  Okay.  So that's a much lengthier time

13  for --

14      A.  If you have to drive to Minneapolis, it's

15  definitely lengthier, yeah.

16      Q.  And --

17      A.  We have flown from Wausau to -- Wausau to

18  Minneapolis, Minneapolis to Eagle.

19          And then I've also done fly to Denver

20  and then Denver, a little short hop up to Eagle.

21          I remember one night, that flight got

22  canceled.  We had to take a Colorado Mountain Express

23  one time from Denver up to Beaver Creek because the

24  weather was bad.  They canceled the local flight.

25      Q.  Okay.  I want to go back to this in a

 Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 71

01  second.

02      A.  Sure.

03      Q.  But I just wanted before -- just to close

04  out this trip.

05          Where do you -- where did you stay?

06      A.  At Ian Swift's condominium in Snowcloud.

07      Q.  Did you pay for that -- for staying at

08  Mr. Swift's --

09      A.  No.

10      Q.  -- condominium?

11      A.  The only time I've ever paid Ian for the use

12  of his condo is when he was not with me, when I've

13  rented privately from him for my family and kids.

14      Q.  Sure.

15      A.  So Ian is an ear, nose, and throat doctor

16  who used to live in Wausau.  He now -- he moved away,

17  and now he's in Gillette, Wyoming.  But Ian was

18  Matt Hattenhauer's next-door neighbor and a good

19  friend of ours.  And Ian had two places in Colorado.

20          And so I never paid to stay at Ian's

21  place when we were -- Ian was with us.

22      Q.  What did you pay for on that trip?

23      A.  Group expenses.

24          What -- if we'd go out to lunch,

25  dinner, we'd take turns paying for meals.  And then


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 72

01  we'd square up at the end.

02      Q.  Tell me about that squaring up.

03      A.  Sure.

04      Q.  How -- how does that work?

05      A.  You betcha.

06          On the 2010 trip, Joe Mella, who's an

07  attorney and also very type-A personality --

08      Q.  Many of us are.

09      A.  -- would -- would be the accountant.

10          So there was a -- a bowl, like a salad

11  bowl or a wooden bowl, on Ian's dining room table.

12  And every time we'd go to a meal, we'd keep -- we had

13  breakfast at the condo.  And then we'd go skiing, and

14  then we'd stop and eat lunch at private cabins that

15  Ian had access to because he was a homeowner there.

16          There are three cabins on the Beaver

17  Creek mountain:  Beano's, Allie's, and Zach's cabin.

18  And those three cabins, you could make a reservation

19  to have lunch there.

20          So we'd have a very nice -- we'd ski

21  hard in the morning.  We'd get out, 9:00 o'clock; ski

22  hard until about 1:00.  Have a leisurely lunch with,

23  you know, some wine.  And then we'd ski in the

24  afternoon until about 4:00 o'clock.  And then go back

25  to the condo, relax.  And then we'd go out to a group



Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

## US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 73

01  dinner, usually fancy group dinners, at some nice
02  restaurants.
03      Q.  So you'd take turns paying.
04      A.  We'd take turns.
05          So okay.  You paid yesterday.  You
06  know, here's my credit card for lunch.  Here's my
07  credit for dinner.
08          Then you'd go back to the condo, put
09  the receipt in the bowl on the table.  And then, at
10  the end of the weekend, we'd figure out who paid what
11  and who owed what to each other.
12          And you'd either write a check or --
13  you know, Keith Kocourek always liked to carry a lot
14  of cash.  He's a car dealer who was on the trip.
15  And --
16      Q.  Sure.
17      A.  -- you know, what do I owe?  You know, he
18  always figured it out.  And then we'd -- we'd square
19  up.
20          So we'd all pay the same amount of
21  money for the trip for the weekend.
22      Q.  So would you pay -- would you -- -- would
23  you pay it to -- like, by check?
24      A.  I like to put things on my credit card,
25  because I like to, you know, get the airline miles



Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 74

01  and stuff.  So --

02      Q.  Sure.

03      A.  -- I'd use a credit card, oftentimes, if I

04  was paying for a group, you know.

05      Q.  Right.

06              But in the settling-up process, when

07  you got the final accounting --

08      A.  Like I said, sometimes check, sometimes

09  cash.  Depends what -- you know, sometimes people

10  paid me.  I didn't necessarily owe people.  If I paid

11  for a lot of meals, they would pay me back.

12      Q.  Was there a -- some sort of a documentation

13  of this settling up?

14      A.  No.  Just -- you know, just a piece of paper

15  that Joe Mella would --

16      Q.  And so --

17      A.  -- you know, figure out.  You know, Ian owes

18  Matt this; or, you know, Keith owes Kevin so much,

19  the differential for the --

20      Q.  Would -- would anyone send an invoice or

21  anything like that?

22      A.  No.

23      Q.  No?

24      A.  No.  Just guys.  Just traveling together.

25      Q.  Sure.  Okay.


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 75

01          So did Paul Ehlen pay for an expensive

02 sushi dinner one night for the group?

03      A.  I saw that.

Ps: 403/602
75:1-23

04          No.  In fact, I paid for that sushi

05 dinner that night.  And I've got the receipt on my

06 credit card there.  It's Sato.

07      Q.  So I'm talking about 2010.

08      A.  Oh, I'm -- I -- I'm not sure.

09          I mean, he might have.

10          Like I said, we all took turns paying.

11 But I know I paid for -- I saw a receipt on my credit

12 card for an expensive sushi dinner.

13      Q.  Okay.  And, I mean, we can -- we can get to

14 that.  But --

15      A.  Uh-huh.

16      Q.  -- here's --

17      A.  So it's very -- like I said, everyone --

18 everyone paid for different meals, and then we

19 squared up at the end.

20          So, yeah, he probably put something on

21 a -- on his credit card one time.  It wouldn't

22 surprise me at all.  Like I said, we all took

23 turns.

24      Q.  Okay.  And do you know if that was

25 Paul Ehlen's personal card or --

 D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 76

```
01      A.  I have no idea.

02      Q.  -- Precision Lens' card?

03      A.  Don't know.

04      Q.  Do you talk business on these trips?

05      A.  Mostly, it's just fun.

06      Q.  Did you talk any business on those trips?

07      A.  I mean, you -- if you got your partners

08  there, occasionally, you'd talk business.  Because

09  your -- you know, your colleagues are there.  You

10  talk about stuff.  But --

11      Q.  Well, no.  If your -- these are your vendors

12  that are there as well.

13      A.  I mean, they might say, "Oh, there might be

14  a new lens coming out."  Or, you know, "You might

15  want to do this or that."

16              They may -- they may have, in

17  conversation, but I don't recall ever talking

18  business, really, with them.

19      Q.  Okay.  But given the amount of time you were

20  together, the fact that you work in the same arena,

21  it's likely that you did talk some business?

22      A.  You're riding chair lifts, you're -- you

23  know, you're skiing.  You just -- it was really just

24  fun, you know.

25              My retired partner lives out there.  He
```


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 77

01 would join us every year and ski a couple days.

02 Steve Herman.

03     Q.  All right.  So 2011 --

04     Well, actually, the flight.  Did that

05 come into -- I guess who -- did you pay for the

06 flight?

07     MR. BIRRELL:  Which flight?

08 BY MR. SAMIE:

09     Q.  The 2010 flight out to Beaver Creek.

10     A.  Typically, what would happen is we'd ask

11 Paul how much the fuel was.  You know, "What do we

12 owe you for fuel?  How much?  You know, how much is

13 it?"

14     You know, Paul would be flying the

15 plane himself.  And he -- you know, we'd say, "What

16 are -- you know, what do we owe?  You know, put that

17 into the equation."

18     Q.  Yeah.

19     A.  We'd ask.

20     Q.  So your recollection was that, in the

21 settling-up process, the cost of the fuel would be

22 kind of the metric for evaluating the value of this

23 flight?

24     A.  Typically, yes.

25     Q.  And then that would be split up amongst the



Flaherty
designations

D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 78

```
01  people that were on the flight.
02      A.  Right.
03              "What do we owe?"
04      Q.  "What do we owe for the fuel?"
05      A.  Right.
06      Q.  Okay.
07      A.  Because that I -- we -- we -- everything
08  else was black and white.  We knew -- you know, you
09  could see the receipts for everything else.  But we
10  really didn't know, you know, what, you know, the --
11  the fuel expense or airplane expense would be.
12      Q.  Sure.
13              The -- the settling up, you have -- for
14  this 2010 trip, do you have any documentation of
15  checks paid or the accounting for that settling up?
16      A.  I -- I tried to find some old checks.  I
17  didn't really find the old checks.  I saw my credit
18  card statements.
19      Q.  Sure.
20      A.  And that's all I could find.
21      Q.  And those are the credit card statements for
22  the stuff that you get --
23      A.  That I paid for.
24      Q.  -- you get credited for --
25      A.  Right.  Right.
```

 Flaherty
designations

D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

## US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 79

01     Q.  -- in the settling up?

02     A.  Right.  Right.

03            MR. DIXON:  Objection.  You guys are

04  talking over each other.

05            MR. SAMIE:  Okay.

06  BY MR. SAMIE:

07     Q.  The -- that -- that -- those credit card

08  statements, those -- those charges in there that you

09  highlighted, those are the items that you

10  contributed --

11     A.  Could -- could easily identify.

12            The -- and the -- you know, with the

13  first look at them.

14            MR. SAMIE:  Are we on 21?

15            (Exhibit 21 marked for

16  identification.)

17  BY MR. SAMIE:

18     Q.  So I'm showing you 21.  So these are -- this

19  is a four-page exhibit, and the Bates number is

20  Flaherty 32 through 35.

21            Do you see that?

22     A.  Yeah.

23     Q.  Are these, kind of, pages of different bank

24  statements that you --

25     A.  Yeah.  Credit card statements.


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 80

01     Q.   That -- these came from your personal --

02     A.   My --

03     Q.   -- credit card statements?

04     A.   Yes.  Exactly.

05     Q.   And these accurately reflect what it is

06 that -- the actual copies that you received from the

07 bank?

08     A.   They do.

09     Q.   So on this very first page, this is Flaherty

10 32, you've circled two items here?

11     A.   Right.

12     Q.   And -- and is this your handwriting?

13     A.   "Group meal," I wrote -- I wrote that.

14     Q.   And you circled the amounts?

15     A.   I did.

16     Q.   So these -- are these circled amounts items

17 that -- that you would have been credited in the

18 settling-up process?

19     A.   Yeah.

20     Q.   Okay.  It looks like this is the only page

21 for 2010.

22     A.   Incorrect.  The next page as well.

23     Q.   So the next page looks like it's December 20

24 to January 27 --

25     A.   But the -- look at the -- the -- the

 Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 81

01 transaction date for the Sato meal, the sushi meal.

02 January 7.  Sato meal, 553.  I paid for that.

03      Q.  Right.

04           I'm saying the second page, it looks

05 like it might be from -- a statement from 2011.

06      A.  Yeah.  It was.  December 28 to January '11.

07 It's the statement at the top, right.

08      Q.  All right.  So on the first one, though,

09 that's for January 2010; right?

10      A.  Well, no.

11           The first one, it says the posting date

12 is January 11.

13      Q.  Of 2010.

14      A.  Um --

15      Q.  It's one of those deals where I think

16 we're -- unfortunately have days in the years that

17 are --

18      A.  All right.

19           MR. DIXON:  Top of the page.

20 BY MR. SAMIE:

21      Q.  It's at the top of the page, circled.

22      A.  Oh, yeah.  January 2010 statement.  Okay.

23      Q.  2010 statement.

24      A.  All right.

25      Q.  So we're looking at -- so just on the first


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 82

01 page, we're looking at --

02      A.   Yes.

03      Q.   -- posting dates of --

04      A.   Okay.

05      Q.   -- or you know, transaction dates and

06 posting dates.

07      A.   Yeah.

08      Q.   Okay.  So --

09      A.   January 8 and January 9.

10      Q.   So for this document here, is this the

11 extent of what you believe you put on your card or

12 what you were credited for in the accounting

13 process --

14      A.   That's --

15      Q.   -- for the 2010 trip?

16      A.   That -- that's all I could find when I was

17 asked to look for it.

18      Q.   Okay.

19      A.   You know, there might be more.  Because,

20 like I said, I may have had a different credit card

21 as well.  But it -- you know, I don't -- fortunately,

22 my wife's fairly organized.  She was able to find

23 these statements, but --

24      Q.   Sure.

25      A.   -- there -- you know, I'm -- there might


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 83

01 have been a different statement.

02          I often use an American Express card

03 too, and this is a -- this is a Visa statement.

04 So...

05     Q.  Do you recall if this was a year that you --

06 you owed at the end of it, or you were getting money

07 back?

08     A.  I have no clue.  I don't recall.

09     Q.  Okay.  And -- but you don't have any records

10 of any additional payments that you made related to

11 this trip?

12     A.  I don't.

13     Q.  All right.  Let's move on to 2011.

14          So 2011, January, you took another ski

15 trip to Beaver Creek; is that right?

16     A.  Right.

17     Q.  Okay.  And who -- who was on that trip?

18     A.  Basically, the same group, except Joe Mella

19 did not go that year and Doug Edwards came.

20     Q.  And who is Doug Edwards?

21     A.  One of my colleagues.

22     Q.  He's another surgeon?

23     A.  You met him yesterday.

24     Q.  Right.

25          Okay.  And how did you -- how did you


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 84

01  get to Beaver Creek in 2011?

02      A.  Well, that was a -- a little different,

03  because I was doing surgery the morning that we left

04  and Doug also was, I believe.

05              And so rather than driving over to

06  Minneapolis -- and Paul indicated that he wanted to

07  leave from Flying Cloud, which was fine.  He was

08  still offering to, you know, fly with us out there.

09  So Keith Kocourek flew us from Wausau over to Flying

10  Cloud that morning.

11      Q.  Okay.

12      A.  So we worked.  Doug and I worked that

13  morning here in Wausau.  And then Keith, who is also

14  a pilot and a friend of Paul's, that's part of their

15  connection, flew his plane with us to Minneapolis, to

16  Flying Cloud, and we left from Flying Cloud.

17      Q.  Okay.

18      A.  On that morning.

19      Q.  And that was on January 9 --

20      A.  Whatever that Thursday was.

21      Q.  It was a Thursday?

22      A.  Yeah.

23      Q.  Okay.  I think it was January 6, actually,

24  2011.

25              Does that sound about right?


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 85

```
01      A.  I -- it would --

02      Q.  It was a Thursday, though?

03      A.  I can look at my calendar, if you want me

04 to.

05      Q.  But you're sure it was a Thursday?

06      A.  Yeah.

07      Q.  Okay.

08              (Exhibit 22 marked for

09 identification.)

10 BY MR. SAMIE:

11      Q.  Giving you 22.

12              Okay.  So this is an email that was

13 from December 14, 2010; so the end of 2010.  And the

14 subject matter is a "Beaver Creek plan."

15              It looks like you are a recipient of

16 some of these emails.

17      A.  Yep.  I was on them.

18      Q.  Okay.  So you would have received these

19 emails?

20      A.  Right.

21      Q.  Okay.  And so it looks like these are -- are

22 these emails relating to the planning for the Beaver

23 Creek trip --

24      A.  Uh-huh.

25      Q.  -- happening in January?
```

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 86

01     A.  Yep.

02     Q.  Okay.  And it looks like, on -- so on the

03  second from the top, there's an email from

04  Pete Gosz -- well, actually, let's just go from the

05  bottom.

06          It says "Here is the plan:  Keith will

07  be flying Wausau group to Minneapolis."

08          Do you see that?

09     A.  I do.

10     Q.  All right.  Is that what you're referring

11  to?

12     A.  Yes.

13     Q.  Okay.  Did -- did Matt Hattenhauer also go

14  on that or --

15     A.  He went on the trip, but he -- he drove over

16  to Minneapolis.  I think his wife was going to

17  Minneapolis for something.  So she drove him to

18  Minneapolis.  His daughter, I think, was in

19  Minneapolis at the time.  So --

20     Q.  Okay.

21     A.  -- he drove.  His wife gave him a ride, I

22  believe, to Flying Cloud.  He did not fly with Keith

23  and Doug and I over there.  So he was there when we

24  arrived.

25     Q.  He was there when you --

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 87

01      A.  At Flying Club, uh-huh.

02      Q.  Got it.  Okay.

03           "We will all" -- so the next -- "We
04  will all fly to Eagle together, and Paul will drop
05  Wausau group in Wausau on Sunday night."

06           Is that how it ultimately worked?

07      A.  Yes.

08      Q.  Okay.  So he -- you caught a ride from
09  Minnes- -- Minneapolis, Minnesota, to Eagle --

10      A.  Uh-huh.

11      Q.  -- and on the way back, you got --

12      A.  Came to Wausau.

13      Q.  -- the flight all the way to Wausau.

14      A.  Right.

15      Q.  Okay.

16           "What time do you want to leave from
17  Wausau on Thursday?  Paul does like to land before
18  dark at Eagle airport."

19           Do you see that?

20      A.  Yep.

21      Q.  Okay.  And then we -- kind of skipping
22  over Mr. -- Dr. Hattenhauer's email, but Pete Gosz
23  asked, "Do we want to ski Thursday?"

24           And -- do you see that?

25      A.  Yeah.  At the top.

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 88

01     Q.  And that Dr. Edwards says, "Absodamlutely.
02  Off all day as well."
03               Do you see that?
04     A.  Uh-huh.  Yep.
05     Q.  Do you remember if you -- if you did ski on
06  that Thursday?
07     A.  I -- I don't recall.
08     Q.  Okay.  Do you remember -- do you remember
09  generally being able to ski on the days that you
10  would travel out there?
11     A.  Occasionally.  And commercially too.
12               Their deal -- Delta had a deal where,
13  if you flew Delta to Eagle, and when you presented
14  your boarding pass to the lift ticket at Beaver
15  Creek, they would give you a half-a-day pass free.
16  You wouldn't have to pay for it.
17     Q.  But it would have -- it would have to be on
18  the day that you actually --
19     A.  Yeah.
20     Q.  -- flew there?
21     A.  The day you flew, yeah.
22               So if you -- if you arrived in -- in
23  Beaver Creek, you go out -- say you get there at 1:00
24  or 2:00 in the afternoon.  The lifts are open until
25  4:00.  You could take the boarding pass from Delta

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 89

01 and present it to the lift ticket, and they would

02 give you a pass for -- without charging you.

03     Q.  Okay.  So that was a flight from Minneapolis

04 to --

05     A.  That -- yeah.  On a commercial flight.

06     Q.  Commercial flight --

07     A.  Yeah.

08     Q.  -- from Minneapolis to --

09     A.  So I remember doing it a couple times.

10     Q.  -- to Eagle?

11     A.  Now, the -- and I do remember, also, on the

12 days we would travel, coming back, we would ski on,

13 you know, Sunday, and then fly back, which was

14 nice.

15     Q.  Fly back commercially --

16     A.  No.

17     Q.  -- or fly back --

18     A.  When we went with Paul.

19     Q.  When you went with Paul.

20     A.  Yeah.

21     Q.  Okay.  So that was the only time you could

22 get in a ski on --

23     A.  Yeah.  Yeah.

24             MR. DIXON:  Objection.  Form.

25 Foundation.


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 90

01 BY MR. SAMIE:

02      Q.  So that would have been the only day that

03 you can ski on the day you were flying back, back

04 home?

05           MR. DIXON:  Objection.  Foundation.

06           THE WITNESS:  It -- it would depend on

07 when your return flights were commercially.

08           We -- we did it a few times when we

09 were flying from -- from Vail to -- from Eagle to

10 Minneapolis.  You could do it.

11           But if you -- if you had to connect

12 through Denver, you couldn't do it.  There wasn't

13 enough time in the day.

14 BY MR. SAMIE:

15      Q.  Okay.  The flight from Minneapolis that you

16 were referring to, that you get this discount for --

17      A.  Uh-huh.

18      Q.  -- that was direct to Eagle?

19      A.  Yep.

20      Q.  They -- do you remember what time that would

21 leave Minneapolis?

22      A.  Like 10:20 in the morning or something like

23 that.

24      Q.  10:20 in the morning.

25      A.  Yeah.  Something -- thereabouts.

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 91

01      Q.  Okay.  So on this particular trip, there's

02  no way that you would have ever been able to take

03  that flight if you were going to be doing surgeries

04  in Wausau Thursday morning; right?

05                MR. DIXON:  Objection.  Foundation.

06                THE WITNESS:  I'd have to start really

07  early and leave really early.

08  BY MR. SAMIE:

09      Q.  It -- but it's, like, a three-hour drive.

10      A.  It would -- you wouldn't get a lot of

11  surgery in.

12      Q.  Okay.  So you were able to get the amount of

13  surgery in that you wanted to for this particular --

14  the way that this was particular -- was -- was

15  organized; right?

16      A.  I don't remember how much I wanted to do

17  that day.

18      Q.  Okay.

19      A.  But --

20      Q.  Okay.

21      A.  But it just -- I was scheduled to work.  So

22  that's why we did it that way.  That way, Keith flew

23  us.

24      Q.  So what did you pay for -- or I should --

25  where did you stay on this trip?


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 92

01     A.  Every time I've been out there with the
02 group of guys, I've stayed at Ian Swift's condo.
03 Every single time.
04     Q.  Did he charge anything for the use of the
05 condo?
06     A.  No.
07          But he was in the pool, like the rest
08 of us, where, you know, the money he spent on
09 stocking it with groceries and -- and beer and wine
10 and, you know, cheese and -- just -- the things
11 that -- that we had around there.
12     Q.  Sure.
13     A.  Breakfast food.  You know, bacon and eggs.
14 He would have that laid in, and we would all pay for
15 that too, obviously.
16     Q.  Okay.  So these grocery expenses.
17     A.  Yeah.  Just, like, split, like everything
18 else.
19     Q.  But for the -- the lodging itself --
20     A.  No.  Only -- only when I did not stay with
21 him.
22          When I've rented it from him, he's
23 given me a heck of a deal.  When I've stayed with my
24 family, I pay, you know, a minimal amount for the
25 condo and then pay for his cleaning fees and stuff --


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 93

01    Q.  Got it.

02    A.  -- afterwards.

03    Q.  The -- so in the -- in the accounting of it,

04 the cost of his unit was not --

05    A.  No.

06    Q.  -- credited to him through that accounting.

07    A.  No, it was not.

08    Q.  Okay.

09    A.  It was never in the -- never in the

10 accounting.  Never in the equation.

11    Q.  Do you recall how the accounting worked for

12 this trip?

13    A.  I was trying to recall if -- if

14 Matt Hattenhauer was sort of the -- the Joe Mella

15 this time as far as the -- writing the numbers down.

16         I know it was not me reconciling the

17 receipts that were in the bowl on the dining room

18 table on the 2011 trip.

19    Q.  Okay.  Do you remember if it was

20 Paul Ehlen?

21    A.  I don't think it was Paul.

22    Q.  Would --

23    A.  I think it was Matt.  I really believe it

24 was Matt.  But I'm not -- I'm not a hundred percent

25 certain.

Ps: 602
93:9-25



D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 94

01      Q.  How did the -- how did -- how did things

02  work with the flight?  Was it the same as with 2010,

03  where you figured out the cost of the fuel?

04      A.  It -- same thing.

05      Q.  Same --

06      A.  It was the same -- same -- you -- you ask,

07  you know, "What does -- what does it cost for fuel?"

08              So -- because that's the one thing

09  we -- I didn't know.  You -- we knew everything else.

10              "What do we owe for fuel for the trip,

11  you know, this year?"

12      Q.  So did you pay for the flight separately

13  from the tallying-up costs?

14      A.  Yes.  It was -- it was afterwards.

15              Because I -- I saw an email.  I had to

16  ask what the fuel cost was.  It was, like, 800 bucks

17  or something.  I saw a subsequent email about that

18  after -- after the trip was back.

19              Because I -- you know, I -- we hadn't

20  squared for fuel in 2011.  And I think Doug did right

21  away.  When Heidi picked him up at the airport, I

22  think he might have.

23              But I -- I didn't.  And I knew I -- I

24  owed for -- for fuel.  So I wanted to know how much

25  it was.  I think it was about 800 bucks, as I


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 95

01  recall.

02      Q.  It was 800 bucks for the fuel?

03      A.  (Nods head.)

04      Q.  That's what you recall it being?

05      A.  Uh-huh.

06      Q.  Okay.

07      A.  Which I thought was reasonable.

08      Q.  And you squared up on that separately from

09  the accounting --

10      A.  Uh-huh.

11      Q.  -- process?

12      A.  Correct.

13      Q.  And how did you pay for that?

14      A.  I think with a check.

15      Q.  With a check?

16      A.  (Nods head.)

17      Q.  Do you still have a copy of that check?

18      A.  I -- I looked briefly.  I did not find it.

19  But, you know, if it's critical, I could probably

20  find it for you.

21      Q.  Okay.

22              (Exhibit 23 marked for

23  identification.)

24  BY MR. SAMIE:

25      Q.  I'm handing you 23.

Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

D's Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 96

01          MR. SAMIE:  Sorry, guys.  I think I

02 might only have -- you might need to share.  Sorry.

03 BY MR. SAMIE:

04     Q.  So these are items that were produced to us

05 from you --

06     A.  Uh-huh.

07     Q.  -- right?

08          It -- and can you walk me through what

09 this is?

10     A.  Sure.  These are old -- old text messages

11 from 2010, the first one between Paul Ehlen and I.

12     Q.  Okay.  And then at some point --

13     A.  And then it goes -- it goes 2011.  And

14 then 2000 -- it skips to 2014.

15          Yeah.  These are text messages.

16     Q.  Text messages.

17          And then --

18     A.  And Pete Gosz too.

19     Q.  Pete Gosz.

20     A.  Yep.

21     Q.  A bunch of text messages with Paul Ehlen

22 and --

23     A.  Paul and Pete, yep.  Paul and Pete.

24     Q.  And you pulled -- did you pull these off of

25 your phone?

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 97

```
01      A.  Yeah.

02              They -- they refreshed -- the guy from

03  my phone -- my IT guy actually got them off my

04  phone.

05      Q.  Okay.  So he kind of took screenshots and --

06  and --

07      A.  I -- I don't know exactly what he did.

08              He just -- you know, I gave him my

09  phone.  And he said he needed to go through it and

10  find old text messages, and I said fine.

11      Q.  Okay.  So on the -- on the -- Pete --

12      A.  Are these numbered?  Or what page do you

13  want me?

14      Q.  Yeah, my version is not numbered.

15      A.  They're by dates.  We can do it by day.

16              MR. DIXON:  There's a Bates label.

17              THE WITNESS:  All day.  All days.

18              MR. SAMIE:  I know.  But mine, for some

19  reason, don't have it.

20  BY MR. SAMIE:

21      Q.  Okay.  So if you go to July 20 -- sorry.

22      A.  What year?

23      Q.  Strike that.

24              Okay.  Sorry.  So for the Pete Gosz

25  messages, February 2, 2011.
```



Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 98

```
01       A.  Okay.
02       Q.  All right.  So it says "Pete" -- do you see
03  this?  This is a message --
04       A.  Yep.
05       Q.  So the darker messages are the ones from
06  you.
07       A.  Right.
08       Q.  It says, "Pete, how much do I owe you guys
09  for the Colorado ski trip?"
10       A.  Right.
11       Q.  "It was so fun.  Definitely the highlight of
12  the winter so far."
13       A.  Yeah.
14       Q.  And he responds, "Bill on way.  I think
15  one" -- "I think 811 total."
16       A.  That's for the fuel, yes.
17       Q.  Is that -- is that what you recall seeing?
18       A.  For fuel.  Yep.  Yep.
19       Q.  "Great.  I'll drop you a check.  Who should
20  I make it out to?  And what address to send it to?"
21       A.  Right.
22       Q.  And he says, "We had to send a bill.  It
23  went to ECOW.  Should be there soon."
24       A.  That would be weird.  Yeah, I don't know why
25  it would go to ECOW.
```


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 99

01     Q.  You don't know why they would do that?

02     A.  No.

03          That would be -- that would be goofy,

04  because it's not ECOW; it's my personal expense.

05     Q.  Okay.  So do you think it's possible that

06  ECOW paid this bill?

07     A.  No.  No way.

08     Q.  Okay.  But you didn't object to that at that

09  time?  You said, "Sounds good"?

10     A.  I thought that was fair, you know, for, you

11  know, seven people, 800 bucks, about 5600 bucks.

12  That's probably about right for fuel, I thought, to

13  go back and forth.

14          And whatever -- he tells me it's about

15  a thousand bucks an hour to run -- run his plane.

16  You know, that's what he --

17     Q.  To rent his plane?

18     A.  To run it.

19     Q.  Oh, to run it.

20     A.  Yeah, with all the...

21     Q.  Okay.  So -- but you didn't object to them

22  sending a bill to ECOW?

23     A.  Well, I just wanted to make sure I squared

24  up with him, you know, for what I owed him for -- for

25  fuel.

Ds' Counters to Ps'
Flaherty Designations        D's Flaherty
                             designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 100

01     Q.  Okay.

02          (Exhibit 24 marked for

03  identification.)

04  BY MR. SAMIE:

05     Q.  Showing you 24.  Is this the -- the bill or

06  the invoice that you received?

07     A.  I've never seen this before.

08     Q.  You've never seen this document before?

09     A.  Never have, huh-uh.

10     Q.  Did you receive a bill?

11     A.  I don't remember see- -- receiving a bill,

12  no.

13     Q.  Did ECO -- do you remember if ECOW received

14  a bill?

15     A.  I don't know.

16          I just -- I mean, if -- if he -- he

17  told me I owed him 811 bucks, I paid 811 bucks, if

18  that's what it is.

19          But I don't remember seeing a bill.  I

20  think you saw the evidence in my text messages

21  there.

22     Q.  That -- well, that strikes me as if that

23  was -- that a bill was on the way; right?

24     A.  But -- but this is -- this doesn't make

25  sense.  This -- this is no -- it -- the condo, we


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 101

01  didn't pay for.  It was Ian's condo.  We stayed in

02  his condo.  You know, there should be no condo

03  expense.

04          Groceries, we settled up at the time.

05  Wine, that's a ridiculously low wine bill for this

06  group, honestly.

07          It's just not -- this is not based in

08  reality here.

09          The $800 would be for fuel only.  This

10  is -- everything else, we settled, you know, at the

11  end of the weekend.

12      Q.  Okay.  So --

13      A.  So I -- I don't know.  I've never seen this

14  document before.

15      Q.  Was there a second condo that was rented for

16  this trip?

17      A.  Not to my knowledge.

18      Q.  Not to your knowledge?

19      A.  No.

20      Q.  You don't recall Paul Ehlen renting a second

21  condo for this trip?

22      A.  I don't.  I -- I know that one time we were

23  out there, Paul decided to stay at the hotel.  He

24  thought it was too crowded in Ian's condo for seven

25  or eight guys.

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 102

01          Ian has a three-bedroom condo with, you

02  know, a sleeper sofa in the living room and stuff.

03  And I remember Paul one time saying, "I'm going to go

04  sleep in the hotel."  And he -- he went and slept in

05  the hotel one night on one trip for sure.  But I

06  don't know if he had a second condo here.

07          I remember him, at one of the trips,

08  deciding not to stay in Ian's condo, but getting a

09  hotel room and going over to the hotel, which is

10  right next door to Ian's condo.

11      Q.  Okay.  Did you stay -- did you stay anywhere

12  but Ian Swift's condo?

13      A.  Only Ian's condo every time.

14      Q.  Okay.  So back to this number here.

15          The number 811 obviously matches the

16  number that was quoted to you in the text; right?

17      A.  Yep.

18      Q.  But you would -- you would dispute how this

19  is calculated here?

20      A.  Absolutely.

21      Q.  Okay.  And this -- this doesn't make any

22  sense to you?

23      A.  Not at all.

24      Q.  Okay.  So who organized this trip?

25      A.  Matt Hattenhauer has been sort of the

✏️ Flaherty
designations

✏️ Ps' Counters to Ds'
Flaherty Designations

✏️ D's Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 103

01 ringleader every year to get the group of guys going.

02         And when it turned out that -- that

03 Paul's a skier, and Pete, you know, are skiers, I

04 think he invited them to join us.  And then it --

05 obviously, it turned out Paul's got a plane, says,

06 you know, "I'll fly the group."  Fantastic.

07         I mean, some years we've had dentists,

08 anesthesiologists.  I mean, primarily physicians from

09 Wausau that went on these guys' trips.

10    Q.  And you felt, though, that this was -- that

11 this was something that Matt and Ian kind of were

12 responsible for putting it together?

13    A.  Yeah.

14         They were next-door neighbors, Ian

15 owned the condo, and we all loved to ski.  And so

16 we'd -- we went skiing a lot together.

17    Q.  Okay.

18    A.  And like I said, I -- the way I view it is,

19 really, Pete and Paul joined our guys' trip for a

20 couple of years.

21    Q.  So you didn't view this as a trip that Paul

22 would put together?

23    A.  No, he did not.

24    Q.  Paul Ehlen.

25    A.  He did not.

 Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 104

01      Q.  I'm showing you Exhibit 8.

02      A.  Okay.

03              MR. SAMIE:  You guys have this from

04 yesterday?

05              MR. GASKINS:  Uh-huh.

06              MR. DIXON:  Oh, yeah.  Thanks.  I've

07 got to wake up.

08 BY MR. SAMIE:

09      Q.  So this is an email from January 2011.

10          Do you see this?

11      A.  Uh-huh.

12      Q.  That is -- that you are a recipient of this

13 email?

14      A.  Okay.

15      Q.  Okay.  And it says, "Gents, I was trying to

16 come up with something" -- this is in

17 Dr. Hattenhauer.

18      A.  Uh-huh.

19      Q.  "I was trying to come up with something to

20 send to Paul in appreciation of the weekend of

21 skiing.  It is difficult for a guy who has

22 everything, but what do you think about a big floral

23 arrangement sent to his office at Precision Lens?"

24      A.  Yeah.  I mean, just -- you know, it sounds

25 like Matt Hattenhauer is just trying to do something


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 105

01  nice because we had a good time.

02              And, you know, Paul, you know, didn't

03  charge us for being the pilot of this trip.  You

04  know, so wanted to thank him.

05      Q.  Okay.  So he was doing you a solid in some

06  ways in getting you there to -- at a fair cost?

07      A.  He just -- it's nicer --

08              MR. BIRRELL:  Do you know what "solid"

09  means?  I don't know what that means.

10  BY MR. SAMIE:

11      Q.  He was -- he was doing you a favor.

12              MR. DIXON:  Objection.  Form.

13              THE WITNESS:  It was -- it was fun to

14  ski with him.  It was fun to ski with him.

15  BY MR. SAMIE:

16      Q.  You felt that you needed to show

17  appreciation to him for the weekend of skiing.

18      A.  It -- just a thank you, because he went

19  above and beyond.  I mean, when a guy brings his own

20  plane and -- and gives you a ride in his plane,

21  that's -- that's pretty nice, you know.

22      Q.  It's much better than flying commercial.

23      A.  It -- you can get extra skiing in.

24      Q.  Okay.  Did you send any flowers to Ian Swift

25  for this trip?


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**
US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 106

01      A.  Not to my knowledge.

02      Q.  Okay.

03      A.  But I would see Ian regularly.  You know,
04  Paul's in Minneapolis.  Ian was right in town.

05      Q.  Can you pull up 21 again?

06      A.  (Witness complies.)

07      Q.  So on the second page of Exhibit 21, this is
08  Flaherty 33.  This one is the -- the statement for
09  December 28 -- a page from the statement December 28
10  to January 27, 2011, for January; right?

11      A.  Yes.

12      Q.  Okay.  So this -- you circled an item on
13  here.  And you wrote "group meal."

14          That's your handwriting?

15      A.  Yes.

16      Q.  Okay.  Is this the extent of what you have
17  for what you contributed into the pot presettling
18  up?

19      A.  All -- that's all that's on this
20  statement.

21      Q.  That -- but do you have any records of
22  anything else for your -- your contributions into
23  the --

24      A.  I couldn't find any when I was asked to
25  look.

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 107

01              But I -- I would presume that I

02 probably paid for more than one meal on this trip,

03 because everyone usually paid for a couple of meals,

04 a lunch and a dinner.

05      Q.  Okay.  On the next page, it's Flaherty 34.

06      A.  Uh-huh.

07      Q.  It looks like this is -- well, can you

08 explain to me what this -- I don't -- I actually

09 don't know that this is from the same statement, but

10 you pulled it from another statement, perhaps?

11      A.  I think, I -- right.  I'm -- this is, like,

12 a summary statement, I think, for the end of the year

13 or something.

14      Q.  Okay.

15      A.  Where they organize stuff by categories.

16      Q.  To kind of tell you what you --

17      A.  Yeah.

18      Q.  -- spent the money on --

19      A.  What you did --

20      Q.  -- what you did?

21      A.  -- yeah.

22      Q.  Okay.  So "My" -- and this is your

23 handwriting, "my own airfare for trips"?

24      A.  Yeah.  Exactly.

25      Q.  Were -- are any of these trips trips with

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 108

01  Precision Lens people?

02       A.  I think that -- yeah, I think there might

03  have been -- well, I'm not sure.

04                  The -- the bills -- you know, Delta

05  Air, Los Angeles, California, I think that just might

06  be their billing site, because I did not fly to

07  Los Angeles six or seven, eight times, whatever that

08  is, in 2011.

09                  So this might have been a -- might have

10  been an airfare for a trip.

11                  I -- I don't know.  I really don't

12  know.

13       Q.  Okay.  The next page, the last page of

14  this --

15       A.  Yeah.

16       Q.  -- you've highlighted some season ticket

17  prepayment.

18       A.  Uh-huh.

19                  Oh, the reason I highlighted this --

20       Q.  Yeah.

21       A.  -- is just to show that the -- in that --

22  the allegations that people paid for my ski tickets,

23  that's total malarkey.  No one ever bought me a ski

24  ticket.  I always paid for my ski tickets.

25       Q.  Sure.

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 109

```
01      A.  And this just shows you I get a season

02  ticket every year.  This is the prepayment for the

03  preseason tickets.

04      Q.  For 2011.

05      A.  Yeah.  Basically, every year.

06      Q.  Okay.  It's -- would you be -- would these

07  be prepayments for 2012?

08      A.  Could be pre- -- they're probably payments

09  for next year.  That's right.  Yeah, they do it

10  in --

11      Q.  Okay.

12      A.  But I -- I could find it.  I mean, I get a

13  season ticket every year out there.  I don't -- you

14  know...

15      Q.  Did you take any other private flights with

16  Mr. Ehlen other than these ones that we talked

17  about for --

18      A.  No.

19      Q.  -- these trips?

20          In February of 2013, did you fly on a

21  flight with Mr. Ehlen?

22      A.  No, I don't believe so.

23          To where?

24      Q.  I don't know.

25          What about May of 2013?
```

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 110

01      A.  No.

02      Q.  After the 2011 ski trip, did you take any

03 other ski trips with Paul Ehlen?

04      A.  No.

05      Q.  After 2011, you said you did take some ski

06 trips with Pete Gosz.

07      A.  Pete -- yeah.  Pete came.

08           What happened, I -- I don't know the

09 exact date, but Paul separated his -- his -- he had

10 an ACL tear in his knee, or MCL tear.  And so he was

11 out of commission skiing at least one, maybe two

12 seasons.  So he did not ski.

13           But Pete came on our guys' ski trip,

14 still, a year or two after.  And we all flew

15 commercially, obviously.

16      Q.  Can we talk a little bit about --

17           MR. SAMIE:  Well, do you -- does anyone

18 need a break?

19           MR. BIRRELL:  Nope.

20           MR. DIXON:  Do you need a break?

21           COURT REPORTER:  I'm fine.  Thank you.

22           MR. SAMIE:  Okay.

23 BY MR. SAMIE:

24      Q.  Did Pete Gosz or did Precision Lens try to

25 get you to use more multifocal lenses in your


Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 111

01  surgeries?

02      A.  No.  They never pressured me to do anything

03  like that, no.

04      Q.  Did they -- they're salespeople, though.

05  And they -- did they want you to try to use more?

06      A.  They -- they really didn't ever push me to

07  use any product.  I used what was right for my

08  patients.

09              So I -- I -- I did not feel I was ever

10  pressured to use any device or lens or anything that

11  they were selling.

12              So I would say no.  I -- I never felt

13  any pressure to use any specialty lenses or

14  multifocal lenses, no.

15              MR. SAMIE:  Actually, why don't we just

16  go ahead and take a break.

17              MR. DIXON:  Okay.

18              VIDEOGRAPHER:  Going off the record at

19  9:36.

20              (Discussion held off the record.)

21              VIDEOGRAPHER:  We're back on the record

22  at 9:46.

23  BY MR. SAMIE:

24      Q.  Dr. Flaherty, I was just asking you, before

25  we went off, if Precision Lens was trying to get you


Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 112

01 to use the multifocal lens more.

02          Did they -- did they ever take you out

03 for dinner or a meal to discuss your usage of

04 multifocal lenses?

05    A.  No.

06    Q.  No?

07          (Exhibits 25 and 26 marked for

08 identification.)

09 BY MR. SAMIE:

10    Q.  I'm handing you 25 and 26.

11          MR. DIXON:  25 is on top?

12          MR. SAMIE:  Sorry.  If you could --

13 that one is for them as well.

14          MR. DIXON:  This is 25?

15          MR. SAMIE:  That's 25.  That's 26.

16          MR. DIXON:  Okay.  That's 25.  That's

17 26.

18 BY MR. SAMIE:

19    Q.  So here is an email between you and

20 Mr. Gosz, 25 is, ECLSI_012295.

21    A.  Okay.

22    Q.  And on the bottom here, it says -- from

23 Mr. Gosz to you and Dr. Hattenhauer.  "Matt and

24 Kevin, can you meet for a beer Monday the 21st after

25 work.  Amy" -- we'll say "Amy N." here -- "and me


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 113

01 would like to visit with you both and discuss any

02 interest you may have in the TECNIS Multifocal."

03          And you said, "I can meet with you but

04 not for a beer because I'm on call."

05          And it looked like you planned for a

06 meeting at the City Grill.

07          Does that sound --

08     A.  Looks like it, yeah.

09     Q.  Okay.

10     A.  I mean, I always -- I -- you know, I like

11 Pete, and I -- you know, when he's in town, I like to

12 see him.  He's been to my house for a beer before,

13 when I'm not on call --

14     Q.  Sure.

15     A.  -- you know --

16     Q.  So --

17     A.  -- I consider him a friend.

18     Q.  -- if you go to -- if you go to 26, this is

19 an expense report that was produced by

20 Precision Lens, PL0002337.

21          And the top entry there -- this is

22 Pete Gosz expense report for the month ending June

23 of two thousand -- well, it looks like that's a typo

24 there, because it says "submitted 8-18-2010."  And

25 the date on the top entry is for June 21, 2010.


Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 114

01      A.   Uh-huh.

02      Q.   Do you see that?

03      A.   I do see it, yep.

04      Q.   It says "City Grill, Wausau.  Drs. Flaherty,

05  Hattenhauer, Sprik."  And it says "TMF."

06      A.   Uh-huh.

07      Q.   Okay.  What do you -- what do you think

08  "TMF" means?

09      A.   Probably TECNIS Multifocal.

10      Q.   Okay.  And there's an entry here for meals

11  and entertainment for $127.

12      A.   I see that.

13      Q.   And back to 25, it looks like, in that first

14  email, he was asking you to meet on the 21st of June?

15      A.   That's what it says, yeah.

16      Q.   Okay.  So do you think it's likely that

17  you -- you did go out for meals to talk about --

18      A.   I could well have.

19           But I'm not sure we -- yeah, I might

20  have said, you know, at this point, I'm not

21  interested in that lens, or I might have said I'm

22  already using it.  I don't know at that point.

23      Q.   Okay.  But he did take you out to talk about

24  it.

25      A.   Looks like it.  I don't know the exact --



Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 115

01  again, this was nine years ago.

02      Q.   Sure.

03           I want to go back to the ASC for a

04  second.

05           When -- when we were talking about --

06  well, why is it that you all wanted to build the ASC?

07      A.   Because --

08      Q.   Why not stay at -- why not stay at the

09  Wausau Surgery Center?

10      A.   Control.  Scheduling, ease of scheduling.

11  So much easier to do a case in your own surgery

12  center than to have to drive across town to do it.

13      Q.   Okay.

14      A.   Plus, it's profitable.

15           For a lot of reasons:  ease of

16  scheduling, control, you're not competing with other

17  people for start times.  You know, plastic surgery,

18  ENT, urology.  We could start, you know, at 7:30 in

19  the morning, at 12:30 in the afternoon.  You weren't

20  being bumped by other surgeons.

21      Q.   Okay.

22      A.   So -- and there's a lot of advantages to

23  being just single specialty.  We're a -- really a

24  finely focused factory to -- to put a pun on it.  You

25  know, we do just eyes.  We don't do all the rest it.


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 116

01              So it's just more control.  It's
02 just -- it's a better facility.
03      Q.  So do you -- by -- through that efficiency,
04 are you able to do more cases?
05      A.  Absolutely.
06      Q.  Okay.  So the volume goes up.
07      A.  The -- we're much more -- much more
08 efficient.
09              The -- the -- you know you're going to
10 get good staff.  We have control of hiring.  We can
11 have good surgical techs.
12              You know, if you're at a place like the
13 hospitals now, it's sort of a crapshoot who you get
14 as a circulating nurse or the people in the room.
15 You don't have the quality control.
16      Q.  Uh-huh.
17      A.  So it's -- it's quality and it's efficiency
18 and profitability.
19      Q.  And so with the volume comes the
20 profitability, presumably.
21              You have some added costs -- right? --
22 operating costs and --
23      A.  Right.  Absolutely.
24      Q.  But, overall, the idea is the increased
25 volume of -- of the surgeries --

 Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 117

01     A.  Convenience --

02     Q.  -- and convenience?

03     A.  -- control, quality.  All things that --

04 that benefit our patients.

05     Q.  Okay.

06     A.  I mean, I can give you a really prime

07 example.

08     Q.  No.  No.  I think that's -- that's

09 sufficient.  I --

10              So with more surgeries, that includes,

11 obviously, more cataract surgeries, as well.

12     A.  We do more -- we do retinal surgery there.

13 We do kids with crossed eyes there.  We do, you

14 know --

15     Q.  Right.

16     A.  -- eye surgeries.

17     Q.  But I'm saying, as you increase volume,

18 you're increasing the volume of cataract surgeries

19 that you're able to do at the ASC than you were at

20 the --

21     A.  In the same period of time, that's right.

22              So you can -- you can do more cases in

23 less time if you're more efficient.

24     Q.  Right.

25              And so, annually, you end up doing more



Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 118

```
01  cataracts -- surgeries at the ASC than you did at --
02      A.  Well, there's -- to some degree, there's
03  only a certain number of cataracts that have to be
04  done --
05      Q.  Okay.  That -- that's fair.
06      A.  -- in the population.
07      Q.  Sure.
08      A.  So you can't increase the population of
09  people that come and have cataract surgery done by
10  building a new facility.
11      Q.  Uh-huh.
12      A.  But you can use the time much more
13  efficiently.
14      Q.  You can use the time more efficiently.
15      A.  Uh-huh.
16      Q.  Okay.
17      A.  So you have more time to ski.
18      Q.  More time to ski, yes.
19          And --
20      A.  We have a ski hill in the winter.  It's
21  great.  Granite Peak.
22      Q.  Uh-huh.
23          So what was Precision Lens' involvement
24  in helping you create the ASC?
25      A.  I'm not sure of all their involvement.  But
```

 Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 119

01  I know we ran many different pro formas before we

02  built our ASC, and we got advice from as many people

03  as we could.

04          We talked to other surgery centers in

05  the country.  We had some consultants that looked at

06  the numbers we were doing to try to figure out, you

07  know, where our break-even point would be, after

08  running it for how long.  All those kinds of things.

09          So we -- we tried to avail ourselves of

10  a lot of resources.  And I do think that -- that

11  Precision Lens did suggest someone who ended up being

12  a consultant for us, a guy named Ron Blair, who

13  helped us with our surgery center design.  And he had

14  done a lot of surgery centers around the country.

15      Q.  So they introduced to this Ron Blair?

16      A.  I don't know how the introduction took

17  place.  But I believe that they gave us his name.

18      Q.  Did they ever come out for meetings for

19  planning with respect to the ASC?

20      A.  Ron Blair was involved a lot after we chose

21  him, yeah.  He came for meetings.

22      Q.  Not Ron Blair.  I'm talking Precision Lens

23  people --

24      A.  I -- I --

25      Q.  -- Pete Gosz or Paul Ehlen or anyone else.


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

## US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 120

01     A.  I don't think they really had the nuts and

02 bolts for the -- the planning of the surgery center.

03 No, I don't think they were really involved with

04 that.

05     Q.  You don't -- did they ever take you out for

06 meals to discuss the surgery center?

07     A.  Not -- I don't recall ever going out for a

08 meal and talking about the surgery center with

09 them.

10     Q.  Okay.

11          (Exhibit 27 marked for

12 identification.)

13 BY MR. SAMIE:

14     Q.  Showing you Exhibit 26.

15          MR. DIXON:  Hold on.  Didn't we just

16 have 26?

17          MS. VERKAMP:  Yeah, that should be 27.

18          MR. SAMIE:  Oh, I'm sorry.

19          COURT REPORTER:  Sorry.  Yep.

20          MR. SAMIE:  Okay.

21          MR. DIXON:  Can we re-mark that one?

22          MR. SAMIE:  Yeah.

23          MR. BIRRELL:  I'm going to go over

24 that.

25          MR. DIXON:  I hate to be a stickler for


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 121

01 numbers.

02         MR. SAMIE: No. I appreciate that.

03 Here. I've got this one.

04 BY MR. SAMIE:

05     Q. So I'm showing you 27.

06         MR. SAMIE: Here's 27.

07         MR. DIXON: Thank you.

08         MR. SAMIE: Thank you, Joe.

09 BY MR. SAMIE:

10     Q. So this is an expense report from

11 Precision Lens dated February 2012. So this would

12 have been before you guys had finalized the -- the

13 ASC; right? The ASC opened in 2013.

14     A. Yeah. I think we were probably under

15 construction already by this point.

16     Q. Okay. So --

17     A. So I don't think there was -- I mean, I

18 think, by February of '12, most of the planning was

19 done, honestly.

20     Q. Who is Gary Scheidegger?

21     A. Gary Scheidegger. That's this one. He's

22 the guy who used to work for Allergan --

23     Q. Right.

24     A. -- I mean, 30 years ago or, you know, 25

25 years ago. And then he subsequently ended up working



Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 122

01 for Precision Lens.

02          That's the guy I referenced earlier

03 today.

04      Q.  Yes.

05          So this is an expense report for him

06 from February 2012.  And if you look down, there is

07 an entry for February 17.  There's a couple in here.

08      A.  Dinner.  It says "Dinner with Cal Sprik and

09 Kevin Flaherty."

10      Q.  And it says "Discussed new ASC."

11      A.  Yeah.

12          But Gary was not really involved in

13 planning the ASC at all.  He was a -- he basically

14 was a lens salesman.

15      Q.  So -- but you did -- he did take you out for

16 dinner to discuss the ASC?

17      A.  I -- I don't know if he did or not.

18          I see he wrote that on his expense

19 report, but I -- I question if we really talked about

20 ASC.  Gary was not an ASC expert.

21      Q.  Okay.

22      A.  He was a lens salesman.

23      Q.  I'm showing you 15, 16, and 17.  So this

24 here looks like there's a -- this is -- 15 is an

25 email Bates ECLSA_008225.  And this looks like an


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 123

01  email chain that starts on February 14, 2012,

02  Pete Gosz, writing to --

03      A.  My colleague Doug Edwards.

04      Q.  -- to Doug Edwards, it looks like.

05      A.  Right.

06      Q.  And it's discussing a -- and I know you're

07  not on this email chain, but this will --

08      A.  I'm not.

09      Q.  -- make sense in a moment.

10          "Doug, are you around the week of March

11  12?  Dinner with family and a beer?  Also, I heard

12  Sharon left.  Is that true?"

13          And then as you go up on -- on February

14  15, Doug Edwards says, "Can you do the 15th, Pete?

15  We have SC meeting Wednesday night."

16          And it looks like they scheduled this

17  meeting for March 15.

18          Does that seem to be what's going on

19  here to you?

20          MR. DIXON:  Objection.  Foundation.

21          THE WITNESS:  I -- I don't -- I mean,

22  I -- this is, again, not between me.  And -- and I'm

23  not sure what -- I mean, they're referencing our

24  former administrator, Sharon Long, who retired.  And

25  Doug's confirming she retired.

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 124

01  BY MR. SAMIE:

02      Q.  Okay.

03      A.  And the -- and Doug is saying we have a

04  service corporation meeting Wednesday night.  That's

05  a meeting of our -- our service corporation at the

06  eye clinic.

07      Q.  Okay.

08      A.  That's nothing -- not a meeting with

09  Pete Gosz or anything.  It's just -- he's telling him

10  we have a meeting of our physicians on that night.

11      Q.  Well, let's just go to 16.

12              So this is an email, Exhibit 16,

13  ECLSI_010376.  And this is an email from Pete Gosz

14  dated March 15, 2012, to Dr. Edwards, to you, and to

15  Dr. Hattenhauer.  And the subject is "Back When."

16              It says, "Good a.m.  Does 5:00 p.m.

17  work at the Back When?"

18              And Dr. Hattenhauer says, "I don't

19  think they open until 5:30 p.m.  Want to try

20  somewhere else?"

21              So it looks like, on the 15th of March

22  2012, were you part of a plan to go out to dinner

23  somewhere, possibly Back When?

24      A.  Possibly.

25      Q.  Okay.  And let's go to 17.  And if you go to

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 125

01 the third page of this document, where it says --

02 this is a Precision Lens expense report, month ending

03 3-31-12.

04          There's an entry here -- this is for a

05 Pete Gosz.  Excuse me.  Pete Gosz Precision Lens

06 expense report.  There's an entry here for 3-15-2012.

07          Do you see that?

08     A.  I do.

09     Q.  It says "Back When Cafe, Wausau, dinner with

10 Wausau group, ASC plans."

11     A.  Uh-huh.

12     Q.  Were you at this meeting?

13     A.  I don't know.  I might have been.  I -- I'd

14 have to go back and look at my calendar from 2012.

15 I'm not sure where I was seven years ago.

16     Q.  Do you know if your family or significant

17 other or anything -- anyone like that would have been

18 there?

19     A.  I -- I -- if I -- if I was there, my wife

20 or none of my kids would have been there.

21     Q.  Okay.  And that says "ASC plans"?

22     A.  That's what it says.

23     Q.  Okay.  So were you there discussing ASC

24 plans in --

25     A.  I don't know.


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 126

01      Q.  Do you have any reason to doubt this?

02      A.  No.

03              I am sure he submitted this expense

04   report.

05      Q.  Okay.

06      A.  I just don't know if I was there or not.

07      Q.  If we go back to the text messages.  I don't

08   know which exhibit that was.

09              MR. DIXON:  23.

10   BY MR. SAMIE:

11      Q.  Go back to 23.

12      A.  Okay.

13      Q.  So if you go to the Pete Gosz again, the

14   Pete Gosz text messages, that's halfway through at

15   some point.  I'm looking for a March 15, 2012.

16              MR. DIXON:  It's on page Flaherty 16.

17              MR. SAMIE:  Thank you.

18              THE WITNESS:  March 15, 2012?  I have a

19   blank page in here.

20   BY MR. SAMIE:

21      Q.  The page right before the blank page.

22      A.  Okay.

23      Q.  Okay.  So March 15, 2012, that's the date

24   that we've been talking about for --

25      A.  Okay.

Ds: 401/403, sanction 126:18-22


Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 127

01     Q.  And it looks there's a text from you to
02 Pete Gosz saying "At Back When now with Doug."
03     A.  Okay.  So -- so I was there, yeah.
04     Q.  So you were there?
05     A.  Yep.
06     Q.  Okay.  And then this next page is blank.  Do
07 you know, kind of, what happened here?  Do you know
08 if there's text messages that are missing here?
09     A.  No, I don't know.
10             But it -- I doubt it.  Because you see
11 March 15, 2012, 4:50 p.m., and then March 15, 2012,
12 at 6:00 p.m.
13             MR. SAMIE:  Is this something we can --
14 we can look into just to see if there's anything
15 that's missing?
16             MR. BIRRELL:  Sure.
17             MR. SAMIE:  Okay.
18 BY MR. SAMIE:
19     Q.  The same goes a little bit later in this
20 document.  October 28, 2014.  It looks like you're
21 texting from Australia.
22             Yeah, right there.
23     A.  Yeah.  Yeah.
24             So he's asking if I was in Wausau, and
25 I said, no, I'm in Australia.


Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 128

01     Q.  The next page is blank again.

02     A.  I think it's blank just because the --

03     Q.  But then we pick up March 5, 2015.

04     A.  Okay.

05     Q.  That's a pretty large gap.

06     A.  I've got my phone with me.  I can look and

07 see if there's any gap in there.  If you want me to

08 check it right now, I can.

09     Q.  Yeah.  Why don't we.

10     A.  I can do that real easily.

11             Texts.

12             MR. SAMIE:  We can go off the record.

13             THE WITNESS:  Pete Gosz.  Let me just

14 see.

15             VIDEOGRAPHER:  Off the record, then,

16 sir?

17             MR. SAMIE:  Yes, please.

18             VIDEOGRAPHER:  Going off the record at

19 10:04.

20             (Discussion held off the record.)

21             VIDEOGRAPHER:  We're back on the record

22 at 10:05.

23 BY MR. SAMIE:

24     Q.  So we just went off the record,

25 Dr. Flaherty.  Did you look to see if there were any

**Transcript of Flaherty, Kevin**

Page 129

01  text messages missing in that gap from October '14 to

02  March --

03      A.  Yeah.  And there were none missing.

04      Q.  And there were none missing, okay.

05              (Exhibit 28 marked for

06  identification.)

07              MR. DIXON:  Are we done with 23?

08              MR. SAMIE:  Done with 23.

09  BY MR. SAMIE:

10      Q.  Showing you 28.  This is another expense

11  report from -- for Pete Gosz, Precision Lens, dated

12  month ending June 30, 2012.

13              And do you see the entry here, Bates

14  number is PL0001991?

15      A.  Yeah.

16      Q.  Do you see there's an entry here on

17  6-20-2012?

18      A.  Uh-huh.

19      Q.  And it's dinner with Drs. Flaherty, Edwards,

20  Hattenhauer, and Sprik?

21      A.  Uh-huh.

22      Q.  It looks like that's misspelled.

23              But, again, it says ASC plans, phaco.

24              (Clarification by court reporter.)

25              ASC plans, phaco.  P-h-a-c-o.


Flaherty
designations

**Transcript of Flaherty, Kevin**

Page 130

01              Do you see that?

02      A.   Yep.

03      Q.   Okay.  So is this another meeting you that

04 with Mr. Gosz to discuss ASC plans?

05      A.   Again, I don't really remember ever talking

06 about ASC plans much with -- with Pete Gosz.   You

07 know, Pete, you know, sold us products that we used.

08 But he didn't really help in our planning of the AC.

09              So I'm not sure, while it says "ASC

10 plans," I think they -- they did say they could help

11 direct us to maybe get some vendors for, you know,

12 microscopes or equipment, maybe.  And that might be

13 what it's about.  But they didn't really plan the ASC

14 for us.

15      Q.   Okay.  But they were assisting in some way

16 to get you off the ground running; right?

17              MR. DIXON:  Objection.  Form.

18              THE WITNESS:  I -- like I said, we --

19 we tried to get help wherever we could find it before

20 we put our AC together.

21 BY MR. SAMIE:

22      Q.   And you found help from Precision Lens.

23      A.   I think they were helpful to us, yes.

24      Q.   Okay.  And they took you out to eat to

25 provide that help?


Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 131

01              MR. DIXON:  Objection.  Foundation and

02  misstates the record.

03              THE WITNESS:  The -- this -- his

04  expense report shows that it looks like he paid $171

05  for dinner for -- one, two, three, four, five -- six

06  of us.

07  BY MR. SAMIE:

08      Q.  Okay.  I'm showing you --

09      A.  It looks like it's a lot cheaper to eat in

10  Wausau than Milwaukee, by the entry after -- after

11  this.  It's just four people for 723 bucks.  Mr. B's

12  Steakhouse.

13              (Exhibit 29 marked for

14  identification.)

15  BY MR. SAMIE:

16      Q.  I just handed you 29.  This is another

17  expense report for the month ending September 12 --

18  excuse me, September 30, 2012.  It's for Pete Gosz

19  again.

20              There's an entry in here for 9-25-2012,

21  Red Eye Brewing.

22              Do you see that?

23      A.  Uh-huh.

24      Q.  And that says "Wausau, Wisconsin,

25  Drs. Sprik, Flaherty" and it says "contract."

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 132

```
01              Do you have any idea, you know, what
02 kind of a contract you'd be meeting with Mr. Gosz
03 about?
04      A.  No, I don't know.
05      Q.  No?
06              Do you think it could have related to
07 the ASC?
08      A.  I don't know what it relates to.
09      Q.  Sorry.  I've got one more question on the
10 text messages.  That's 23.
11      A.  Okay.
12      Q.  So, again, you're going to have to help me
13 out here, but I think this is early on.
14              MR. DIXON:  What's the date?
15              MR. SAMIE:  July 21, 2016, with
16 Paul Ehlen.
17              MR. DIXON:  Flaherty 6.
18 BY MR. SAMIE:
19      Q.  Are you there?
20      A.  Yep.
21      Q.  Okay.
22      A.  July 21.
23      Q.  So this looks like a message from 2016 from
24 Mr. Ehlen to you.
25              Does that sound right?
```

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 133

01     A.  Yep.

02     Q.  And it says, "Great to see you today.  Let's

03 ski together.  Paul."

04     A.  Uh-huh.

05     Q.  And he said -- and you respond, "I'd be up

06 for it.  Keep giving us a good deal on lenses."

07     A.  Right.

08     Q.  Does your skiing and the deal on lenses --

09 what do those have to do with each other?

10     A.  Nothing.

11          MR. SAMIE:  I think we are -- we're

12 done.

13          MR. DIXON:  I'll go.

14

15          EXAMINATION BY MR. DIXON:

16     Q.  Doctor, I think you know, I represent

17 Paul Ehlen, and I'm here for Precision Lens too.

18          And just to stick with that, you say to

19 Mr. Ehlen -- I just want to finish out that thread

20 that got stopped.

21     A.  Sure.

22     Q.  It says, "Keep giving" -- you say, "I'd be

23 up for skiing.  Keep giving us a good deal on

24 lenses."

25          And what is Mr. Ehlen's response?

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 134

01      A.  "We will if the volume warrants the pricing.

02 We'll figure it out."

03      Q.  Okay.  And when was the last time that you

04 went skiing with Paul Ehlen?

05      A.  The 2011 in Colorado.

06      Q.  Two thous- -- five years -- over five years

07 earlier than this.

08      A.  Yeah.

09      Q.  Let me -- let me go back.

10           How long have you been a physician?

11      A.  I graduated from medical school in 1984.

12      Q.  And how long have you been a practicing

13 ophthalmologist?

14      A.  I finished my residency in '88, and then I

15 did some fellowship training.  I've been here in

16 Wausau since 1989.

17      Q.  And I believe you said you have been,

18 essentially, using the same base lens for the vast

19 majority of your patients, which was an AMO product;

20 is that -- is that right?

21      A.  Yes.

22           It started -- I -- I was introduced to

23 it when I was out in Massachusetts.  There was a

24 physician named Roger Steinert, who was an

25 investigator, I believe, for AMO.  And he was using



Flaherty
designations

D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 135

```
01  foldable lenses through a small incision, and I
02  thought that was pretty revolutionary and wanted to
03  bring it back to Wisconsin when I start practicing.
04          So that's -- it didn't make sense to
05  have a small incision when you still had to make the
06  incision large to put the lens in.  But with the
07  advent of foldable lenses, this has revolutionized
08  ophthalmology.
09          And AMO was the first one who had
10  the -- what I thought was a good lens, and that was
11  SI18.  And that's when we started using that, in
12  the -- '89, 1990 about.
13     Q.  And that company has gone through different
14  iterations as it's been purchased, but you basically
15  used the same lens as your base lens throughout your
16  entire career?
17     A.  Different generations of it, yes.  Same
18  style lens.
19     Q.  Are you still using that today?
20     A.  I am.
21     Q.  And that's a --
22     A.  Put them in --
23     Q.  -- now it's a Johnson & Johnson?
24     A.  -- this week.
25     Q.  If I -- now it's a Johnson & Johnson
```

 D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 136

```
01  product --
02        A.  It is.
03        Q.  -- is that right?
04            Are you still -- is Precision Lens
05  still the exclusive distributor for that lens in this
06  area?
07        A.  I think so.  But I'm not positive.
08        Q.  You started using that lens prior to any
09  relationship with Precision Lens; correct?
10        A.  Yes.
11        Q.  You started dealing with Precision Lens
12  because it was the exclusive distributor in this area
13  for the lens you wanted to use?
14        A.  Yes.
15        Q.  Did Paul Ehlen understand that you used that
16  lens?
17        A.  He -- he must have, because, again, he
18  showed up at our clinic and said, "I'm the
19  distributor for, you know, these lenses."
20        Q.  Have you --
21        A.  Many years ago.
22        Q.  Have you explained to Mr. Ehlen why you like
23  this particular lens?
24        A.  I have.
25            Because at a certain point, when the
```

 D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 137

```
01  hospital in Rhinelander didn't want to -- they were
02  purchased, and they didn't want to buy lenses from
03  Precision Lens anymore, they -- the -- people
04  suggested maybe I try a different lens.  And I said,
05  "No, I'm happy with the lens I have."
06              So even though the -- Ascension, which
07  is a big company, they -- they weren't buying
08  Precision Lens for a while, I still stuck with the
09  same lens.
10      Q.  Do you know who you buy visco from?
11      A.  I don't, really.
12      Q.  Have you ever paid attention to who
13  distributed the visco you purchased from?
14      A.  No.
15              I just wanted a product that worked
16  well for my patients.
17      Q.  We've talked -- what percentage of your
18  cataract surgeries do you use the lens that we've
19  been describing, in its various iterations?
20      A.  95 percent.
21      Q.  And have you -- with your cataract
22  surgeries, have they all been medically necessary?
23      A.  Of course.
24      Q.  Is there anything elective about cataract
25  surgery other than if you want to see well?
```

Ds: 401/403
sanction
137:24-138:14



Flaherty
designations

Ps' Counters to Ds'
Flaherty Designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 138

01    A.   Yeah, I mean, it is -- it's very rarely an
02  emergent procedure, unless you have a lens that's
03  ruptured or leaking.  So cataract surgery is almost
04  always elective surgery.  And it's always the
05  patient's call when to have to done based on their
06  symptoms.
07           It depends on their visual needs.  If
08  you have someone who's a professional airline pilot,
09  they might have the cataract removed at 20/30 acuity
10  because they have glare complaints.  If you have
11  someone who's sitting in the nursing home listening
12  to the radio all day, they might never need cataract
13  surgery, despite not being able to see the big E.
14           So it's patient dependent.
15    Q.   But -- but they've all been medically          Ps: 402/403
16  necessary, in your judgment?                          138:15-25
17    A.   Yes.
18           I mean, you can do clear lens
19  extraction for someone, but that's a refractive
20  procedure; not going to be covered by -- by
21  Medicare.
22    Q.   Are you familiar with how CMS reimburses
23  your clinic for procedures, cataract procedures?
24    A.   I know there's a fee schedule that they
25  follow.  And Medicare sets a price for a cataract

🖊 Ps' Counters to Ds'    🖊 D's Flaherty
Flaherty Designations       designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 139

01 operation, and then they pay 80 percent of the price

02 they set.

03         And then the patients that have private

04 insurance, the other 20 percent is, perhaps, billed

05 by a private insurance or supplemental policy.

06     Q.  And you're aware, though, that there's a

07 physician fee component to a cataract surgery that

08 CMS reimburses for the physician's skill; is that

09 right?

10     A.  Correct.

11     Q.  And that has nothing to do with surgical

12 supplies or anything.  That's just for the physician;

13 is that right?

14     A.  Right.

15     Q.  Do you have any idea how much that is?

16     A.  I think it's about 600, 700 bucks.

17 Something like that.

18         It's gone down dramatically since I

19 started.  It was $3,000 when I started practicing 30

20 years ago.  Now the operation is better, more

21 effective, and we get paid about a fifth of what we

22 used to get paid for doing it.

23     Q.  And for the surgical supplies and the use of

24 the ASC, are you familiar with there's a facility fee

25 that CMS reimburses?

Ps: 402/403 611

139:1-25-140:02


D's Flaherty designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

## US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 140

01    A.  I know there is, yes.

02    Q.  Do you know what the facility fee is?

03    A.  I don't know off the top of my head, no.

04    Q.  Does $1500, more or less, sound about right?

05    A.  It --

06         MR. SAMIE:  Object to form.

07         THE WITNESS:  I don't know what the

08 amount is.

09 BY MR. DIXON:

Ps: 402/403/
602/611
140:10-25
141:1-24

10    Q.  Do -- what does the facility fee cover, if

11 you know?

12    A.  It -- it covers the expenses for the

13 facility:  nursing staff, the -- the supplies, the --

14 the microscope, all the -- the disposables that are

15 necessary at the facility.  And I believe it covers

16 the lens too.  I think the lens is pummeled into

17 that.  I'm not positive.

18    Q.  So you believe that the lens is a component

19 of that --

20    A.  I think --

21    Q.  -- facility fee?

22    A.  -- that the lens is a component of the

23 facility fee, yes.

24    Q.  Do you have any idea how much your ASC pays

25 for lenses?



D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 141

01    A.  I think, for the lens that I use for my

02 patients, we pay about 90 bucks.

03    Q.  And does CMS reimburse you differently if

04 you use a premium lens as opposed to a base lens?

05    A.  No, they don't.  And that's a problem.

06 Because it took an act of Congress to allow patients

07 to be able to have a premium lens.

08         So, initially, Medicare patients were

09 essentially discriminated against because they

10 couldn't have a premium lens.  But now Medicare

11 passed a law that said people can privately contract

12 for additional payments if they want to have a -- a

13 premium lens put in.  That's a lens to correct

14 astigmatism or a lens to correct a presbyopia.  So

15 they -- the patients pay independently of that.

16    Q.  So you're saying that CMS rules originally

17 wouldn't even permit Medicare patients to be

18 reimbursed for using a premium lens, and Congress

19 decided to change that?

20    A.  Right.  There had to be a law change to

21 allow that.

22    Q.  But CMS only reimburses one --

23    A.  The standard -- stand- -- for a standard

24 lens.

25    Q.  You mentioned hosting Pete Gosz, who was

 D's Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 142

01  then a representative for Precision Lens, golfing.

02              Do you recall that?

03     A.  Yep.

04              I took him golfing at the Wausau County

05  Club one time.

06     Q.  Do you recall hosting Paul Ehlen at dinners

07  at your home or at a private club?

08     A.  Never a private club.  At my house.  I had

09  him to my house for drinks and appetizers and things

10  like that before, yes.

11     Q.  And do you recall giving him an antique

12  piggy bank?

13     A.  I think I did give him a toy bank one time,

14  yeah.

15     Q.  What --

16     A.  It was just -- just -- yeah.  Because I

17  collect -- I collect antique toys, antique banks.

18  And he was admiring the collection.  I had a

19  duplicate of something.  So I gave him a bank as a

20  present, yeah.

21     Q.  When you stayed at Ian's -- Ian Swift's

22  condo, did Mr. Swift charge the others for the use of

23  the condo?

24     A.  No.

25     Q.  Did Mr. --

Ps: 402/403,
602
142:6-25-
143:07


D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 143

```
01      A.  Not to my knowledge.
02          MR. SAMIE:  Object to form.
03 BY MR. DIXON:
04      Q.  To your knowledge, when Pete Gosz or
05 Paul Ehlen joined the Wausau trip, were they charged
06 for the use of the -- Ian Swift's condo?
07      A.  Not to my knowledge.  I don't believe so.
08      Q.  You mentioned flying with Mr. Ehlen down to
09 Chicago --
10      A.  Uh-huh.
11      Q.  -- when he got a jet.
12      A.  Uh-huh.
13      Q.  You know that Mr. Ehlen is a pilot?      Ps: 402/403/602
14      A.  Yes.                                     143:13-25
15      Q.  He's been a pilot for a long time.
16      A.  Uh-huh.
17      Q.  Do you know if he enjoys flying?
18      A.  He loves flying.
19          MR. SAMIE:  Object to form.
20          THE WITNESS:  He loves flying.  He --
21 he's flown to Wausau many occasions when I wasn't
22 here, just for fun.  He had a P-51 Mustang, and he
23 flew it over here a couple of times, weekends when I
24 wasn't around, but to -- to give Keith Kocourek, the
25 car dealer, a ride.  He -- he brought it over for an
```



D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 144

01 air show one time.  He went to Oshkosh.  He loves to

02 fly.

Ps: 402/403/
611
144:1-25

03 BY MR. DIXON:

04     Q.  And you mentioned that Mr. Ehlen flew

05 himself and others when he joined this Wausau trip in

06 2010 and 2011.

07          Do you recall that?

08     A.  Yes.

09     Q.  When Mr. Ehlen wasn't participating in this

10 trip but the Precision Lens sales rep Pete Gosz was,

11 how did you all get out to Colorado?

12     A.  Commercially.

13     Q.  So Precision Lens made no --

14     A.  No.

15     Q.  -- effort to provide you with any

16 transportation?

17     A.  No.  None.  No.

18     Q.  I'm going to -- there's an allegation in

19 this matter that in January of 2010, Precision Lens

20 took you and Matt Hattenhauer and Doug Edwards, in

21 2010, January of 2010, on a ski trip to Colorado and

22 paid for assorted expenses and did not charge you for

23 that trip.

24          Is that allegation true?

25          MR. SAMIE:  Object to form.

 D's Flaherty
designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 145

```
01                 THE WITNESS:  It's false.
02  BY MR. DIXON:
03      Q.  There's an allegation in this matter that in
04  January of 2011, Precision Lens gave you helicopter
05  transportation in the ski area.
06                 Is that true?
07      A.  No.
08                 I've never been in a helicopter with
09  Pete -- with anyone at Precision Lens, or they never
10  provided any helicopter transportation to me.  That's
11  totally false.
12      Q.  There's an allegation that Ehlen also
13  purchased ski jackets on the trip for more than
14  $2500.
15                 Did he provide you with a ski jacket?
16      A.  Never did.
17      Q.  And in terms of the accommodations and the
18  food and the wine, that was divided among all the
19  participants in the way you've described?
20      A.  Yes.
21      Q.  Did you inviting Mr. Ehlen on these trips in
22  January of 2010 and January of 2011, or any other
23  possible ski trip you've gone on, have anything to do
24  with your decision to purchase lenses?
25      A.  No.
```

Ps: 402/403/611
145:1-25



D's Flaherty designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 146

01                MR. SAMIE:  Object to form.

02                THE WITNESS:  No.

03  BY MR. DIXON:

04     Q.  Did -- did it have anything to do with your

05  purchase of visco?

06     A.  Absolutely not.

07                MR. SAMIE:  Object to form.

08                MR. DIXON:  I think that's all I have.

09  Thank you.

10

11                FURTHER EXAMINATION BY MR. SAMIE:

12     Q.  I have just a quick follow-up on this clinic

13  fee.

14                Is that a set amount?        Ps: 402/403

15     A.  For the -- what fee are you referring to?

16     Q.  For the facility fee.  Excuse me.

17     A.  That's -- that's set by Medicare too.

18     Q.  And that's a -- but that's a scheduled

19  amount that would be approved?

20     A.  It -- and it varies from, I think,

21  geographic zone to geographic zone in the country

22  based on prior history of Medicare expenses.

23                So the -- the federal government sets

24  that fee.  And there's been a lot of controversy

25  lately because the fee has been higher for hospitals



D's Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 147

01   than for surgery centers.  And we -- you know,

02   surgery centers are less expensive to do surgery in.

03           I had a patient that had one eye done

04   at Rhinelander hospital, St. Mary's, and then the    Ps: 402/403

05   other eye at the A- -- our ASC.  It costs, like, a

06   thousand dollars less to have the surgery at our ASC

07   in Wausau than the hospital in Wausau -- or the

08   hospital in Rhinelander.

09           She brought me the -- the bills and

10   showed me.  In fact, she was so irate about it, she

11   sent me a note about it with the numbers on about how

12   much cheaper it was.

13           If she had known the surgery was going

14   to be cheaper at the ASC, she would have -- she would

15   have had both of her eyes done at our ASC instead of

16   the -- one at the hospital in Rhinelander and one at

17   our ASC in Wausau.

18       Q.  So -- so the set amount for the facility

19   fee, the cost of the lens, if it -- if it costs you

20   less or costs you more, that doesn't affect what that

21   fee is going to be?

22       A.  Correct.  It doesn't.

23       Q.  Okay.  And the same thing for the

24   viscoelastics?

25       A.  Right.

 D's Flaherty designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

### US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 148

```
01      Q.  Okay.

02              MR. SAMIE:  I think that's all I have.

03

04              FURTHER EXAMINATION BY MR. DIXON:

05      Q.  Could I just ask, following up on that, so

06  am I right to understand that, when physicians decide

07  to open up an ASC and perform cataract surgeries in

08  an ASC, it actually costs the federal government less

09  money than if they did the surgeries in a hospital

10  setting.

11              MR. SAMIE:  Objection to form.

12              THE WITNESS:  Yes.

13              I -- I think I have the note in my

14  wallet.  Because -- where she talked about the

15  differential between the hospital in Rhinelander and

16  our ASC, the difference.

17              The total bill, for everything for her

18  cataract surgery -- this was done -- the St. Mary's

19  Hospital was October 8 of last year.  The total bill

20  was -- at the hospital, was $6,702.

21              When she had it done at the ASC, the

22  Eye Clinic Laser & Surgery Center, was $4,746, done

23  on November 20.

24              So October 8 to November 20, six weeks

25  difference, and almost $2,000 difference in the total
```

Ps: 402/403
148:5-25
149:1-2



D's Flaherty designations

**Transcript of Flaherty, Kevin**

# Flaherty, Kevin

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 149

01  expense for the cataract surgery at the hospital in

02  Rhinelander versus our ASC.

03                    MR. SAMIE:  Can we get a copy of this

04  so we have it?

05                    THE WITNESS:  Sure.

06                    MR. GASKINS:  Is there a pa- -- is

07  there patient information on there?

08                    THE WITNESS:  Yeah, there is.

09                    MR. SAMIE:  Could we at least get it

10  marked as an exhibit?

11                    THE WITNESS:  Actually, there's not.

12                    MR. GASKINS:  Okay.

13                    MR. BIRRELL:  Just --

14                    THE WITNESS:  There's not.  Not her

15  name.  That's just her handwriting.  She just handed

16  it to me.  That's the differential of price between.

17  You can have it.

18                    MR. SAMIE:  Joe, how do you want to

19  mark this?

20                    MR. DIXON:  You can mark it, and we'll

21  just maybe -- maybe make a copy of it and call it --

22  what number are we on now?

23                    COURT REPORTER:  30.

24                    MR. DIXON:  30.

25                    Do you need it back?

 D's Flaherty
designations

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 150

```
01                    THE WITNESS:  No.  No.  I just --
02                    MR. SAMIE:  Just photocopy it first
03  before we --
04                    MS. VERKAMP:  You'll get a copy.
05                    THE WITNESS:  Okay.  That's fine.  But
06  it just --
07                    MR. SAMIE:  It's going to have the --
08                    THE WITNESS:  That's fine.  I don't --
09  you can put it anywhere.  I don't care.
10                    MR. GASKINS:  Put it on the back.
11                    MR. BIRRELL:  Put it on the back.
12                    THE WITNESS:  I just -- it --
13                    MR. SAMIE:  I'll put it on the back.
14                    THE WITNESS:  But, I mean, since it was
15  such a big differential for her, you know, I've tried
16  to make more of a point if -- to tell patients that,
17  depending on their insurance, there might be a
18  difference in cost.
19                    MR. SAMIE:  I'm sorry.  What number are
20  we on?
21                    COURT REPORTER:  30.
22                    MR. BIRRELL:  30.
23                    MR. DIXON:  30.
24                    MR. SAMIE:  Okay.  So this note is 30.
25  And we're going to circulate -- do you want to see
```

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al

Page 151

01  this, Joe, right now?

02              MR. DIXON:  No.  That's okay.  I'll

03  just take a copy.

04              MR. SAMIE:  Okay.

05              MR. DIXON:  Are we done?

06              MR. SAMIE:  I think you're --

07              MR. DIXON:  I'm done.

08              MR. SAMIE:  Yeah, I think.

09              MR. DIXON:  Thank you, Doctor.

10              THE WITNESS:  You're welcome.

11              (Exhibit 30 marked for

12  identification.)

13              VIDEOGRAPHER:  Going off the record at

14  10:28.

15              (Deposition concluded at 10:28 p.m.)

16                  *    *    *    *    *    *

17

18

19

20

21

22

23

24

25

**Transcript of Flaherty, Kevin**

**Flaherty, Kevin**

**US ex rel Kipp Fesenmaier v The Cameron-Ehlen Group et al**

Page 152

```
01              CERTIFICATION PAGE
02
03  STATE OF WISCONSIN )
04  MARATHON COUNTY    )
05
06            I, CHRISTINE J. WILLETTE, RDR, CRR,
07  CRC, Notary Public in and for the State of Wisconsin,
08  do hereby certify that:
09
10            Prior to being examined, the deponent
11  named in the foregoing deposition, KEVIN T. FLAHERTY,
12  M.D., was by me duly sworn to testify the truth, the
13  whole truth, and nothing but the truth.  Said
14  deponent did not request the opportunity to read and
15  sign the transcript.
16            Said deposition was taken before me at
17  the time, date, and place set forth; and I hereby
18  certify the foregoing is a full, true, and correct
19  transcript of my shorthand notes so taken and
20  thereafter reduced to computerized transcription
21  under my direction and supervision.
22               I am neither counsel for nor related to
23  any party to said action, nor in any way interested
24  in the outcome thereof; and I have no contract with
25  the parties, attorneys, or persons with an interest
26  in the action that affects or has a substantial
27  tendency to affect impartiality, or that requires me
28  to provide any service not made available to all
29  parties to the action.
30               IN WITNESS WHEREOF, I have hereunto
31  subscribed my name this 16th day of June 2019
32
33
34
35
36  Christine J. Willette
37  - Registered Diplomate Reporter
38  - Certified Realtime Reporter
39  - Certified Realtime Captioner
40  Notary Public - State of Wisconsin
41  My Commission Expires June 19, 2021
42
```

**Transcript of Flaherty, Kevin**