UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America ex rel. Kipp Fesenmaier, | Case No. 13-cv-3003 (WMW/DTS) |
| Plaintiff, | **ORDER** |
| v. | |
| The Cameron-Ehlen Group, Inc., doing business as Precision Lens; and Kathryn Weitzel Ehlen, personal representative for the Estate of Paul C. Ehlen, | |
| Defendants. | |

---

Judgment has been entered in this matter against defendants The Cameron-Ehlen Group, Inc. ("Precision Lens") and Paul Ehlen in the amount of $487,048,705.13, not including post-judgment interest, statutory attorneys' fees or other taxable costs. *See* Dkt. 1043. This matter is now before the Court on the motion of Precision Lens and defendant Kathryn Weitzel Ehlen (in her capacity as personal representative for the Estate of Paul Ehlen) for post-judgment relief.[1] *See* Dkt. 1047. In their motion, defendants seek (1) judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure; (2) to the extent that judgment as a matter of law is not granted, a new trial under Rule 59 of the Federal Rules of Civil Procedure; and (3) to the extent that neither a new trial nor

---

[1] Paul Ehlen died shortly after judgment was entered in this matter, and his wife, Kathryn Weitzel Ehlen, was substituted as a party pursuant to Rule 25(a)(1) of the Federal Rules of Civil Procedure. *See* Dkt. 1079.

judgment as a matter of law is granted, a reduction in the monetary judgment on the grounds that the monetary award violates the Excessive Fines Clause[2] of the federal constitution.

For the reasons addressed below, defendants' motion is granted in part and denied in part—specifically, the request for a new trial is denied, the request for judgment as a matter of law is denied with respect to all but one of the transactions found by the jury to be a kickback, and the request for a reduction in the judgment is granted, although not to the extent sought by defendants. The judgment previously entered in this matter will be amended to reflect an award of $216,675,248.55, not including post-judgment interest, statutory attorneys' fees, or other taxable costs. This is the maximum award permitted by the constitution in this case.

## BACKGROUND

After a two-month trial, a jury concluded that Precision Lens and Paul Ehlen violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, by offering remuneration in the form of trips, meals and other items of value to dozens of ophthalmologists over a 10-year period. The ophthalmologists, in turn, purchased medical supplies from Precision Lens and later sought reimbursement from Medicare for medical procedures conducted using those items. The jury concluded that, because the requests for

---

[2] Defendants' constitutional challenge also arises under the Due Process Clause of the Fifth Amendment, but defendants do not distinguish in their briefing between the two constitutional provisions, and the legal analysis under both provisions appears to have been treated largely the same by courts in similar cases. *See, e.g.*, *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 368 (4th Cir. 2015). For simplicity, the Court will refer throughout this order only to the Excessive Fines Clause.

Medicare reimbursement did not disclose that the AKS had been violated with respect to the purchase of supplies used during the medical procedures, those requests for reimbursement violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733. The jury also concluded that Precision Lens and Paul Ehlen had caused the false claims to be submitted to Medicare or had caused records or statements to be made or used in support of the false claims. According to the jury, 64,575 false claims were submitted to Medicare due to Defendants' conduct, resulting in $43,694,641.71 in damages to Medicare. *See* Dkt. 985 at 38-39 (verdict form).

The Court subsequently directed that judgment be entered against Precision Lens and Paul Ehlen in the amount of $487,048,705.13. Of that amount, less than one tenth ($43,694,641.71) represented actual damages to the United States. That actual-damages amount was then trebled pursuant to 31 U.S.C. § 3729(a)(1), resulting in approximately $131 million in trebled damages. The remaining three quarters of the judgment amount, or approximately $358 million, represented statutory penalties assessed for each of the 64,575 requests for Medicare reimbursement found by the jury to be false claims. Approximately $2.5 million was deducted from the judgment amount due to settlements from other parties on claims related to the conduct at issue in this proceeding.[3]

---

[3] The more precise calculation of the amount of judgment can be found in the Court's May 12, 2023 Order. Dkt. 1042.

## ANALYSIS

Defendants challenge the judgment on many grounds. Those challenges can be divided into four categories: First, defendants contend that the Court erred in several respects when interpreting the FCA and AKS and that, absent those errors, the result of this case would have been different—either because summary judgment would have been granted in their favor or because the jury would have been instructed differently and, therefore, reached a different conclusion. Second, defendants contend that the Court erred in its handling of several evidentiary issues that arose before and during trial. Third, defendants contend that there was insufficient evidence admitted at trial from which the jury could reasonably conclude that defendants had violated the FCA—or, there was insufficient evidence from which to conclude that defendants had violated the FCA with respect to many of the specific transactions found by the jury to be kickbacks. Fourth, defendants challenge the calculation of damages and the amount of judgment, including an argument that the punitive portion of the judgment exceeds the amount permitted by the Excessive Fines Clause.

### A.  Standards of Review

Rule 50(b) of the Federal Rules of Civil Procedure governs renewed motions for judgment as a matter of law. "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b). A renewed motion for judgment as a matter of law may be granted only if "'a reasonable jury would not have a legally sufficient evidentiary basis'" to return the verdict that it reached. *Bavlsik v. Gen.*

*Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017) (quoting Fed. R. Civ. P. 50(a)(1)).  In deciding a motion for judgment as a matter of law, the court must view the evidence in the light most favorable to the party who prevailed before the jury, making all reasonable inferences in that party's favor.  *Id*.

Rule 59 governs motions for a new trial.  Following a jury trial, on the motion of any party, a district court may grant a new trial on all or some of the issues.  *See* Fed. R. Civ. P. 59(a)(1)(A).  But "a district judge is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."  *King v. Davis*, 980 F.2d 1236, 1237 (8th Cir. 1992) (citation omitted). The "trial judge may not usurp the functions of a jury."  *White v. Pence*, 961 F.2d 776, 781 (8th Cir. 1992) (quotation omitted).  A new trial is warranted only when "the verdict was so contrary to the evidence as to amount to a miscarriage of justice."  *Butler v. French*, 83 F.3d 942, 944 (8th Cir. 1996).

### B.  Legal Standards for Liability

#### 1.  Intent

To prove a violation of the AKS, a plaintiff must establish that the remuneration offered or paid by the defendant was intended "to induce" the payee to purchase, lease, or order—or arrange for or recommend purchasing, leasing, or ordering— any good, facility, service, or item, or to refer an individual to a person for the furnishing of any item or service.  *See* 42 U.S.C. § 1320a-7b(b)(2).  "The AKS's plain language thus makes it unlawful for a defendant to pay a kickback with the intent to induce a referral, whether or not a particular

referral results." *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013).

Throughout this litigation, the parties have disputed whether the AKS requires that intent to induce purchases be the *primary* motivation of the remuneration for liability to attach, or whether it is sufficient that the intent to induce purchases was one motivation of the remuneration (perhaps among many). When addressing the parties' motions for summary judgment, the Court surveyed the case law of the several appellate courts that have considered the issue and found that each of those courts had concluded that an AKS violation exists if one purpose of the remuneration was to induce purchases, even if other legitimate purposes for the remuneration also existed. *See United States v. Borrasi*, 639 F.3d 774, 781-82 (7th Cir. 2011) (collecting cases from the Third, Fifth, Ninth, and Tenth Circuits and rejecting the argument that inducement must be "the primary motivation behind the remuneration"); *United States ex rel. Lutz v. Mallory*, 988 F.3d 730, 741 (4th Cir. 2021) (similarly adopting the one-purpose standard rather than the primary-purpose standard).

Defendants continue to maintain that the AKS requires that the primary motivation of the remuneration was to induce purchases. Defendants' argument is preserved for appeal, but the Court continues to be persuaded that the appropriate standard on intent was applied in this matter for the reasons explained in the Court's January 12, 2021 order. *See* Dkt. 722 at 16-19.

2. Causation

Defendants raise essentially two claims with respect to the causation standard applied by the Court in this matter.  First, relying on *United States ex rel. Cairns v. D.S. Medical LLC*, 42 F.4th 828 (8th Cir. 2022), defendants argue that plaintiffs were required to establish but-for causation in proving a violation of the AKS.  But as more fully addressed in this Court's January 4, 2023 order, the causation standard described in *Cairns* applies only to claims governed by 42 U.S.C. § 1320a-7b(g).  *See* Dkt. 842 at 1-7; *Cairns*, 42 F.4th at 836 ("Our ruling today is narrow.  We do not suggest that every case arising under the False Claims Act requires a showing of but-for causation.").

Second, defendants object to what they characterize as plaintiffs' "taint theory" of establishing causation.  On defendants' version of events, plaintiffs led the jury to believe that any request for Medicare reimbursement submitted within one year of an alleged kickback—the so-called "taint period"—may be presumed to have been caused by the kickback and therefore unlawful.  But plaintiffs were not permitted to argue any such thing. As the Court explained in a previous order, "'[t]emporal proximity between a kickback and a Medicare claim, without more, is insufficient to establish the requisite causal link under the AKS.'"  Dkt. 722 at 27 (quoting *United States ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 99 (3d Cir. 2018)).

To be sure, for most (although not all) of the alleged kickbacks, the United States did seek recovery for any requests for Medicare reimbursement that were submitted by doctors in the year following the alleged kickback.  But the strategic decision to seek recovery for one year of Medicare claims following the alleged kickbacks reasonably

reflected that temporal proximity, although not sufficient by itself to establish causation, was nevertheless relevant.  All else being equal, claims for Medicare reimbursement made very shortly after a kickback would be more likely to have been caused by that kickback than claims for Medicare reimbursement made many years after the fact.  Plaintiffs would inevitably have had a more difficult time, all else being equal, establishing causation on claims made more than one year after an alleged kickback event.  Reasonably, then, plaintiffs limited their case for the most part to requests for Medicare reimbursement that occurred within one year of the alleged kickback event.  But for each allegedly false claim, regardless of when it occurred, plaintiffs were required to establish proximate causation, not merely temporal proximity.

### 3.  Damages

The FCA provides for the recovery of "damages which the [United States] sustains because of" a false claim.  31 U.S.C. § 3729(a).  Plaintiffs argue that the appropriate measure of damages in this matter is the full amount of each Medicare claim paid by the United States that was found by the jury to be false.  The rationale for this argument is straight forward.  Because doctors are required to certify that they are in compliance with the AKS, had the doctors (truthfully) refused to certify that they were in compliance with the AKS with respect to any particular claim for Medicare reimbursement, that claim for reimbursement never would have been approved.  Applying plaintiffs' logic, every penny paid by the United States in reimbursement of false claims amounts to actual damages that are recoverable by the United States under the FCA.

Defendants offered several alternative theories for calculating damages. One theory is that the United States's actual damages were zero, because every one of the medical procedures for which reimbursement was sought was medically necessary and, therefore, would have been reimbursed anyway. Another theory is that actual damages should be limited, at most, to the profits that accrued to Precision Lens from the sales of lenses and viscoelastic tainted by kickbacks. A third theory separates the requests for Medicare reimbursement into claims for Physician Professional Fees and claims for Facility Fees—defendants objected to *either* fee being recoverable. But defendants especially objected to the Physician Professional Fees being recoverable because no portion of that fee served directly as reimbursement for the purchase of Precision Lens products.

This Court agreed with plaintiffs that the full amount of the claims—including the portions attributable to Physician Professional Fees—were recoverable as actual damages in his matter. *See* Dkt. 842 at 7-12. The rationale for that decision is set forth more fully in this Court's January 4, 2023 order and will not be revisited here, except to state that it is well-established that the appropriate measure of damages is the full value of the false claims paid by the United States. *See, e.g.*, *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008); *Teva Pharmaceuticals USA, Inc.*, No. 20-11548-NMG, 2022 WL 6820648, at *5 (D. Mass. Oct. 11, 2022).

### 4.  Jury Instructions

Finally, defendants object to several of the final instructions given to the jury and argue that, because of supposed errors in those instructions, a new trial should be granted. "[A] district court has broad discretion in instructing the jury, and jury instructions do not

need to be technically perfect or even a model of clarity." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 252 F.3d 1010, 1012 (8th Cir. 2001) (citations and internal quotation omitted). A new trial based on erroneous jury instructions "is necessary only when the errors misled the jury or had a probable effect on the jury's verdict." *Slidell, Inc. v. Millennium Inorganic Chemicals, Inc.*, 460 F.3d 1047, 1054 (8th Cir. 2006) (citation omitted).

### i.  AKS Instruction

As explained above, defendants have argued that the AKS requires that, for liability to attach, the intent to induce purchases must be the primary motivation of the remuneration. The Court rejected this argument.  As a result, the jury's instructions did not follow defendants' proposed primary-motivation standard.  Defendants renew their argument that the jury instructions were erroneous in this regard.  That argument is rejected for the same reasons that defendants' underlying argument regarding the appropriate standard of intent was rejected.

Defendants similarly object that the phrase "in exchange for" was omitted from the Court's final instruction on the AKS, arguing this phrase should have been included because it would have reinforced what they believe to be the correct primary-purpose standard.  As the Court has explained, the primary-purpose standard is not a correct statement of the law, and any proffered instruction reinforcing that incorrect understanding would have been an error.

Finally, defendants argue that the jury should have been instructed that a hope or expectation of future business from physicians does not by itself result in AKS liability. The Court believes that the definition of remuneration provided to the jury adequately

established the boundaries of liability under the AKS and that no clarifying instruction was necessary.

### ii. FCA Instruction

Most of defendants' objection to the final jury instruction on the FCA pertains to the appropriate standard of causation under the FCA, with defendants asserting that the jury should have been instructed that the but-for standard set forth in *Cairns* applies in this matter. For the reasons addressed above, the Court rejects this argument that but-for causation is the appropriate standard in this litigation and concludes that the jury was instructed correctly regarding causation.

Defendants also argue that the Court provided an inaccurate description of the concept of materiality to the jury. The definition of materiality provided to the jury derived directly from *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016), and was an accurate and neutral summarization of the holding of that case.

### iii. Damages

As explained above, the Court determined that the appropriate measure of damages in this proceeding is the full amount paid by the United States for each false claim resulting from a kickback. *See* Dkt. 722 at 7-10 (order on motions for summary judgment). Defendants argue that this conclusion regarding the appropriate measure of damages is wrong and that, because of the error, the jurors were instructed improperly on how to calculate damages in this matter. Because the Court does not believe its conclusion regarding damages to be wrong, the Court similarly does not believe that there was any error in the damages instruction that was given to the jury.

*iv. Relator's Award*

The jurors were instructed that "[y]ou are not to allow the possibility of a relator's share of the recovery enter into your deliberations about whether, or the extent to which, the United States is entitled to monetary damages." Jury Instruction 18. Defendants objected to the instruction, arguing that the jurors should have been informed that Fesenmaier and his attorneys had a pecuniary interest in the outcome of the litigation.

The jury instruction given was appropriate, and the instruction that defendants preferred would have been inappropriate. That Fesenmaier stood to benefit from a favorable outcome in this case is wholly irrelevant to the questions presented to the jury: whether, and to what extent, Precision Lens or Paul Ehlen violated the FCA. *See United States ex rel. Feldman v. Van Gorp*, No. 03 CV 8135 (WHP), 2010 WL 2911606, at *5 (S.D.N.Y. July 8, 2010). Nor was it relevant—or even, for that matter, unusual—that the attorneys of one party stood to benefit from a favorable outcome. The jury was instructed correctly to ignore the issue.

## C. Evidentiary Issues

Defendants' next category of post-judgment arguments pertains to decisions made by the Court regarding the admissibility of evidence at trial. None of defendants' arguments are availing.

### 1. Evidence Related to Materiality

In 2010, both the U.S. Department of Health and Human Services Office of Inspector General ("HHS-OIG") and the Centers for Medicare & Medicaid Services ("CMS") were presented with complaints that Precision Lens had violated the AKS. The

HHS-OIG elected not to investigate the complaints, and the CMS continued to pay claims for Medicare reimbursement for procedures in which Precision Lens products had been used. Defendants sought admission of exhibits and testimony regarding the actions (or the inaction) of HHS-OIG and CMS, arguing that the comportment of those agencies tended to show that the United States did not regard defendants' conduct as material. The Court disagreed with defendants then, and continues to disagree with defendants now, that the evidence was relevant to materiality. The inaction of HHS-OIG and CMS did not fairly reflect that those entities found kickbacks generally or the actions of defendants particularly to be unimportant. And the admission of the evidence described above would have risked the jury drawing an unwarranted inference from that evidence.

Defendants also argue that expert David Gregory should have been permitted to testify regarding whether and to what extent the false statements on the Medicare reimbursement forms were material. As the Court explained, when this issue was presented, Gregory (by defendants' own admission) had not offered an opinion on materiality in his expert report. For this reason, he was appropriately not permitted to testify on the topic. *See* Dkt. 931 (citing Fed. R. Civ. P. 37(c)(1)).

## 2. Tiffany's Fifth Amendment Invocation

At trial, the United States sought to designate the bulk of the deposition testimony of James Tiffany, who was the former chief executive officer of Sightpath Medical, LLC ("Sightpath"). Both Tiffany and Sightpath previously were defendants to this action, and both Tiffany and Sightpath had a substantial business relationship with Precision Lens during much of the period during which the events at issue occurred. Throughout his

deposition, Tiffany invoked his Fifth Amendment right against self-incrimination and declined to answer any substantive question posed to him by counsel for any party. Defendants objected to admission of the deposition on the grounds that Tiffany's invocation of his Fifth Amendment rights was not relevant to the issues in dispute and that admission of Tiffany's invocation would be unfairly prejudicial to them.

The Court sustained in part and overruled in part defendants' objection. The United States was permitted to introduce no more than 50 lines from the Tiffany deposition transcript—essentially, only enough to establish that the United States had been unable to elicit deposition testimony from Tiffany because of his Fifth Amendment invocation. Defendants, in turn, were permitted to counter-designate a snippet of Tiffany's deposition showing that they, too, had been unable to elicit testimony from Tiffany.

In their post-judgment motion, defendants renew their objection to the admission of any portion of the deposition. Defendants' argument is rejected on the grounds set forth in the Court's January 22, 2023 order, Dkt. 872, overruling in part the objection to the admission of the deposition.

### 3. Ehlen Audio Recording

Defendants sought admission of a 77-minute audio recording[4] in which Paul Ehlen discussed with Fesenmaier the investigation of the transactions later found to be kickbacks

---

[4] In their motion for post-judgment relief, defendants refer to audio recordings (plural) "which span 50 hours over the course of years." Dkt. 1048 at 33. But during trial, defendants sought the admission of only one such recording, Exhibit D-75, and only that one recording was expressly excluded. In fact, the Court expressly stated before trial that the audio recordings of Ehlen and Fesenmaier would *not* be categorically excluded and would instead be evaluated on a case-by-case basis. *See* Dkt. 842 at 21.

and, speaking generally, asserted his innocence of having violated the AKS.  The Court sustained the objection to the admission of that evidence on the grounds that it was inadmissible hearsay.  *See* Dkt. 922.   Defendants contend that Paul Ehlen's statements in the recording are not hearsay and that, even if they were, the statements are admissible under Rule 803(3) of the Federal Rules of Evidence as reflecting Ehlen's state of mind at the time that he made the statements.

The Court remains satisfied that Paul Ehlen's statements in the recording at issue are inadmissible hearsay.  Moreover, to the extent that defendants intended to introduce the recordings for non-hearsay purposes, Paul Ehlen's statements were irrelevant to any question being presented to the jury.  That Paul Ehlen—while being investigated by the United States—told Fesenmaier that he did not believe the transactions for which he was being investigated to be kickbacks is not probative of whether those transactions were, in fact, kickbacks.  Moreover, that Paul Ehlen did not know he was being recorded does not make his statements any more probative.

4. Evidence Related to Knowledge of Fesenmaier

Defendants designated portions of Fesenmaier's deposition for admission.   The Court sustained plaintiffs' objection to the designation, explaining at the time that

> much of the designated testimony relates to Fesenmaier's motivation in bringing a claim against Defendants. Mr. Fesenmaier has not testified in this matter, and his deposition testimony regarding his motivation is not relevant. *See United States ex rel. Landis v. Tailwind Sports Corp.*, 292 F. Supp. 3d 211, 215 (D.D.C. 2017) (finding that a defendant could not call the relator as a witness solely for the purpose of attacking his character or highlighting his motivation for filing the qui tam action).

15

Dkt. 935.  Similarly, the Court precluded Paul Ehlen from testifying about Fesenmaier's possible motivations for acting as a whistleblower.  *See* Tr. 3509-11.

Defendants argue that evidence regarding Fesenmaier's motivations and state of mind should have been admitted.  But this kind of evidence would have been "not relevant to any of the elements of an FCA claim" and thus was properly excluded under Rule 403.[5] *Feldman*, 2010 WL 2911606, at *5.  As the Court explained at greater length prior to trial, when a relator does not testify, "his self-serving interest in filing suit is irrelevant, as it does not affect whether a defendant's actions were legal or not."  *United States ex rel. Kiro v. Jiaherb, Inc.*, No. CV 14-2484-RSWL-PLAX, 2019 WL 2869186, at *4 (C.D. Cal. July 3, 2016) (citing *Landis*, 292 F. Supp. 3d at 215).

### 5. Evidence Related to Amount of Damages

Defendants next argue that various forms of evidence should have been admitted at trial showing (in their view) that the amount of actual damages to the United States resulting from any false certification was less than the full amount of reimbursement paid to the doctors.  The issue of how actual damages should be calculated in this matter has been litigated repeatedly, and the Court's exclusion of defendants' proffered evidence on damages follows directly from the Court's prior ruling that the appropriate measure of

---

[5] To be sure, "[t]he motivation of a witness in testifying, including [his] possible self-interest and any bias or prejudice against the defendant, is one of the principal subjects for cross-examination."  *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994).  A party certainly may test the quality of an adversarial witness's testimony by pointing out that the motivations of the witness are something other than pure.  But Fesenmaier did not testify at trial.  Accordingly, there was no testimony of Fesenmaier for defendants to attempt to impeach.

actual damages in this matter was the full amount of false claims paid by the United States. In light of that ruling, the evidence for which defendants sought admission was irrelevant and therefore properly excluded. *See* Fed. R. Evid. 403.

### 6. Expert Demonstratives

Defendants objected to the admission of Exhibit P-1216, which was intended for use as a demonstrative exhibit by plaintiffs during the testimony of their expert Michael W. Phillips but was later admitted into evidence. The Court's explanation as to why the exhibit was admitted was provided on the record during trial, *see* Tr. 2546, and it is unnecessary to provide further explanation here. The Court notes only that every word and number on the exhibit would have been admitted into evidence through Phillips's testimony—and, indeed, every word and number was in the process of being admitted through Phillips's testimony when the exhibit was admitted. Admission of the document thus spared the needless expenditure of juror time in a trial that had already gone on for nearly one month and would go on for yet another month.

Defendants counter that, having admitted plaintiff's demonstrative exhibit used during expert testimony, the Court should have granted the same courtesy to defendants and admitted Exhibit D-335, which was shown to the jury as a demonstrative during the testimony of their expert Scott Van Meter but was not admitted into evidence. But the rationales that supported the admission of the Phillips exhibit did not support the admission of the Van Meter exhibit. The Van Meter exhibit, unlike the Phillips exhibit, was a true demonstrative—the exhibit provides a visualization of data supporting Van Meter's underlying testimony regarding physician purchases before and after alleged kickback

events.[6]   The exhibit used during the Phillips testimony, by contrast, was merely a summarization of opinions that Phillips already intended to offer as testimony.  Indeed, the Phillips exhibit was hardly a "demonstrative" at all.  It is a chart that shows only what Phillips's testimony was about to be.  The information on the Phillips demonstrative exhibit therefore was destined for admission, while the information on the Van Meter demonstrative exhibit was not.

Nor does the Court believe that defendants were unduly prejudiced by the discrepancy.  This is not a situation in which two experts offered dueling opinions on a topic and one of those opinions was admitted into evidence while the other was excluded, thereby preventing one side or the other an adequate opportunity to present its case on a particular issue.  Phillips and Van Meter testified as to entirely unrelated topics—the former regarding the fair market value of transactions alleged to be kickbacks, the latter as to the quantity of purchases made by doctors from Precision Lens before and after the alleged kickback events.

### 7.  Van Meter Testimony on Maintenance of Business

Finally, defendants argue that Van Meter should have been permitted to testify to the effect that the alleged kickbacks did not cause the physicians to continue using Precision Lens products.  Van Meter's opinions in this regard, however, were not fairly

---

[6] Defendants characterize the Van Meter exhibit as a Rule 1006 summary, but it was not. *See White Industries, Inc. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1070-71 (W.D. Mo. 1985) (distinguishing Rule 1006 summaries from "pedagogical" summaries).  This by itself does not mean that the exhibit was inadmissible.  The Phillips exhibit was not a Rule 1006 summary, either.  It does mean, however, that Rule 1006 of the Federal Rules of Evidence did not compel admission.

encompassed by his expert report.  He was, therefore,  properly precluded from testifying on that topic.  *See* Fed. R. Civ. P. 37(b).

### D.  *Sufficiency of the Evidence*

Defendants' next group of arguments relates to the sufficiency of the evidence admitted at trial.  Some of these sufficiency-of-the-evidence arguments overlap with the arguments that were considered and rejected above.  For example, defendants contend that plaintiffs were required under the AKS to establish that the primary purpose of the alleged kickbacks was to induce referrals.  With respect to the sufficiency of the evidence, defendants argue that the evidence admitted at trial does not suffice to meet this primary-purpose standard.  But the Court rejected the primary-purpose standard, and defendants' sufficiency-of-the-evidence argument related to the primary-purpose standard, therefore, fails as well.  Similarly, defendants contend that plaintiffs failed to establish but-for causation.  But as addressed above, plaintiffs were not required to establish but-for causation under the AKS.  Therefore, any sufficiency-of-the-evidence claim premised on but-for causation must be rejected.

Defendants, however, also challenge the sufficiency of the evidence on grounds that are not necessarily encompassed by the arguments examined above and which, therefore, must be addressed in greater detail.  Some of these challenges to the sufficiency of the evidence implicate the *entirety* of the verdict against defendants.  In these arguments, defendants contend that plaintiffs failed to establish a critical component of their case, fatally undermining any finding of liability.  Other challenges, by contrast, attack the sufficiency of the evidence with respect to specific transactions found by the jury to be

kickbacks.  The Court will address these arguments next, starting with the more general arguments and ending with the more specific.

In reviewing these arguments, the Court must view the evidence in the light most favorable to the verdict and may reverse the verdict only if no reasonable juror could have returned the verdict that the jury in this matter returned.  *See, e.g.*, *Ryther v. KARE 11*, 108 F.3d 832, 836 (8th Cir. 1997).

### 1.  Materiality

To establish liability under the FCA, plaintiffs were required to show that the false or fraudulent information in the claim for Medicare reimbursement was material to the United States's decision to pay the claim.  Defendants contend that there was insufficient evidence admitted at trial to establish the necessary materiality.

Defendants challenge the sufficiency of the evidence as to materiality on two grounds.  The first argument is a restatement of the argument described above regarding the failure of HHS-OIG and CMS to follow up on whistleblower complaints concerning the conduct of Precision Lens and Medicare's subsequent payment of claims.  Defendants argue that these agencies' actions establish that the misstatements in the Medicare reimbursement forms were not material.  The Court determined that the inaction of HHS-OIG and CMS, far from being conclusive on the issue of materiality, was not even probative on the issue of materiality.  In any event, the jury had an adequate evidentiary basis upon which to conclude that lack of compliance with the AKS was a material

misstatement through the testimony of Scott Lawrence, a CMS representative.[7]  *See* Tr. 444-79.

Defendants also advance a second argument regarding materiality, focusing again on the "taint theory" that defendants attacked with respect to causation.  To summarize, Defendants' argument generally contends that, even if a false certification of compliance with the AKS is, speaking generally, a potentially material misrepresentation, plaintiffs did not establish that the United States would have regarded the specific transactions alleged to be kickbacks in *this* litigation to be material.  For example, defendants characterize one of the transactions found by the jury to be a kickback as being nothing more than a salad and a soda offered at a Christmas party.  Plaintiffs sought recovery from Precision Lens and Paul Ehlen for one full year of Medicare claims submitted by that doctor following the Christmas party.  Defendants argue, in essence, that plaintiffs did not establish that the United States would have refused to pay the claim had the doctor certified on her Medicare reimbursement forms that she had accepted a salad and soft drink from one of her medical suppliers.

---

[7] To be clear: "A misrepresentation cannot be deemed material merely because the [United States] designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment."  *Escobar*, 579 U.S. at 194.  But Lawrence's testimony provided the jury an adequate evidentiary basis to conclude that compliance with the AKS is an especially weighty concern of the United States, as the existence of a kickback implicates the quality of care provided to the patient.  Tr. 459 ("We care—any time there's influence, we care about it any time because we want all the decision-making to be purely to benefit the patient and to follow the rules.").

Defendants' argument regarding the *de minimis* nature of some of the kickbacks has some force when applied to causation.[8]  That argument also may be relevant in establishing the existence of remuneration—that is, some benefits might be of such insubstantial benefit that they do not amount to remuneration under the AKS and, therefore, cannot constitute kickbacks.  While the Court rejects this contention in its analysis below, the contention is far from frivolous.  But defendants' salad-and-a-soda argument is a poor fit in the context of materiality.  There is no reason to believe that the United States would not have cared about the doctor's false certification of compliance with the AKS if only it had known that the kickback was a modest meal, not something more lavish.

Accordingly, the Court concludes that the evidence admitted at trial was sufficient to establish materiality.

## 2.  Proximate Causation

Defendants raise several arguments with respect to the sufficiency of the evidence regarding causation.   Many of these arguments reprise the complaints pertaining to plaintiffs' putative "taint theory."  The Court addressed that issue above and declines to repeat the point here, except to observe that the United States was required to establish causation with respect to each individual claim and that proximity in time to a kickback was not a sufficient basis upon which to conclude that the necessary causation existed here.

Two other arguments on this subject require somewhat closer attention.  First, defendants contend that the United States did not establish that Precision Lens or Paul

---

[8] How much influence, for example, can be purchased with a salad at lunch or a modest meal at a holiday party?

Ehlen caused any claim to be submitted, thereby severing a necessary link for proving liability under the FCA. Second, defendants contend that the United States did not establish that the requests for Medicare reimbursement at issue in this matter were false.

Both arguments can be addressed briefly. First, the jury was entitled to conclude that the defendants violated the FCA if (among other things) the defendants caused records or statements to be made or used in support of a false claim to the United States. The jury was further instructed that a defendant's conduct may be found to have caused the submission of a claim for Medicare reimbursement (1) if the alleged misconduct was a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct. The evidence at trial was sufficient for a reasonable juror to conclude that requests for Medicare reimbursement would likely result following the use of the products tainted by kickbacks. The products at issue were used in cataract surgeries, which are especially prevalent in populations covered by Medicare. The evidence at trial was also sufficient for the jury to conclude that defendants understood that compliance with the AKS would be a prerequisite of reimbursement.

Second, defendants argue that the doctors were required only to certify to the United States that *they* (that is, the doctors) had not knowingly violated the AKS. Many of the doctors testified that they believed that they had adequately recompensed Precision Lens and Paul Ehlen for any benefit given to them—for example, by paying invoices for trips. Defendants contend that these doctors therefore could not have knowingly certified a false statement. But a knowing violation of the FCA includes not only claims made with actual

knowledge of falsity, but also claims made in deliberate ignorance or reckless disregard of the truth or falsity of the information provided on the reimbursement form.  There was a sufficient evidentiary basis for the jury to conclude that the doctors at issue acted in deliberate ignorance or reckless disregard of the truth, even if the doctors did not subjectively believe themselves to have violated any law.

The Court therefore concludes that the evidence admitted at trial was adequate to establish causation.

### 3.  Proof of Remuneration

Defendants' next series of arguments focuses on specific transactions found by the jury to be kickbacks.  According to defendants, there was insufficient evidence admitted at trial from which to conclude that remuneration was provided to doctors in these transactions. For this reason, defendants argue, there was insufficient evidence from which to conclude that these transactions amounted to kickbacks.

### i.  Fair Market Value

Defendants first challenge several instances in which the jury "found kickbacks for trips in which doctors testified that they were invoiced and paid their own costs and/or what they considered to be fair market value." Dkt. 1048 at 13.  This category can be addressed briefly. Regardless of the doctors' beliefs about these trips, the jury was entitled to conclude that the amount paid for these trips fell short of the fair market value of those trips based on Phillips's testimony and analysis of fair market value of difficult-to-quantify benefits such as private flights.  There was sufficient evidence to conclude that this category of transactions constituted remuneration.

*ii.  Third-Party Benefits*

Defendants next argue that, in some instances, the remuneration alleged by plaintiffs came from a third party, not from Precision Lens or Paul Ehlen.  Defendants are less than clear about which kickbacks they believe to fall into this category.  The memorandum in support of the post-judgment motion refers vaguely to locations in which many trips had been conducted, rather than to specific transactions believed to have not been remunerative.  Absent greater precision as to the specific trips at issue, the Court will not enter into an extended analysis as to why each of the possible trips to which defendants *might* be alluding could reasonably have been found by the jury to have been remunerative.  It suffices to state that, for each of these trips, the jury could reasonably have concluded that the doctor either accrued a remunerative benefit from Precision Lens and Paul Ehlen (for example, in the form of a private flight for which fair market value was not provided) or that Precision Lens and Paul Ehlen were the ultimate payees of the benefit supplied by the third party.

Two instances, however, are specifically cited by defendants, and the Court will address them with greater detail here.  First, one of the transactions that the jury found to be a kickback was a 2006 golf outing in Las Vegas attended by Dr. Kurt Weir.  *See* Dkt. 985 at 24 (verdict form).  Weir did not pay for the outing, but it is uncertain who did pay.  The United States believes it was Paul Ehlen. But the evidence is inconclusive.  Weir testified that he "assume[d]" that Paul Ehlen had paid for the trip, Tr. 594, but he did not have a specific recollection.  Weir's assumption, in turn, appears to have been premised on an email shown to him during direct examination.  In that email, Linda Norling—a Precision Lens employee and Paul Ehlen's personal assistant—informed the host at the casino where

the golf course at issue was located that "Paul left me a VM last night and said it was OK to charge all of the Cascata golf to his card."  Exhibit P-378 at 1.  But Norling testified that another doctor had provided her with his credit card information for that trip, *see* Tr. 2001-03, and there is documentary evidence showing that Norling forwarded that doctor's credit-card information to the casino host approximately one month prior to sending the email shown to Weir, *see* Exhibit D-265.  If the other doctor paid for the trip, then Precision Lens and Paul Ehlen would not have provided remuneration with respect to that trip and no false claims could have resulted from that trip.

The jury could have reasonably inferred from the evidence admitted at trial that it was the other doctor, not the defendants, who paid for Weir's golf.  But that conclusion certainly is not compelled by the evidence.[9]  The jury also could have reasonably inferred that Norling's email to the casino host meant exactly what it said—that Paul Ehlen had told her to tell the casino manager "to charge all of the Cascata golf to his card."  Exhibit P-378 at 1.  Viewed in the light most favorable to the verdict, the evidence was sufficient for the jury to conclude that Paul Ehlen had paid for Weir's golf and therefore it was a kickback, notwithstanding that other evidence supported a different conclusion.

Second, defendants cite to the testimony of Dr. Richard Lindstrom that, for at least one of the trips that the jury found to be a kickback, he had flown on the private plane of Dr. Bill Link, not Paul Ehlen's plane.  *See* Tr. 3128.  Link, however, was closely associated

---

[9] Norling herself, when reviewing the documents at trial, declined to testify that the other doctor had in fact paid for the trip.  *See* Tr. 2003 ("Q. Can you tell from these e-mails who ultimately paid for Dr. Weir's golf?  A. No, I cannot tell.").

with Precision Lens, serving for approximately two years on its advisory board around the same time as the events at issue. *See* Tr. 3151. Lindstrom himself was under the impression that Link and Ehlen would "divvy up the costs between the participants as they thought was appropriate." Tr. 3129. None of the costs of that private flight appear to have been divvied to Lindstrom. A reasonable juror could conclude from the evidence that a free flight provided by Link to an event attended by Paul Ehlen amounted to remuneration from Precision Lens and Ehlen to Lindstrom, albeit through an intermediary.

### iii. Davis Christmas Party

Dr. Elizabeth Davis attended the Precision Lens Christmas party in 2013. According to her testimony, she ate a salad and drank a soda while she was there. *See* Tr. 1838. The jury found that this was a kickback. *See* Dkt. 985 at 8.

Plaintiffs strive diligently to suggest that the value of the remuneration provided to Davis was something more than a salad and a soft drink. But the evidence adduced at trial does not bear that out. For example, Precision Lens did submit a report under the Sunshine Act that the per-person value of the Christmas party was $240. But the fact that *other* invitees might have received a great deal of value from the party does not mean that Davis received any more benefit than what she had admitted to receiving. Plaintiffs also speculate that Davis might have attended pre-party or post-party events held by Precision Lens, but there is no evidence in the record bearing that out. The jury reasonably could have concluded that Davis received a salad and a soda on that occasion, which she admitted, but nothing beyond that.

The problem for defendants, however, is that remuneration within the meaning of the AKS includes the provision of *anything* of value for an amount other than the fair market value of that thing.[10]  42 U.S.C § 1320a-7a(i)(6).  Davis, by her own admission, received a dinner at a restaurant. While not an extravagant dinner, the dinner nevertheless is an item of value.  The jury was entitled to conclude from that testimony that Davis had received a kickback.

### iv.  Riedel New York Trip

The jury found that a trip taken by Dr. Patrick Riedel and his wife to New York City with Paul Ehlen and his wife constituted an unlawful kickback.  *See* Dkt. 985 at 26. Defendants argue that there is insufficient evidence to support jury's verdict with respect to this trip.

Although the question is close, there was sufficient evidence to support a finding that Riedel had received a kickback.  Riedel testified that he had taken a trip with Paul Ehlen to New York, that he had flown on Ehlen's plane, and that he did not recall paying

---

[10] Defendants cite to *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1048 (6th Cir. 2023), for the proposition that "giving someone a soda does not constitute remuneration within the meaning of the statute." Dkt. 1048 at 13.  But *Hathaway* says only that remuneration within the meaning of the AKS requires the transfer of money, goods or services, and does not include more nebulous transactions.  For example, in *Hathaway*, the alleged remuneration was "a hospital's decision not to hire an ophthalmologist in return for a general commitment of continued surgery referrals from another ophthalmologist for patients from the local community . . . ." *Id.* at 1046.  The transaction in *Hathaway* did not involve the transfer of money, services or goods, and thus there was no remuneration.  But *Hathaway* does not state that some transfers of money, goods, or services are so slight as to not be of value.

anything for trip. *See* Tr. 1143-1144. A reasonable juror could conclude from the testimony that the trip occurred and that Riedel had received renumeration from Ehlen.

Although there was sufficient evidence from which to conclude that Riedel received a kickback, there is insufficient evidence regarding when the trip occurred to tie that kickback to any specific violation of the FCA. Riedel could do no better than to testify that the trip occurred either in 2008 or 2009. The selection of any date within that two-year period by the jury would have been arbitrary. And no claims for Medicare reimbursement occurring before the date of that trip could have been caused by that kickback or could be said to have resulted in a violation of the FCA due to the kickback.[11] Because there is insufficient evidence from which to conclude that any particular false claim resulted from the New York City trip, judgment as a matter of law must be granted on behalf of defendants with respect to that trip.

*v. Swarup Trips*

Defendants final set of claims with respect to sufficiency of the evidence pertain to trips paid for by Dr. Jitendra Swarup. Defendants again do not cite any specific kickback event, which makes further analysis of this argument exceedingly difficult. Like the claim regarding the provision of a private flight to Dr. Lindstrom by Dr. Link rather than by defendants directly, the Court concludes that there was a sufficient nexus between Swarup, Sightpath, and plaintiffs that a jury could reasonably have concluded that the trips were renumeration to doctors on behalf of defendants.

---

[11] Plaintiffs did not seek recovery for any claims for Medicare reimbursement submitted by Riedel in 2010. *See* Exhibit P-1223.

### E.  Damages

Defendants next challenge the damages calculations made by the jury.  These arguments pertaining to damages can be grouped into four categories.  First, defendants contend that the actual damages suffered by the United States are far less than the $43,694,641.71 found by the jury.  Second, defendants contend that statutory penalties should not be assessed with respect to most of the 64,575 false claims found by the jury.  Third, defendants contend that the penalties that make up the bulk of the $487,048,705.13 judgment constitute a violation of the Excessive Fines Clause.  Fourth, the amount of the judgment, defendants contend, should be further offset against settlement amounts procured from other defendants.

### 1.  Calculation of Actual Damages

Defendants' arguments attacking the jury's calculation of actual damages are substantively identical to their arguments attacking the Court's conclusions with respect to the appropriate measure of damages in this case.  To the extent that those arguments were rejected above, they are again rejected here for the reasons explained above.

However, because the Court concluded above that there was insufficient evidence admitted at trial from which to conclude that an undated New York City trip taken by Paul Ehlen and Dr. Riedel resulted in a false claim being presented to Medicare,  the judgment in this matter must be reduced to reflect the fact that damages and statutory penalties may no longer be attributed to that trip.

The jury was not asked to attribute a specific amount of damages or a specific number of false claims to any particular transaction found to be a kickback.  Therefore, the

Court cannot say for certain how much in damages or how many false claims the jury attributed to the New York City trip.  Making matters still more complicated, the jury also found that Riedel had received two other kickbacks in late 2007 and 2008, and the jury attributed false claims to those other kickbacks.  It is not possible to determine from the verdict form with certainty which false claims would have been attributed to the other kickbacks and which to the New York City trip.

In any event, because the trip was noted on the verdict form with the arbitrary date of January 1, 2009, and because plaintiffs sought relief for all false claims that were made within one year of that date that resulted from the kickback, the Court will assume that all claims for Medicare reimbursement submitted by Riedel in 2009 for which plaintiffs sought relief are attributable to the New York City trip.  This amounts to 258 claims and $359,592 in actual damages to Medicare.  Accordingly, the judgment in this matter must be reduced by $4,563,840.  This amount consists of statutory penalties of $13,508 for each of the 258 claims and $1,078,776 in trebled actual damages.

## 2. Statutory Penalties

The FCA requires the assessment of an additional penalty, separate from damages, on each false claim.  The jury found that 64,575 false claims were submitted to Medicare as a result of kickbacks attributable to defendants (including the false claims related to the Riedel trip to New York City), resulting in a total penalty of $358,445,780.[12]  Separate

---

[12] Of the 64,575 false claims found by the jury, at least 410 were made on or after December 1, 2015.  These false claims are subject to a minimum penalty of $13,508, or a total of $5,538,280.  *See* 28 C.F.R. § 85.5.  The remaining 64,165 false claims are subject to the $5,500 minimum penalty established by 28 C.F.R. § 85.3(a)(9), for a total of

from the arguments addressed above, defendants challenge the calculation of the number of false claims, and therefore the amount of penalties that should result from those false claims, in two respects.

First, defendants argue that, because each cataract surgery would have generated at least two separate claims to Medicare, a "Facility Fee" (which included the cost of Precision Lens products) and a "Physician Professional Fee" (which did not), assessing statutory penalties on each fee represents a double-counting of misconduct, since only one surgery will have been performed.  But penalties are assessed under the FCA per false claim presented to the United States resulting from defendants' misconduct, not based on the number of surgeries or kickbacks or any other metric.

Second, defendants point to several claims with unusually small or unusually large amounts requested in reimbursement from Medicare.  Defendants contend that these amounts do not correlate to the kinds of procedures in which Precision Lens products would have been used, suggesting that these entries may be the result of a coding error rather than a reflection of actual false claims made to the United States.  This argument is unavailing for at least two reasons.  First, evidence of the existence of these outlier claims and the methodology through which the claims were assembled was presented to the jury, which was entitled to make a factual determination regarding whether the relevant data

---

$352,907,500.  The sum of these figures is $358,445,780.  The Court has already concluded that $3,485,064 must be subtracted from that amount due to judgment as a matter of law having been granted on all FCA claims arising out of the Riedel trip to New York City.

entries represented false claims motivated by a kickback.[13]  Second, there appear to have

been very few of these outlier claims.  *See* Exhibit P-1169b.  Defendants have identified

no more than a handful.  Even if each of these actual damages from these claims (many of

which are for only one dollar) were excluded, and even if no penalties were assessed on

any of these claims, the amount of judgment would change minimally.  Moreover, any such

changes would have no effect on this Court's analysis of the amount of judgment under the

Excessive Fines Clause.  Even if the Court were to conclude that the outlier claims should

be removed, judgment would be altered to reflect the limits established by the Excessive

Fines Clause, and those constitutional limits would not be affected by the removal of a very

small number of claims amounting to only a very small fraction of the judgment amount.

### 3.  Constitutionality

After taking into account that judgment as a matter of law has been granted on the

claim related to Riedel's New York City trip, defendants remain responsible under the FCA

for $482,484,865.13 in damages and penalties.  Of that amount, $43,335,049.71 consist of

actual damages to the United States.  Another $86,670,099.42 in damages result from the

mandatory trebling of the actual damages amount.  *See* 31 U.S.C. § 3729(a)(1).  The

remaining $352,479,716 consist of statutory penalties assessed for each claim for Medicare

reimbursement found to be false.[14]

---

[13] The jury was spared from providing a yes-or-no verdict on each of the tens of thousands
of allegedly false claims.  Therefore, it is impossible to say whether any particular claim
for Medicare reimbursement was found by the jury to be true or false.

[14] This is the minimum amount in penalties that the FCA permits the Court to impose.  *See*
31 U.S.C. § 3729(a)(1).  The FCA authorizes the Court to impose up to twice that amount
in penalties.

Defendants argue that the Excessive Fines Clause precludes the imposition of such a massive imposition of penalties.  The Court agrees.

"The Excessive Fines Clause applies to civil penalties that are punitive in nature." *United States v. Aleff*, 772 F.3d 508, 512 (8th Cir. 2014) (citation omitted).  Neither party questions, as this Court has already determined in another context in this proceeding, *see* Dkt. 1077 at 6-7, that the amount owed by defendants consists substantially of penalties, even though how much of the judgment is "remedial" and how much is "punitive" is a matter of dispute.  In any event, the Excessive Fines Clause applies to the judgment entered in this matter.

"A punitive sanction violates the Excessive Fines Clause if it is 'grossly disproportional to the gravity of a defendant's offense.'"  *Aleff*, 772 F.3d at 512 (quoting *United States v. Moyer*, 313 F.3d 1082, 1086 (8th Cir. 2002)).  The United States Court of Appeals for the Eighth Circuit has instructed district courts to consider a variety of factors in determining whether a penalty is grossly disproportional, including the reprehensibility of the defendant's conduct, the relationship between the penalty and the harm to the victim, the sanctions in other cases for comparable misconduct, legislative intent, and the defendants' ability to pay.  *Id*.  The Supreme Court has suggested that the ratio of punitive damages to compensatory damages may provide a guidepost to district courts in conducting this inquiry, further stating "an award of more than four times the amount of compensatory damages *might* be close to the line of constitutional impropriety," *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) (emphasis added), and that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to

compensatory damages, can reach the outermost limit" of constitutionality, *id*. But the Supreme Court also has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 582 (1996).

The Court considers each of those factors in turn. At the outset, however, the Court notes is mindful that this is not a sentencing. The Court's role in this proceeding is not to determine the *appropriate* punishment for defendants. Instead, the Court is limited to determining what is the *permissible* punishment under the Excessive Fines Clause.

a. Reprehensibility of Defendants' Conduct

The parties dispute the degree of moral turpitude underlying defendants' conduct. Defendants characterize Paul Ehlen as a person exerting strenuously to comply with the AKS who was foiled by his generosity towards "a small number of doctors who were his longtime friends and whose families were friends with his family." Dk. 1048 at 48. This depiction, in the Court's view, does not comport with the evidence at trial. Nor is it a depiction accepted by the jury, which found Paul Ehlen (and Precision Lens) to be in knowing disregard of the AKS. Defendants' conduct also was not an isolated slip-up. The jury concluded that defendants had committed well over 150 violations of the AKS over a ten-year period.

The AKS is not a technicality. "Put simply, anti-kickback statutes are important pieces of the governmental healthcare apparatus, ensuring that claims presented for reimbursement are the product of untainted and independent medical judgment." *State v. MedImmune, Inc.*, 342 F. Supp. 3d 544, 556 (S.D.N.Y. 2018). Indeed, the United

States's interest in preventing kickbacks is important enough that violations of the AKS sometimes constitute *criminal* violations punishable by up to 10 years in prison. *See* 42 U.S.C. § 1320a-7b.

Although all misconduct under the AKS is serious, defendants' misconduct is somewhat less severe in a few respects than the usual AKS case. First, the judgment vastly overstates the benefit that defendants derived personally from the misconduct. Reimbursement for Precision Lens products comprised only a small percentage of the cost of any surgery for which doctors sought reimbursement, and the profit accruing to Precision Lens from any sale to those doctors would represent only a percentage of that already small percentage.[15] Defendants are wrong to suggest that the harm to the United States is capped by the amount Precision Lens profited from any misconduct. But the amount of profit is relevant, although certainly not determinative, in assessing the reprehensibility of conduct.

Second, as this Court explained above, the definition of remuneration provided for in the AKS includes the provision of anything of value for an amount other than fair market value. This definition precludes defendants from contending that some benefits to doctors were too slight to constitute violations of the AKS, and therefore the FCA. But the definition of remuneration cuts in the other direction when the reprehensibility of defendants' conduct is considered. One example, addressed at length above, is that a doctor was offered a salad and soda at a Christmas party amounts to remuneration. While the jury

---

[15] Defendants' calculations suggest that Precision Lens would have accrued only about $1.3 million in profit from the sale of the products at issue.

could reasonably conclude that violation of the FCA resulted from that remuneration, but it is difficult to categorize that particular instance of conduct as reprehensible.

Third, there is truth to defendants' argument that the penalties imposed in this matter are something of an accounting fluke. If Medicare required only one claim per surgery rather than separate claims for Facility Fees and Physician Professional Fees, the substantial penalty assessed against defendants would be reduced at least by half. If that were so, the judgment in this matter would be reduced by over $175,000,000, even though nothing about the conduct of the defendants or the harm resulting to the United States would have changed.[16]

Finally, at no point has anyone alleged that physical harm resulted from the misconduct. *See State Farm*, 538 U.S. at 419 (identifying factors to be considered in evaluating the reprehensibility of the defendant's conduct). No patient is alleged to have undergone a procedure that would not otherwise have occurred. Not one of the products sold by Precision Lens is alleged to have been defective. This is not to minimize the harm that was caused to patients, who were entitled to services untainted by kickbacks, or to the United States, which was entitled not to provide reimbursement for those services. Fortunately, however, those harms were not physical.

---

[16] Even the United States seems to recognize that this quirk of Medicare reimbursement leads to an unwarranted result in this matter, as the United States now requests that statutory penalties be applied only to half of the claims found to be false. This concession alone, if accepted, would result in the judgment being reduced from roughly $487 million to roughly $310 million.

b.  Harm to the Victim

As addressed earlier, the appropriate measure of actual damages in this matter is the amount paid by the United States as reimbursement for claims found to be false.  This amount, after the exclusion of claims potentially based on the claim for which judgment as a matter of law was granted for defendants, is $43,335,049.71.  Added to those actual damages are other, harder-to-quantify harms.  These include, for example, the costs to the United States in investigating and litigating this action and the harms to patients resulting from any conflicts of interest between them and their doctors.  The Court will not attempt to derive an exact number, but the harm that resulted from defendants' conduct is significant.

c.  Ratio of Punitive Damages to Compensatory Damages

Calculating the ratio of punitive damages to compensatory damages in this matter is not straightforward.   Of the remaining judgment, $43,335,049.71 is plainly compensatory.  That amount reimburses the United States for the amounts paid on false claims.  The remaining statutory penalties of approximately $355 million are plainly punitive.  But the trebled damages required by the FCA have been characterized as both compensatory and punitive, as "treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives."  *Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003).  If the trebled damages in this matter were to be regarded as purely punitive, the ratio of punitive damages to compensatory damages would exceed 10-to-1.  If the trebled damages were to be regarded as purely compensatory, the ratio of punitive damages to compensatory damages would fall to just below 3-to-1.  The

true ratio in this matter, after trebled damages have been divided between compensatory and punitive aspects, lies somewhere between those two figures.

### d. Legislative Intent

The Eighth Circuit and other courts have identified legislative intent as a relevant factor in determining whether a penalty amounts to a violation of the Excessive Fines Clause.  *See Qwest Corp. v. Minnesota Public Utilities Commission*, 427 F.3d 1061, 1069 (8th Cir. 2005).  This Court would not be the first to observe that this is something of an oddity.  Where legislative intent is used to help guide the analysis of the Excessive Fines Clause, "Congress both levies the fine and, at least as a presumptive matter, determines its constitutionality," which "[s]eems a bit like letting the driver set the speed limit." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1318 (11th Cir. 2021) (J. Newsom, concurring).  The legislative-intent factor is also tautological when applied to statutory penalties.  Every statutory penalty evinces the intent of the legislature to impose that penalty.  The legislature passed the statute, after all.

Although the penalties for FCA violations are established by Congress, there is at least one indication from Congress itself that the penalties resulting from defendants' misconduct might be overly severe.  If defendants had been charged criminally with violations of § 1320a-7b(b) for every transaction found by the jury to be a kickback, and found guilty of those violations, which is by no means a certainty, in light of the greater burden of proof on the United States in criminal proceedings, the maximum fine that this Court could have imposed for the misconduct would have been a $100,000 fine on each count, or about $15.5 million for each defendant.  Indeed, the maximum fine that may be

assessed for *any* federal criminal violation (except where the statute of conviction itself imposes a larger fine) is only $250,000 per offense for individuals or $500,000 per offense for organizations—that is, a fine of about $38.7 million for Paul Ehlen and a fine of $77.5 million for Precision Lens. *See* 18 U.S.C. § 3571. The minimum penalties called for under the FCA, even after excluding trebled damages, which should also be regarded as partly punitive, amount to more than $350 million in this case. *Cf. United States v. 817 N.E. 29th Drive, Wilton Manors, Fla.*, 175 F.3d 1304, 1309 n.9 (11th Cir. 1999) (observing that "[a] forfeiture far in excess of the statutory fine range . . . is likely to violate the Excessive Fines Clause.").

### e.  Defendants' Ability to Pay

There is not a great deal of evidence in the record regarding defendants' ability to pay the judgment entered in this matter. The evidence that has been presented to the Court, however, suggests that neither Precision Lens nor Paul Ehlen's estate will be able to satisfy even the compensatory damages in this matter, much less any penalties imposed in addition to those compensatory damages. Kathryn Weitzel Ehlen attests that Paul Ehlen's estate possesses assets of approximately $25 million, not including Paul Ehlen's interest in Precision Lens. *See* Declaration of Kathryn Weitzel Ehlen, Dkt. 1073-1. William Henneman, chief executive officer of Precision Lens, estimates the current value of the company to be less than $5 million. *See* Declaration of William Henneman, Dkt. 1073-2. In light of the evidence produced at trial, neither representation is implausible.

### f.  Sanctions in Other Cases for Comparable Misconduct

Finally, the Court is tasked with reviewing the sanctions assessed in other cases for similar misconduct.  Performing this task is difficult in the context of this litigation for four reasons.

First, it is not entirely clear what "comparable misconduct" is supposed to entail. For example, do all claims arising under the FCA involve comparable misconduct? Perhaps all claims arising under the FCA premised on violations of the AKS constitute "comparable misconduct."   Or all claims arising under the FCA in which penalties comprise such a substantial portion of the overall monetary judgment may be deemed "comparable misconduct."  Certainly, cases in which a medical supplier is found to have supplied purchasers with kickbacks in the form of trips, meals, and other enticements would be "comparable misconduct."   Different scopes of comparison would potentially yield different results regarding the constitutional limits on damages imposed by other courts.

Second, having presided over a trial that lasted for nearly two months, the Court is *very* familiar with defendants' conduct.   By contrast, in determining the relative reprehensibility of the conduct of defendants in other cases, the Court must rely on the brief synopses of evidence supplied in case reports.  This is a very imperfect substitute for having reviewed thousands of documents and listened to weeks of testimony.

Third, in those cases that appear most closely comparable to this litigation, few courts have concluded that the penalties imposed exceed the constitutional barrier. Sometimes this has been because the penalties required by the FCA are found not to violate

the Excessive Fines Clause.  Other times, the United States has agreed to seek a lesser

monetary judgment in an effort to evade a constitutional challenge.[17]  While it would not

be accurate to conclude that the amounts sought by the United States in those cases

necessarily represent the constitutional limit on penalties that could have been imposed in

those cases, to say that the full imposition of penalties required by the FCA would have

been a constitutional violation also is not an apt conclusion.  Unfortunately for this case,

the United States's decision to seek lesser amounts in judgment in prior litigation deprives

other courts of the benefit of analysis regarding whether the penalties required by the FCA

would have been a violation of the Excessive Fines Clause in those cases.

     With those caveats, this Court briefly summarizes the monetary awards imposed in

litigation similar to this matter, with a particular focus on those cases identified by the

parties as comparable to this litigation.

---

[17] That is the case here as well.  Plaintiffs are now seeking only about $310 million rather than the $487 million currently reflected by the judgment.  Plaintiffs contend that "[i]t is uncontroversial that the [United States] possesses the discretion to seek a lower penalty amount in the context of a constitutional analysis."  Dkt. 1059 at 46.  But it is far from obvious to the Court that either the United States or the Court has this discretion to ignore the penalties plainly required on the face of the FCA following a jury verdict—except, of course, insofar as the statutory penalties are unconstitutional.  Nor are the invocations by the United States of "prosecutorial discretion" convincing.  Undoubtedly it was withing the discretion of the United States not to prosecute tens of thousands of claims under the FCA against the defendant.  But it *did* prosecute those claims.  Prosecutorial discretion does not, as a general matter, entail the privilege of seeking relief outside the boundaries of the law.

Of course, if the United States believes the penalties imposed by the FCA to be unconstitutional in the context of this litigation, then it has an obligation not to seek those penalties to the extent that the penalties violate the Excessive Fines Clause.  But in that case, the United States should be forthright about why a lesser punitive sanction—particularly a sanction that is not permitted on the face of the statute—is being sought, rather than framing its constitutional obligations as *noblesse oblige*.

*i.* Tyson

Plaintiffs identify *United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719 (N.D. Ill. 2007) as comparable to the present matter. *Tyson* involved false claims for Medicaid reimbursement found to violate the FCA. The monetary penalties imposed in that litigation were roughly similar to the penalties imposed in this case, $48 million in actual damages and an overall monetary judgment of $334 million based on 18,130 false claims. The Court in *Tyson* concluded that the penalty imposed in that matter did not violate the Excessive Fines Clause.

Despite the facial similarities with this litigation, *Tyson* is in some ways a poor comparator for this lawsuit. First, the claims in *Tyson* related not to kickbacks by a medical supplier, but to discrimination against unhealthy patients by an insurance company. The conduct of defendants in that matter—"a several years long, institution-wide goal to fleece Defendants' pockets at the expense of the United States, the Medicaid system, and . . . pregnant women and 'unhealthies,'" *Tyson*, 488 F. Supp. 2d at 745— was, in this Court's view, more morally opprobrious than the conduct at issue in this case. Second, the defendant in *Tyson* directly profited from the misconduct more so than Precision Lens profited from the misconduct at issue in this litigation. [18] Third, although the conduct in *Tyson* appears to have been somewhat more reprehensible than the conduct in this case.

[18] It is impossible, however, to know to what extent the *Tyson* defendant profited from the misconduct. The defendant in *Tyson* boosted its profits by discriminating against unhealthy patients and thereby skewing the risk profile of the pool of insureds. The measure of profit resulting from the scheme, then, was the difference between the profits actually accrued by the defendant and the profits that would have accrued if the defendant had not acted in a discriminatory manner. *See Tyson*, 488 F. Supp. 2d at 748.

The penalties imposed on the defendant in that matter were approximately $160 million less than the penalties imposed under the FCA in this case (with nearly identical actual damages to the United States). Fourth, the penalty imposed in *Tyson*, although large, was by no means crippling for the defendant. *See id.* at 747.

In each of these respects, *Tyson* differs substantially from the current litigation, limiting the value of *Tyson* as a comparator case. The Court, therefore, is reluctant to conclude that the judgment entered in *Tyson* would also be constitutional if entered in this case.

*ii.* Drakeford

In *United States ex rel. Drakeford v. Tuomey*, the United States Court of Appeals for the Fourth Circuit concluded that a judgment under the FCA of $237,454,195—of which $39,313,065 represented actual damages, $78,626,130 represented trebled damages, and $119,515,000 represented penalties— did not violate the Excessive Fines Clause. 792 F.3d 364, 387-90 (4th Cir. 2015). *Drakeford* is helpful insofar as the Fourth Circuit appears to have concluded that the penalty imposed in that matter, although not constitutionally excessive, was approaching the limits of what the Excessive Fines Clause might permit. *See id.* at 389 (noting that "the ratio of punitive damages to compensatory damages is approximately 3.6-to-1, which falls just under the ratio the Court deems constitutionally suspect."). As in this case, but unlike the penalty in *Tyson*, the penalty imposed in *Drakeford* was likely to have crippling effects on the defendant. *See id.* at 391 (J. Wynn, concurring) ("But I write separately to emphasize the troubling picture this case paints: An impenetrably complex set of laws and regulations that will result in a likely death sentence

44

for a community hospital in an already medically underserved area."). The violations of the FCA in *Drakeford* were premised on violations of the Stark Law, 42 U.S.C. § 1395nn, not the AKS, but they are roughly comparable to the claims in this proceeding in terms of reprehensibility.

While *Drakeford* is not a perfect comparator to this case, it is a closer comparator than the other cases examined in this section. The amended judgment imposed in this matter is somewhat in line with the judgment imposed in *Drakeford*. To be constitutionally permissible, the Court has entered a slightly lower judgment amount despite slightly higher actual damages resulting from the conduct of defendants in this matter. The resulting ratio of punitive damages to actual damages awarded in this matter is marginally lower in this matter than in *Drakeford*. As explained by the Supreme Court, however, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit" of constitutionality. *State Farm*, 538 U.S. at 425. Accordingly, this Court has placed more emphasis on this statement than the *Drakeford* court.

### iii. Montcrieff

The defendant in *United States ex rel. Montcrieff v. Peripheral Vascular Associates, P.A.*, was found to have billed Medicare for services that it did not perform, thereby violating the FCA. 649 F. Supp. 3d 404, 409 (W.D. Tex. Jan. 9, 2023). A jury awarded $2,728,199 in actual damages. *Id*. at 419. Although the defendant faced a minimum statutory penalty of $40,590,000 in addition to trebled actual damages, the United States sought the imposition of only about half that amount in penalties. *Id*. at 424. The court in

*Montcrieff* concluded that this reduced demand did not result in a judgment exceeding the boundaries of the Excessive Fines Clause.  Because of the substantially lower amount awarded in actual damages, *Moncrieff* is a poor comparator for this case for two reasons, the substantially lower amount awarded in actual damages as well as the difference in underlying misconduct.

*iv.* Lutz

In *United States ex rel. Lutz v. BlueWave Healthcare Consultants, Inc.*, defendants performed unnecessary medical tests and later sought reimbursement for those tests under Medicare, resulting in total damages of approximately $17 million to Medicare. No. 9:14-CV-00239-RMG, 2018 WL 11282049, at *2 (D.S.C. May 23, 2018),  The court in *Lutz* concluded that the imposition of approximately $64 million in statutory penalties did not exceed the limits of the Excessive Fines Clause.  *Id*. at *5.  *Lutz* is not a useful comparator, however, because of the differences in underlying conduct and because the actual damages and penalties in that matter were substantially less than those in this case.  Moreover, the brief analysis in *Lutz* regarding the Excessive Fines Clause appears to be excessively deferential to the penalties imposed by Congress.

*v.* Bickel *and* Mackby

Defendants cite two cases in which the United States sought penalties drastically lower than those provided for by the FCA, *United States v. Bickel*, No. 02-3144, 2006 WL 1120439 (C.D. Ill. Feb. 22, 2006); and *United States v. Mackby*, 339 F.3d 1013 (9th Cir. 2003).  However, neither *Bickel* nor *Mackby* is a helpful comparator for precisely the reason that defendants cite those cases. The United States voluntarily agreed to a lesser

46

recovery in those proceedings, thereby averting more significant challenges under the Excessive Fines Clause. Because of litigation decisions made by the United States in those cases, *Bickel* and *Mosby* are not useful guides here for determining when a statutory penalty violates the Excessive Fines Clause.

### g. Conclusion

After consideration of the appropriate factors—the reprehensibility of defendants' conduct, the harm to the victim, the ratio of punitive damages to actual damages, legislative intent, the financial status of the defendants, and the penalties imposed in similar cases— the Court concludes that the Excessive Fines Clause permits recovery of no more than $216,675,248.55 in this matter. This amount consists of $43,335,049.71 of actual damages, $86,670,099.42 in trebled damages, and $86,670,099.42 in penalties. This amount does not include post-judgment interest, statutory attorneys' fees, or other taxable costs.

While no single factor was determinative in reaching that conclusion, the Court makes the following observations. The amount of the judgment represents five times the actual damages imposed in this case. If the portion of the judgment amount attributable to compensatory damages were limited to actual damages, the ratio of punitive damages to actual damages would be precisely 4-to-1. Alternatively, if a relator's share of 15 percent ($32,501,287.28) were added to the actual damages figure ($43,335,049.71) and regarded as compensatory, the punitive damages ratio to actual damages ratio would be approximately 1.85-to-1.

This latter ratio is somewhat less than that found in many of the cases examined above. But as the Supreme Court has observed, "[w]hen compensatory damages are

substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of" what the constitution permits. *State Farm*, 538 U.S. at 425. The compensatory damages assessed in this matter, however calculated, are notably severe. Additional penalties well exceeding those compensatory damages remain imposed on top of the compensatory damages. The conduct for which defendants were found liable warrants such a judgment. The Court is mindful, however, that an amount greater than the amount imposed here threatens to become grossly disproportional to the gravity of the offense. *Aleff*, 772 F.3d at 512.

### 4.  Offset from Settlement

Finally, defendants requested that the original amount of judgment in this matter be offset by the full amount for which Sightpath, Tiffany, and Swarup paid to the United States in settlement for claims related to the claims litigated against Paul Ehlen and Precision Lens. Plaintiffs had "no objection" to applying a partial settlement offset of $2.481 million. Dkt. 1035 at 7. The Court deducted this amount from the judgment entered in this matter, while reserving the question of whether a greater amount should be deducted. *See* Dkt. 1042 at 4-5.

Neither party has vigorously litigated the question subsequently. Defendants reference it briefly in their memorandum in support of the motion for post-judgment relief, *see* Dkt. 1048 at 26, and defendants do not provide any argument in their responsive brief. As the offset of additional settlement amounts would not alter the Court's conclusion regarding the amount of judgment that could be imposed in this proceeding, the issue is largely moot. And, after rereviewing defendants' initial arguments regarding offset a

second time, the Court concludes that defendants have not adequately established that more than $2.481 million of the settlement amounts is attributable to conduct for which defendants were found liable in this matter.  The Court, therefore, would not reduce the amount of judgment further as a result of that settlement even if the resolution of the Excessive Fines Clause claim did not render the amount of settlement offset moot.

## ORDER

Based on the foregoing analysis and all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED THAT**:

1.  Defendants' motion for post-judgment relief, Dkt. 1047, is **GRANTED IN PART** and **DENIED IN PART**, as follows:

    a.  Defendants' motion for judgment as a matter of law is **GRANTED** regarding the claim related to the trip to New York City of Patrick Riedel occurring on or about January 1, 2009.

    b.  The motion is **GRANTED** insofar as the penalties imposed upon the defendants under the False Claims Act constitute a violation of the Excessive Fines Clause.

    c.  The motion is **DENIED** in all other respects.

2.  The judgment in this matter is **AMENDED** to reflect a judgment amount of $216,675,248.55, not including post-judgment interest, statutory attorneys' fees, or other taxable costs.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: February 8, 2024                    s/Wilhelmina M. Wright
                                           Wilhelmina M. Wright
                                           United States District Judge